**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIR ALLIANCE HOUSTON<br>2520 Caroline Street, Suite 100<br>Houston, TX 77004;<br><br>CENTER FOR BIOLOGICAL DIVERSITY<br>378 North Main Avenue<br>Tucson, AZ 85701;<br><br>CITIZENS FOR PENNSYLVANIA'S FUTURE<br>610 North Third Street<br>Harrisburg, PA 17101;<br><br>CLEAN AIR COUNCIL<br>1617 JFK Boulevard, Suite 1130<br>Philadelphia, PA 19103;<br><br>DAKOTA RESOURCE COUNCIL<br>1902 East Divide Avenue<br>Bismarck, ND 58501;<br><br>DOWNWINDERS AT RISK<br>1808 S. Good-Latimer #202<br>Dallas, TX 76226;<br><br>ENVIRONMENTAL DEFENSE FUND<br>2060 Broadway St., Suite 300<br>Boulder, CO 80302;<br><br>ENVIRONMENTAL INTEGRITY PROJECT<br>888 17th St. NW, Suite 810<br>Washington, DC 20006;<br><br>ENVIRONMENTAL LAW & POLICY CENTER<br>35 East Wacker Drive, Suite 1600<br>Chicago, IL 60601;<br><br>MONTANA ENVIRONMENTAL INFORMATION CENTER<br>324 Fuller Avenue, #C-8<br>Helena, MT 59601; | Civil Action No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

NATURAL RESOURCES DEFENSE
COUNCIL, INC.
40 West 20th Street, 11th Floor
New York, New York 10011; *and*

SIERRA CLUB
2101 Webster St., Suite 1300
Oakland, CA 94612,

> > *Plaintiffs*,

> > v.

DONALD TRUMP, President of the United
States, in his official capacity;

U.S. ENVIRONMENTAL PROTECTION
AGENCY; *and*

LEE ZELDIN, Administrator of the U.S.
Environmental Protection Agency, in his official
capacity,

> > *Defendants*.

## **INTRODUCTION**

1.      In a proclamation issued on April 8, 2025, President Donald Trump purported to exempt nearly one-third of coal-fired power plants across the country from mercury and other toxic air pollution standards critical to protecting Americans, especially infants and children, from a range of harmful health impacts and risks including cancer, birth defects, and developmental harms in children. *Regulatory Relief for Certain Stationary Sources to Promote American Energy*, 90 Fed. Reg. 16,777 (Apr. 21, 2025) (attached as Exhibit 1) ("Exemption Proclamation"). President Trump declared those sweeping exemptions by invoking Section 7412(i)(4) of the Clean Air Act, 42 U.S.C. § 7412(i)(4), a narrow and never-before-used

provision authorizing the President to provide a limited exemption from compliance with hazardous air pollutant emission standards in instances where "the technology to implement" the relevant standard is "not available" and when exempting a facility "is in the national security interests of the United States." 42 U.S.C. § 7412(i)(4). Now, for the first time in the history of the Clean Air Act, President Trump and the U.S. Environmental Protection Agency ("EPA") seek to exploit that narrow provision to indiscriminately exempt scores of coal-fired power plants. Many of the exempted power plants have already installed and are actively using the technology sufficient to meet the targeted mercury and other toxic air pollution standards—technology that EPA itself determined was available in a final rule issued just over a year ago, based on an ample record developed through public notice and comment.

2.      Congress authorized use of Section 7412(i)(4) to exempt a stationary source only where the technology to implement a standard is not available. President Trump violated this limitation by issuing exemptions where the technology is available but where he wishes to relieve sources of their need to expend costs to comply with pollution standards while the Administration undertakes proceedings to repeal them. The Clean Air Act does not permit this use of Section 7412(i)(4) authority. The Exemption Proclamation is illegal and must be invalidated.

3.      The Exemption Proclamation exempts 68 coal-fired power plants from Clean Air Act standards EPA adopted in 2024 to modernize existing pollution standards for highly toxic substances such as mercury, arsenic, and nickel that are emitted by coal-fired power plants in light of developments in pollution control technologies. *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review*

3

*of the Residual Risk and Technology Review*, 89 Fed. Reg. 38,508 (May 7, 2024) (attached as Exhibit 2) ("2024 Rule").

4.      The 2024 Rule established more protective limits on mercury emissions from power plants burning lignite coal, and lowered emission limits for arsenic, nickel, and other toxic metals from all coal-fired power plants. EPA also required plants to demonstrate compliance with the arsenic, nickel, and other toxic metals standard using continuous emissions monitoring systems that provide real-time feedback, and tightened pollution standards for power plants during their startup periods.

5.      EPA required power plants to comply with the startup standard by January 2025 and established a compliance deadline of July 2027 for the lignite mercury standard, the arsenic, nickel, and other metals standard, and the continuous emissions monitoring requirement. From 2028-2037, the standards were expected to reduce significant quantities of mercury, arsenic, nickel, and other toxic metals, delivering cleaner, healthier air and water nationwide from Texas and North Dakota to Pennsylvania and North Carolina.

6.      The President's Exemption Proclamation jeopardizes the realization of these public health benefits without any proper basis. Section 7412(i)(4) authorizes the President in exceptional circumstances to exempt a "stationary source" only if the President "determines" that "the technology to implement such standard is not available" for that source and "it is in the national security interests" to do so. The President violates these firm statutory requirements by issuing exemptions to coal-fired power plants based on a conclusory and false claim that "[t]he technology to implement the Rule is not available" and that "[s]uch technology does not exist in a commercially viable form sufficient to allow implementation of and compliance with the Rule by its compliance date of July 8, 2027."  To the extent these and the other claims in the

Exemption Proclamation operate as "determinations," they cannot support the exemptions issued because they fail to make any determination grounded in the factual circumstances specific to the 68 coal-fired power plants exempted, as the statute requires.

7.    The exempted power plants vary with regards to the actions they need to take to comply with the 2024 Rule, but the Exemption Proclamation treats them equally with a broad brush, does not identify which control technologies any of the 68 coal-fired power plants require to implement the 2024 Rule, and does not identify which of those control technologies are unavailable. The President has not, in the Exemption Proclamation itself or otherwise, provided any factual basis, reasoning, or other support for the exemptions.

8.    Moreover, the Exemption Proclamation's claims are contradicted both by EPA's own recent findings just 11 months earlier that that technology is readily available and by the fact that technology sufficient for meeting the standards is already used by many coal-fired power plants, including by some of those the President exempted. *See*, *e.g.*, 89 Fed. Reg. 38,508, 38,531, 38,536-37, 38,539.

9.    In 2024, EPA found that coal-fired power plants that burn lignite coal could lower mercury emissions by using more of the same chemical additives those plants were already using to comply with existing, less stringent, mercury limits. 89 Fed. Reg. at 38,540. EPA found that coal-fired power plants responsible for generating 93 percent of total coal-fired energy had already demonstrated the ability to meet the revised lower limit for arsenic, nickel, and other metals with existing controls and that this standard could be met using available control technology. *Id.* at 38,530. EPA found that approximately one-third of the existing coal power plant fleet was already using continuous emissions monitoring systems, *id.* at 38,535, and that these monitoring systems provide superior "certainty, accuracy, transparency, and granularity"

while costing only slightly more than the existing requirement to conduct pollution emissions testing a handful of times per year. *Id.* at 38,536-37. EPA also found that the vast majority of plants were already able to meet the startup standard the 2024 Rule required for all coal-fired power plants. *Id.* at 38,551.

10.     The Exemption Proclamation does not rest on findings of any coal-fired power plant's actual inability to comply with the 2024 Rule at all, much less to a degree that implicates national security. Nor does it contain such findings for each of the named plants that it purports to exempt from clean air standards. Rather, the real reason and basis for the exemption, as is apparent from the Proclamation itself and the circumstances leading to its issuance, is to provide "regulatory relief" to coal plants in furtherance of President Trump's policy "to promote American energy" through deregulation as baldly stated in the Exemption Proclamation's title, "Regulatory Relief for Certain Stationary Sources to Promote American Energy." 90 Fed. Reg. 16,777 (Apr. 21, 2025). That is not a permissible basis for granting Section 7412(i)(4) exemptions.

11.     President Trump and his administration have made no secret of their intent to undo a suite of public health and environmental regulations adopted by the last administration. In March, EPA Administrator Lee Zeldin declared "the greatest day of deregulation our nation has seen," announcing the rollback of 31 regulations, including the 2024 Rule. EPA, News Release, *EPA Launches Biggest Deregulatory Action in U.S. History* (Mar. 12, 2025), https://www.epa.gov/newsreleases/epa-launches-biggest-deregulatory-action-us-history.

12.     New presidential administrations that wish to reconsider and revise regulations generally must comply with statutory administrative procedure requirements such as notice-and-comment rulemaking under the Administrative Procedure Act and the Clean Air Act. The Trump

administration announced in a March press release and fact sheet that they would "reconsider" the 2024 Rule because of "concerns" about compliance costs and burdens on the coal industry. At the same time, EPA also announced that, "[t]he Trump Administration is considering a 2-year compliance exemption via Section [7412](i)(4) of the Clean Air Act for affected power plants while EPA goes through the rulemaking process." EPA, News Release, *Trump EPA Announces Reconsideration of Air Rules Regulating American Energy, Manufacturing, Chemical Sectors (NESHAPs)* (Mar. 12, 2025), https://www.epa.gov/newsreleases/trump-epa-announces-reconsideration-air-rules-regulating-american-energy-manufacturing. On June 11, EPA issued a proposed rule to repeal certain requirements of the 2024 Rule. EPA, News Release, *EPA Proposes Repeal of Biden-Harris EPA Regulations for Power Plants, Which, If Finalized, Would Save Americans More than a Billion Dollars a Year* (Jun. 11, 2025), https://www.epa.gov/newsreleases/epa-proposes-repeal-biden-harris-epa-regulations-power-plants-which-if-finalized-would.

13.     In disregarding the limitations imposed by Section 7412(i)(4), Defendants improperly circumvented the procedural requirements (including public comment) that properly constrain agency decisions to weaken, or delay application of, pollution standards. This exercise was plainly unlawful. The Clean Air Act authorizes permitting authorities to provide sources one-year compliance extensions "if necessary for the installation of controls." 42 U.S.C. § 7412(i)(3)(B). Other than that, EPA has authority to revise pollution standards and compliance deadlines where the statute allows,[1] but only after engaging in the public notice and comment process mandated by the Clean Air Act in 42 U.S.C. § 7607(d)(1), addressing procedural requirements for rulemaking, and only when the substantive standards of 42 U.S.C. § 7412,

---

[1] The compliance deadlines for rules promulgated under 42 U.S.C. § 7412 are strictly managed by Section 7412(i)(3)(A).

which governs pollution standards for the hazardous air pollution at issue here, are met. The President lacks authority to exempt coal-fired power plants from emission standards so that EPA can revise or undo the standards themselves.

14.     Plaintiff environmental and public health groups bring this action challenging the Exemption Proclamation as issued in violation of the Clean Air Act and as beyond the President's lawful authority. Plaintiffs seek an order declaring the Exemption Proclamation to be unlawful and invalid and enjoining EPA and its Administrator from implementing or giving effect to it.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under laws of the United States, including the Clean Air Act.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (e) because Plaintiff Environmental Integrity Project resides in this judicial district, because Defendants reside in this judicial district, and because a substantial part of the events giving rise to the claim occurred in this judicial district.

17.     The Court has authority to enter a declaratory judgment and to provide injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

18.     Although the Clean Air Act provides for judicial review through "[a] petition for review of action of the Administrator" of "any emission standard or requirement under section 7412 . . . or any other nationally applicable regulations promulgated, or final action taken, by the

Administrator" in the D.C. Circuit, 42 U.S.C. § 7607(b), the Act does not expressly provide for judicial review of the actions here at issue.

## PARTIES

19.     Plaintiff Air Alliance Houston is a nonprofit organization that works to improve air quality and public health through research, education, and advocacy. Founded in 1988, Air Alliance Houston's mission is to reduce the public health impacts of air pollution in Harris County and Houston, Texas, and the surrounding region. This includes the health impacts of toxic power plant emissions. Air Alliance Houston pursues its mission by conducting applied research on air pollution, educating its members and the community about the harms of air pollution and its sources, and advocating for improvements at the local, state, and national levels. The organization regularly engages with Fort Bend County community members, to provide greater transparency about members' exposure to harmful emissions.

20.     Plaintiff Center for Biological Diversity ("CBD") is a national 501(c)(3) nonprofit conservation organization. CBD's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and waters, and public health through science, policy, and environmental law. Based on the understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked, CBD is working to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for a healthy, livable future for all of us. Part of CBD's core mission is to protect and improve air quality across the country, including by reducing pollution from power plants. CBD is headquartered in Tucson, Arizona, with offices and members throughout the United States, including Alaska, the District of Columbia, and New York.

21.     Plaintiff Citizens for Pennsylvania's Future ("PennFuture") is a nonprofit organization that works to aid the transition to a clean energy economy in Pennsylvania and beyond; to protect our air, water, and land; and to empower citizens to build sustainable communities for future generations. PennFuture advocates for and advances legislative action at the state and federal levels; educates and provides advocacy opportunities for the public; and enforces environmental laws and advocates for the transformation of public policy.

22.     Plaintiff Clean Air Council ("CAC") is a nonprofit, membership-based organization dedicated to protecting and defending everyone's right to a healthy environment, including everyone's right to breathe clean air. It is headquartered in Philadelphia, Pennsylvania, with offices in Philadelphia and Pittsburgh, Pennsylvania and Wilmington, Delaware. CAC engages in community advocacy, regulatory work, and litigation with a primary goal of improving air quality and the corresponding health of those in Pennsylvania and the Mid-Atlantic region, including CAC's members. CAC's programmatic activities include advocating for clean air and stringent emissions standards for power plants.

23.     Plaintiff Dakota Resource Council ("DRC") is a nonprofit, grassroots community organizing group that works on conservation and family farm issues across North Dakota and promotes sustainable use of its natural resources. Formed in 1978, DRC grew out of existing organizing efforts responding to impacts from coal development, and has since focused on agriculture and food policy, and holding the oil and gas industry accountable for its externalities (pollution). DRC works with communities to organize around common goals of securing a thriving North Dakota and putting people first. Members take action to create public awareness and shape public policy to ensure safe and responsible development, to protect North Dakota's

agricultural economy, and to establish a foundation for a just transition to a diverse energy economy.

24.     Plaintiff Downwinders at Risk is a nonprofit corporation organized and existing under the laws of the State of Texas, with its headquarters located in Dallas, Texas. Downwinders at Risk is a diverse grassroots citizens group dedicated to promoting environmental justice through protecting public health from air pollution and promoting good governance in North Texas.

25.     Plaintiff Environmental Defense Fund ("EDF") is a 501(c)(3) non-profit environmental organization dedicated to finding practical solutions to critical environmental problems through the use of law, policy, science, and economics. EDF has offices throughout the United States, including in the District of Columbia. As a membership-based organization, EDF currently has more than 330,000 members in the United States, and members in all 50 states and the District of Columbia. These members have a strong interest in protecting human health and the environment from pollution.

26.     Plaintiff Environmental Integrity Project ("EIP") is a non-profit, nonpartisan organization based in Washington, D.C. that empowers communities and protects public health and the environment by investigating polluters, holding them accountable under the law, and strengthening public policy on toxic air pollution and other environmental health issues. EIP works for more effective enforcement of environmental laws.

27.     Plaintiff Environmental Law & Policy Center ("ELPC") is a Midwest-based not-for-profit public interest organization dedicated to action and advocacy for improving environmental quality—including air quality—and protecting natural resources. ELPC's

headquarters is in Chicago, Illinois, and ELPC also has offices in Washington, D.C., as well as Iowa, Ohio, and Wisconsin.

28.    Plaintiff Montana Environmental Information Center ("MEIC") is a membership-based nonprofit dedicated to protecting public health and the natural environment in Montana. Founded in 1973, MEIC's purpose is to protect and restore the land, air, water, and life-sustaining climate of Montana. MEIC works with Montanans across the state in service of a clean and healthful environment for present and future generations. MEIC has worked for decades to require mercury and air toxics emission limits on power plants.

29.    Plaintiff Natural Resources Defense Council ("NRDC") is a national non-profit environmental membership organization with hundreds of thousands of members nationwide. NRDC's purpose is to safeguard the Earth—its people, its plants and animals, and the natural systems on which all life depends. Part of NRDC's core mission is to improve air quality and safeguard public health by combatting air pollution from power plants.

30.    Plaintiff Sierra Club is a nonprofit corporation with its headquarters located in Oakland, California. The Sierra Club is a national membership organization whose mission is to explore, enjoy, and protect the planet; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out those objectives. As such, Sierra Club is dedicated to the protection of public health and the environment, and regularly works to achieve and strengthen policies that protect air quality. It has 64 chapters and more than 780,000 members who reside in all 50 states, the District of Columbia, and Puerto Rico.

31.    Defendant Donald Trump is the President of the United States. He resides and conducts his duties in Washington, D.C. He is sued in his official capacity.

32.    Defendant U.S. Environmental Protection Agency ("EPA") is a federal agency of the United States. EPA is headquartered in Washington, D.C.

33.    Defendant Lee Zeldin is the Administrator of the U.S. Environmental Protection Agency. He resides and conducts his duties in Washington, D.C. He is sued in his official capacity.

**LEGAL BACKGROUND**

34.    Clean Air Act Section 7412, 42 U.S.C. § 7412, sets forth the regulatory regime for EPA to address "hazardous air pollutants," a group of 188 air pollutants determined by Congress and EPA to be particularly harmful to human health. Mercury, arsenic, hexavalent chromium, lead, and nickel are hazardous air pollutants under 42 U.S.C. § 7412.

35.    This section requires EPA to regulate the largest "stationary sources" of hazardous air pollutants by promulgating pollution standards that "require the maximum degree of reduction in emissions of the hazardous air pollutants . . . (including a prohibition on such emissions where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable." 42 U.S.C. § 7412(d)(2).

36.    For new sources, the statute provides that the standards adopted "shall not be less stringent than the emission control that is achieved in practice by the best controlled similar source." 42 U.S.C. § 7412(d)(3)(A).

37.    For existing sources, the statute provides that the standards adopted "shall not be less stringent, and may be more stringent than, the average emission limitation achieved by the

best performing 12 percent of the existing sources" where there are at least 30 or more sources. 42 U.S.C. § 7412(d)(3)(A)-(B).

38.     For "electric utility steam generating units"—*i.e.*, combustion units at fossil-fuel fired power plants—the EPA Administrator is directed to perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions from such units and the statute provides EPA "shall" regulate those units under Section 7412 if the Administrator determines such regulation is appropriate and necessary after considering the results of the hazard study. 42 U.S.C. § 7412(n)(1)(A). EPA first made the determination that regulation of electric utility steam generating units under Section 7412 is necessary and appropriate in 2000. EPA made that determination again in 2024.

39.     When EPA first adopts standards, Section 7412(d) provides a minimum level of stringency for those standards based on the best performing sources, known as the "maximum achievable control technology" or "MACT" "floor."

40.     After these pollution standards are adopted, the Clean Air Act requires EPA to "review, and revise" those standards every 8 years "as necessary (taking into account developments in practices, processes, and control technologies)." 42 U.S.C. § 7412(d)(6). This process is known as the "technology review" and ensures that standards are modernized as necessary to reflect developments in pollution control technologies and otherwise to comply with the Clean Air Act.

41.     When EPA revises standards pursuant to Section 7412(d)(6), a court has held EPA must consider the same statutory criteria set out in Section 7412(d)(2) that guide the initial standard-setting—including cost and achievability. *See Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 673-74 (D.C. Cir. 2013).

42.    A court has held that EPA is not required to re-calculate the MACT floors when revising standards pursuant to Section 7412(d)(6). *Id.* at 673. A court has held that when revising standards, EPA generally must consider statutorily required factors including cost and achievability.

43.    Congress provided for a strict schedule of compliance with Section 7412 standards. Emission standards "shall be effective upon promulgation." 42 U.S.C. § 7412(d)(2). "New sources," those for which construction or reconstruction "is commenced after the Administrator first proposes regulations under this section establishing an emission standard applicable to such source," *id.* § 7412(a)(4), must comply no later than the effective date of that standard, *id.* § 7412(i)(3)(A). "Existing sources," those that are not "new," *id.* § 7412(a)(10), must comply no later than three years after the effective date, *id.* § 7412(i)(2). EPA may grant a source up to one additional year to comply where "such additional period is necessary for the installation of controls." *Id.* § 7412(i)(3).

44.    The Clean Air Act authorizes the President, in narrowly prescribed circumstances, to provide compliance exemptions to stationary sources from Section 7412 hazardous air pollutant standards. It provides: "The President may exempt any stationary source from compliance with any standard or limitation under this section for a period of not more than 2 years if the President determines that the technology to implement such standard is not available and that it is in the national security interests of the United States to do so. An exemption under this paragraph may be extended for 1 or more additional periods, each period not to exceed 2 years. The President shall report to Congress with respect to each exemption (or extension thereof) made under this paragraph." 42 U.S.C. § 7412(i)(4).

45.    The exemption provision only authorizes exemptions from a standard or limitation established under Section 7412.

46.    D.C. Circuit case law generally allows for review of presidential actions to ensure conformity with statutory requirements, provided that "the authorizing statute or another statute places discernible limits on the President's discretion." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002). The statutory provision here at issue, Section 7412(i)(4) provides discernible limits on the President's discretion, requiring a determination that "technology to implement" a standard "is not available" and that the exemption "is in the national security interests of the United States." 42 U.S.C. § 7412(i)(4).

47.    The Clean Air Act sets out requirements for rulemaking that apply to "the promulgation or revision of any emission standard or limitations under section 7412(d)." 42 U.S.C. § 7607(d)(1)(C). These requirements include establishing a rulemaking docket, publishing in the Federal Register a notice of proposed rulemaking, publicly providing factual data and other information on which the proposed rule is based, allowing submission of written comments, and providing an opportunity for a hearing, among others. *Id.* § 7607(d)(2)-(6), (h).

48.    The Clean Air Act provides EPA limited authority to stay rules that have taken effect. EPA may stay such rules only when it has commenced formal reconsideration proceedings described in 42 U.S.C. § 7607(d)(7)(B). Those proceedings differ from an agency voluntarily revisiting a promulgated rule as EPA is doing in its proposed rule to rescind portions of the 2024 Rule. A rule remains in effect during a reconsideration proceeding unless it is stayed. A stay may not exceed three months. 42 U.S.C. § 7607(d)(7)(B). EPA has not convened a Section 7607(d)(7)(B) reconsideration proceeding for the 2024 Rule and has not sought to stay the

effectiveness of the 2024 Rule. Section 7607(d)(7)(B) is the sole authority EPA has to stay a rule after its effective date has passed. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017).

49.     As part of EPA's duties and authorities implementing the Clean Air Act Title V operating permit program, EPA has the statutory obligation to object to a permitting authority's issuance of a Title V operating permit that is not in accordance with law and to require the permitting authority to revise the permit. *See* 42 U.S.C. § 7661d(b); 40 C.F.R. § 70.8(c). If EPA does not object to such issuance, any person may petition EPA to make an objection. *See* 42 U.S.C. § 7661d(b)(2); 40 C.F.R. § 70.8(d). Any denial by EPA of such petition can be challenged in the relevant U.S. Court of Appeals under 42 U.S.C. § 7607 of the Clean Air Act. 42 U.S.C. § 7661d(b)(2).

50.     EPA also has authority to order a permitting authority to reopen and revise a deficient Title V operating permit. *See* 42 U.S.C. § 7661d(e); 40 C.F.R. § 70.7(f), (g). If the permitting authority does not reopen and revise the permit within 90 days of receiving EPA's reopening notification, EPA may modify or revoke and reissue the permit. *See* 42 U.S.C. § 7661d(e); 40 C.F.R. § 70.7(g)(2), (5).

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   EPA's Mercury and Air Toxics Standards and the 2024 Rule

51.     EPA first set standards, known as the "Mercury and Air Toxics Standards," for emissions of hazardous air pollutants from coal-fired power plants in 2012. *National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial- Institutional, and Small Industrial- Commercial-Institutional Steam*

*Generating Units*, 77 Fed. Reg. 9,304 (Feb. 16, 2012) ("2012 Mercury and Air Toxics

Standards").

52.     In May 2024, EPA adopted the 2024 Rule pursuant to its obligation under Section

7412(d)(6) to review "developments in practices, processes, and control technologies" and revise

the 2012 Mercury and Air Toxics Standards "as necessary." 89 Fed. Reg. 38,508, 38,513.

53.     EPA adopted the 2024 Rule after issuing a proposed rule and holding a public

comment period. The factual record for the 2024 Rule demonstrated that the 2024 Rule would

benefit public health by reducing harmful exposures to toxic pollutants threatening the safety of

communities across the country.

54.     Coal-fired power plants emit mercury, arsenic, nickel, and other toxic metals, as

well as particulate matter. Mercury has adverse health effects including brain and spinal cord

damage. Babies are particularly vulnerable to mercury. Non-mercury toxic metals, including

arsenic, lead, nickel, and chromium have adverse health effects including cancer, kidney damage,

decreased pulmonary function, chronic health disorders such as lung irritation, pneumonia, and

damage to the central nervous system.

55.     A coal-fired power plant consists of one or more electric utility steam generating

units—*i.e.*, individual "coal-fired units" that burn coal to generate steam that is then converted

into electricity.

56.     When EPA reviewed the 2012 Mercury and Air Toxics Standards, EPA found that

coal-fired power plants that burn lignite coal were disproportionately emitting high levels of

mercury. Lignite coal contains more mercury than other coal types and is the least efficient type

of coal to burn for energy. In 2021, 16 of the top 20 mercury-emitting coal-fired units burned

lignite coal. In 2021, lignite coal-fired units were responsible for 30% of all mercury emissions

from coal-fired units but only 7% of total energy generated by coal-fired units. 89 Fed. Reg. at 38,537.

57.    The 2024 Rule revised the 2012 Mercury and Air Toxics Standards to further restrict pollution from coal-fired power plants. The 2024 Rule set forth four standards and requirements relevant here (hereinafter referred to as the "four requirements of the 2024 Rule"):

a.  *Modernized lignite mercury standard:* First, EPA lowered limits on mercury emissions from power plants burning lignite coal to require them to meet the more protective standard that already applies to power plants burning all other types of coal. EPA lowered the mercury limit from 4 lb/TBtu[2] to 1.2 lb/TBtu.

b.  *Modernized arsenic, nickel, and other metals standard:* Second, EPA lowered limits for arsenic, nickel, and other toxic metals from all coal-fired power plants from 0.030 lb/MMBtu[3] fPM to 0.010 lb/MMBtu fPM. EPA uses filterable particulate matter (fPM) as a surrogate for toxic metals.

c.  *Modernized continuous emissions monitoring systems requirement:* Third, EPA required coal-fired power plants to demonstrate compliance with the arsenic, nickel, and other toxic metals standard using continuous emissions monitoring systems that provide continuous feedback and real-time information about emission levels. Under the 2012 Mercury and Air Toxics Standards, coal-fired power plants could demonstrate compliance with the standards through infrequent stack testing of emission levels only four times per year. EPA found it had authority to require continuous emissions monitoring systems under 42 U.S.C.

---

[2] TBtu is an abbreviation for one trillion British thermal units. British thermal unit is a traditional unit of energy.
[3] MMbtu is an abbreviation for one million British thermal units.

§ 7412(d)(6) and separately under 42 U.S.C. § 7414. EPA found authority under Section 7412(d)(6) because it "further[ed] Congress's goal [in Section 7412] to ensure that emission reductions are consistently maintained" by "provid[ing] real-time information to owners and operators (who can promptly address any problems with emissions control equipment)" and "to regulators, to adjacent communities, and to the general public." 89 Fed. Reg. at 38,535. EPA found authority under Section 7414 because it allows EPA to require applicable facilities to "install, use, and maintain such monitoring equipment" on a "one-time, periodic or continuous basis." *Id.*

d. *Strengthened startup standard:* Fourth, EPA removed an extended startup compliance option that allowed coal-fired power plants to delay compliance with numerical emissions limits, and instead comply only with less stringent work practice requirements, for up to four hours after units begin generating electricity. Removing the extended startup compliance option left only one startup compliance option in place, which required power plants to meet numerical emission limits more quickly. 89 Fed. Reg. at 38,551. This change had the effect of requiring all coal-fired power plants to meet a stricter startup standard and would therefore lower hazardous pollutant emissions. *Id.*

58. Each of the four requirements of the 2024 Rule is independently achievable. EPA explained that "a source can abide by any one of these individual requirements without abiding by any others. Thus, the EPA's overall approach to this source category continues to be fully implementable even in the absence of any one or more of the elements included in this final rule." 89 Fed. Reg. at 38,519.

20

59.     The 2024 Rule went into effect on July 8, 2024. Regulated power plants were required to comply with the strengthened startup standard by January 2, 2025. 89 Fed. Reg. at 38,519, 38,564. Regulated power plants are required to comply with the modernized lignite mercury standard, arsenic, nickel, and other metals standard, and continuous emissions monitoring requirement by three years after the effective date (the maximum allowed by statute) on July 6, 2027. *Id.* at 38,564 (see regulatory text).

60.     On information and belief, no coal-fired power plant has requested a compliance extension of up to one additional year available under 42 U.S.C. § 7412(i)(3) "if such additional period is necessary for the installation of controls."

61.     EPA projected that the 2024 Rule would reduce annual emissions of mercury by 900 to 1,000 pounds starting in 2028. EPA projected that the 2024 Rule would reduce emissions of arsenic, nickel, and other toxic metals by about four to seven tons per year. 89 Fed. Reg. at 38,561. From 2028-2037, the 2024 Rule was expected to reduce 9,500 pounds of mercury and 49 tons of arsenic, nickel, and other toxic metals. The 2024 Rule is expected to yield $79 million in monetizable health benefits in 2028 alone, even without considering the benefits from reductions of mercury and toxic metals that EPA was unable to quantify.

62.     EPA also projected that requiring the use of continuous emissions monitoring systems would deliver non-monetizable benefits such as increased transparency, compliance assurance, and faster identification of pollution exceedances allowing operators to act more quickly to address problems and come back into compliance with standards.

**B. The Availability of Technology to Implement the 2024 Rule's Modernized Standards**

63.     Technology to implement the four requirements of the 2024 Rule is available.

64.    The pollution control technologies sufficient to meet the lower emissions standards consist of technologies such as fabric filters and electrostatic precipitators to meet the standard for arsenic, nickel, and other toxic metals, and activated carbon injection systems to meet the mercury standard. Those pollution control technologies are and have been widely used by many coal-fired electric generating units.

65.    Different power plants may apply different configurations and combinations of control technologies and operational methods in order to comply with emission standards.

66.    EPA determined that the four requirements of the 2024 Rule are achievable for at least two reasons. First, EPA determined they are achievable because coal-fired power plants were demonstrating the ability to meet the requirements eventually adopted by the 2024 Rule based on their emissions performance to comply with the 2012 Mercury and Air Toxics Standards. Second, EPA determined they are achievable because the compliance costs were reasonable. For requirements to be achievable, the technology to implement the requirements must be available.

67.    The technology needed for lignite-fired coal power plants to implement the lignite mercury standard, which may include activated carbon injection, fuel additives, scrubber chemicals, and equipment such as blowers, carbon metering valves, and sorbent storage vessels, is available.

68.    The 2012 Mercury and Air Toxics Standards carved out lignite-fired coal power plants for a higher mercury emissions limit than all other coal-fired power plants. In the 2024 Rule, EPA determined that these 22 lignite-fired coal units could meet the same mercury limit as the rest of the fleet because the mercury control technologies they were already using to meet existing standards are "dial up" operational methods, allowing the operator to dial the controls

"up or down to achieve a desired [mercury] emission rate." 89 Fed. Reg. at 38,540. Two lignite units—Twin Oaks units 1 and 2 located in Texas—were already voluntarily emitting at low levels (1.24 lb/TBtu and 1.31 lb/TBtu) near the new limit adopted by the 2024 Rule (1.2 lb/TBtu). *Id.* at 38,539.

69.    EPA acknowledged that the chemical composition of lignite coal, including low halogen content and high sulfur content, created certain challenges for controlling mercury emissions. However, EPA determined that these compositional challenges were not unique and other non-lignite plants had demonstrated the ability to address these issues and meet the lower mercury limit that lignite plants would now be subject to. 89 Fed. Reg. at 38,546-47, 38,549. EPA found that the advanced sorbents and chemical additives used to control mercury emissions at lignite-fired plants were "commercially available" from several vendors. *Id.* at 38,539, 38,541.

70.    EPA stated that lignite coal plants have never been required to meet a lower mercury emission level and therefore had no incentive to incur the greater operating costs required to "dial up" their controls. EPA concluded: "Most units that are permitted to meet a [mercury] emission standard of 4.0 lb/TBtu have no reason to 'over control' since doing so by injecting more sorbent would increase their operating costs. So, it is unsurprising that many units that are permitted to fire lignite have reported [mercury] emission rates between 3.0 and 4.0." 89 Fed. Reg. 38,540.

71.    The technology for coal-fired power plants to implement the arsenic, nickel, and other metals standard, which may include electrostatic precipitators, fabric filters, and operations and maintenance changes, is available.

72.    Coal-fired power plants providing 93% of the total energy capacity generated by the coal power plant fleet have already met the standard for arsenic, nickel, and other metals adopted by the 2024 Rule with their existing technology. 89 Fed. Reg. at 38,522, 38,530.

73.    The fact that the overwhelming majority of coal-fired power plants are already meeting the arsenic, nickel, and other metals standard demonstrates that the technology needed to meet the standard is available.

74.    After EPA found that most power plants were emitting well below the standard adopted in the 2012 Mercury and Air Toxics Standards, the agency determined that it was necessary to update the arsenic, nickel, and other metals standard to require that the worst-performing units in the fleet achieve emissions levels in line with what the vast majority of other units were proving to be achievable due to developments in control technologies following the 2012 standards. This was consistent with Section 7412(d)'s mandate that standards reflect the maximum degree of reduction in emissions that is achievable. 89 Fed. Reg. at 38,522, 38,530.

75.    EPA estimated that very few power plants would require upgrades to comply with the new lower limit on arsenic, nickel, and other metals. Only 33 of 296 coal-fired units would need to take action to meet the arsenic, nickel, and other metals standard. 89 Fed. Reg. at 38,530. EPA, *Presentation: Final National Emission Standards for Hazardous Air Pollutants: Coal and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review,* at 12 (Apr. 25, 2024), https://www.epa.gov/system/files/documents/2024-04/presentation_mats_final-2024-4-24-2024.pdf (attached as Exhibit 3). Of these 33 units, EPA estimated that 20 units would require no new capital investments but only modifications to their existing technology. 89 Fed. Reg. at 38,522, 38,530.

76.    Continuous emissions monitoring technology needed to implement the continuous emissions monitoring requirement is available.

77.    One-third of the coal-fired fleet—over 100 units—has already installed the required continuous emissions monitoring systems. 89 Fed. Reg. at 38,535.

78.    EPA found in the 2024 Rule that technology to implement continuous emissions monitoring for compliance demonstration was "readily available and in widespread use by the electric utility industry." *Id.* at 38,536.

79.    Technology sufficient to implement the strengthened startup standard is also available.

80.    Technology and practices sufficient to implement the strengthened startup standard includes "greater clean fuel capacity, better tuned equipment, better trained staff, a more efficient/better design structure, or a combination of factors." *Id.* at 38,551.

81.    As of the promulgation of the 2024 Rule, the overwhelming majority of coal-fired power plants—generating over 98% of energy generated by the entire coal-fired power plant fleet—were already meeting the more stringent startup compliance option available under the 2012 Mercury and Air Toxics Standards. *Id.*

82.    Only eight coal-fired units were using the more lax extended startup standard that the 2024 Rule removed. These units are Prairie State Generating (Units 1 and 2) (Illinois), Brame Energy Center (Units 2, 3-1, and 3-2) (Louisiana), Sherburne (Unit 3) (Minnesota), Westwood (Unit 1) (Pennsylvania), and Centralia (BW22) (Washington). 88 Fed. Reg. 24,854-85. These units were required to comply with the strengthened startup standard starting on January 2, 2025. All other coal-fired units had already been using the strengthened startup standard even prior to the 2024 Rule.

83.     The fact that all other coal-fired power plants have already implemented the 2024 Rule's startup standard demonstrates that the technology to meet the strengthened startup standard is available.

84.     The costs are reasonable for operators to obtain or maintain the control technologies needed to comply with the 2024 Rule.

85.     For the lignite mercury standard, EPA determined that the improved operational methods needed—injecting more activated carbon sorbent—represented just "a small fraction of" the revenues of the affected lignite-fired coal units. 89 Fed. Reg. at 38,549.

86.     The annual costs to meet the arsenic, nickel, and other metals standard are a small fraction of power sector expenditures and a very small share of total power sector sales. 89 Fed. Reg. at 38,533. EPA determined these costs were "much lower" than estimated in the original 2012 Mercury and Air Toxics Standards. *Id.* at 38,531. Only 33 of 296 coal-fired units would need to make upgrades or install new technology to comply with the modernized arsenic, nickel, and other metals standard. Twenty of those 33 units would incur costs of at most $100,000 a year per coal-fired unit. Those implementation costs are a small fraction of the power sector's annual electricity revenues, which in 2022 were $427.8 billion. *Id.* at 38,532-34.

87.     Implementing the continuous emissions monitoring systems requirement costs about $72,000 per year per coal-fired unit. That is about $12,000 greater per year than the cost of quarterly emissions performance tests allowed under the 2012 Mercury and Air Toxics Standards. *See* 89 Fed. Reg. at 38,535-36.

88.     Implementing the strengthened startup standard would require little to no additional expenditures by coal-fired units. The strengthened startup standard has simplified

reporting and recordkeeping requirements, which can decrease compliance costs. 89 Fed. Reg. at 38,551.

89.    EPA studied the impacts of the 2024 Rule and determined its implementation would not cause any coal-fired power plant to retire, would have no significant impact on retail electricity prices, and would not cause any significant challenges to existing resource adequacy—that is, the power system's ability to meet electricity demand. 89 Fed. Reg. at 38,526, 38,556.

90.    Units that must achieve additional pollution reductions to comply with the four requirements of the 2024 Rule are forecast to produce just 2% of electricity generated in 2028. 89 Fed Reg. at 38,555.

91.    As EPA noted, concerns about the reliability of the power grid were raised in connection with the 2012 Mercury and Air Toxics Standards. The 2012 Mercury and Air Toxics Standards required far greater action and investments by the coal-fired power plant fleet to implement than the 2024 Rule. To date there is no evidence that the 2012 Mercury and Air Toxics Standards contributed to problems with the U.S. power grid's ability to meet energy demand. 89 Fed. Reg. at 38,527.

**C.  Litigation Challenging the 2024 Rule and Coal Industry Requests to Stay the Rule**

92.    A number of coal industry participants filed petitions for review of the 2024 Rule in the U.S. Court of Appeals for the District of Columbia Circuit. Coal industry Petitioners and associated Petitioner-Intervenors also filed emergency applications to stay the 2024 Rule premised on claims of irreparable injury should they be required to comply with the rule or take actions to prepare for compliance with the rule before the litigation in the case resolved and the potential for disruptions to the U.S. power grid should power plants be forced to shut down. The

D.C. Circuit denied the motions to stay the rule. Order in *North Dakota v. EPA*, No. 24-1119

(D.C. Cir., Aug. 6, 2024) (attached as Exhibit 4).

93.    Petitioners and Petitioner-Intervenors then filed stay applications in the Supreme

Court raising similar arguments that they would suffer irreparable injury from the costs of

actions taken to prepare for rule compliance during the pendency of litigation. The Court denied

those applications. Docket Order in *North Dakota v. EPA*, No. 24A180 (D.C. Cir., Oct. 4, 2024)

(attached as Exhibit 5).

94.    The case was fully briefed on the merits when the D.C. Circuit granted EPA's

request that the case be held in abeyance pending the agency's reconsideration of the 2024 Rule.

Order in *North Dakota v. EPA*, No. 24-1119 (D.C. Cir., Feb. 20, 2025) (attached as Exhibit 6). No

party challenged the 2024 Rule's strengthened startup standard, nor EPA's assertion of 42 U.S.C.

§ 7414(a)(1)(C) as additional authority to require continuous emissions monitoring systems to

demonstrate compliance with the arsenic, nickel, and other metals standard.

## D.    The Trump Administration's Announcement That It Was Reconsidering the 2024 Rule and Invitation to Apply for Presidential Exemptions

95.    On March 12, 2025, EPA announced that it would "reconsider" the 2024 Rule—

together with 31 other federal regulations protecting human health and the environment. EPA,

News Release, *Trump EPA to Reconsider Biden-Harris MATS Regulation That Targeted Coal-*

*Fired Power Plants to be Shut Down* (Mar. 12, 2025), https://www.epa.gov/newsreleases/trump-

epa-reconsider-biden-harris-mats-regulation-targeted-coal-fired-power-plants-be. EPA

Administrator Lee Zeldin called it "the greatest day of deregulation our nation has seen."  EPA,

News Release, *EPA Launches Biggest Deregulatory Action in U.S. History* (Mar. 12, 2025),

https://www.epa.gov/newsreleases/epa-launches-biggest-deregulatory-action-us-history.

96.    EPA announced on that day that: "The Trump Administration is considering a 2-year compliance exemption via Section [7412](i)(4) of the Clean Air Act for affected power plants while EPA goes through the rulemaking process." *Id.*

97.    EPA published a "fact sheet" on the reconsideration of the 2024 Rule that stated that: "Any source interested in a Presidential exemption, should provide their recommendations to EPA by March 31, 2025. Sources need only provide why technology is unavailable and why it is in the national security interests of the United States to provide the exemption." EPA, *Mercury and Air Toxics Standards (MATS): Powering the Great American Comeback Fact Sheet* (undated), at https://www.epa.gov/system/files/documents/2025-03/fact-sheet-reconsideration-of-mercury-and-air-toxics-standards.pdf.

98.    The fact sheet provided reasons for the reconsideration of the 2024 Rule—none of which were that the technology needed for power plants to comply with the rule was not available. Instead, the fact sheet cited reasons relating to a changed interpretation of Clean Air Act authority, costs to power plants and operators, and a concern the 2024 Rule created an "undue burden" on certain coal plants. *Id.*

99.    That same day, EPA announced reconsideration of eight other Section 7412 rules limiting hazardous air pollution from various industrial sectors including integrated iron and steel manufacturing, rubber tire manufacturing, synthetic organic chemical manufacturing industry, commercial sterilizers for medical devices and spices, lime manufacturing, coke ovens, copper smelting, and taconite ore processing. EPA stated that the Trump Administration was also considering 2-year compliance exemptions for facilities subject to these standards "while EPA goes through the rulemaking process" and invited sources to "provide their recommendations to EPA by March 31, 2025" to procure an exemption. *See* EPA, Trump EPA Announces

Reconsideration of Air Rules Regulating American Energy, Manufacturing, Chemical Sectors (NESHAPs) (Mar. 12, 2025), https://www.epa.gov/newsreleases/trump-epa-announces-reconsideration-air-rules-regulating-american-energy-manufacturing; EPA, National Emission Standards for Hazardous Air Pollutants (NESHAP), Powering the Great American Comeback Fact Sheet, https://www.epa.gov/system/files/documents/2025-03/neshap_powering_the_great-american-comeback_fact-sheet_2.pdf.

100.    On or about March 24, 2025, EPA posted a new webpage with details on how facilities could submit requests for presidential exemptions from compliance with the nine Section 7412 rules—including the 2024 Rule—previously identified as being reconsidered. EPA, *Clean Air Section 112 Presidential Exemption Information* (last updated Apr. 14, 2025), https://www.epa.gov/stationary-sources-air-pollution/clean-air-act-section-112-presidential-exemption-information. (attached as Exhibit 7). The webpage explained, "EPA set up an electronic mailbox to allow the regulated community to request a Presidential Exemption under section [7412](i)(4)" and provided requesters an email address—airaction@epa.gov—to submit requests "by March 31, 2025." *Id.* EPA has since removed much of the information in an April 14, 2025 update to the webpage. EPA did not ask for any information from the general public or affected communities or otherwise invite their input on issuing exemptions.

101.    On information and belief, a presidential administration has only once previously established a process for the consideration of whether the President might provide exemptions from a national emissions standard for hazardous air pollutants, for facilities that sterilize medical products. The process for consideration of and granting such exemptions was set forth in a presidential memorandum. *Memorandum on the Orderly Implementation of the Air Toxics Standards for Ethylene Oxide Commercial Sterilizers*, 90 Fed. Reg. 6,773 (Jan. 17, 2025)

("Sterilizers Memorandum"). On information and belief, no exemptions were granted as a result of this process.

102.    The President stated in the Sterilizers Memorandum that the exemption process was intended to address "the exceptional circumstances in which a commercial sterilizer can demonstrate that, notwithstanding due diligence and best efforts, it will be unable to meet a covered standard or limitation required by the [] Rule before the compliance deadline due to the unavailability of control technology for the facility, leading to likely shutdown of the facility, and the best available information demonstrates that the shutdown of the facility will likely lead to a serious disruption to the supply of medical products, such as medical devices and pharmaceuticals, necessary for America's national security and public health." 90 Fed. Reg. at 6,774.

103.    The President made clear in the Sterilizers Memorandum that issuing an exemption is a last resort reserved for when "notwithstanding its due diligence and best efforts, the facility cannot be brought into compliance before the compliance deadline for the covered standard or limitation." *Id.*

**E.    President Trump Granted Exemptions from the 2024 Rule to 68 Coal-Fired Power Plants.**

Release and Publication of the Exemption Proclamation and Annex 1

104.    On April 8, 2025, President Trump issued a proclamation (the Exemption Proclamation) that exempted "certain stationary sources . . . as identified in Annex I of this proclamation" from the 2024 Rule pursuant to "authority vested . . . by the Constitution and the laws of the United States of America, including section [7412](i)(4) of the Clean Air Act, 42 U.S.C 7412(i)(4)." Exemption Proclamation.

105.    In support of the exemptions, the Exemption Proclamation included what it referred to as two "determinations." *Id.*

106.    First, the Exemption Proclamation purported to "determine" that "[t]he technology to implement the Rule is not available." *Id.* The Proclamation stated: that "[s]uch technology does not exist in a commercially viable form sufficient to allow implementation of and compliance with the Rule by its compliance date of July 8, 2027." *Id.*

107.    Second, the Exemption Proclamation purported to "determine" that "[i]t is in the national security interests of the United States to issue this Exemption" because the 2024 Rule "places severe burdens on coal-fired power plants" and the "viability of our Nation's coal sector," "requires compliance with standards premised on the application of emissions-control technologies that do not yet exist in a commercially viable form," and provides a "compliance timeline . . . [that] therefore raises the unacceptable risk of the shutdown of many coal-fired power plants, eliminating thousands of jobs, placing our electrical grid at risk, and threatening broader harmful economic and energy security effects . . . in turn undermin[ing] our national security, as these effects would leave America vulnerable to electricity demand shortages, increased dependence on foreign energy sources, and potential disruptions of our electricity and energy supplies, particularly in times of crisis." *Id.*

108.    The Exemption Proclamation declared that the exempted power plants "are exempt from compliance with the Rule for a period of 2 years beyond the Rule's compliance date—*i.e.*, for the period beginning July 8, 2027, and concluding July 8, 2029 (Exemption)." *Id.*

109.    The Exemption Proclamation asserts the compliance deadline of the 2024 Rule is July 8, 2027. That is wrong. The compliance deadline for the lignite mercury standard, the nickel, arsenic, and other metals standard, and the continuous emissions monitoring systems

requirement is July 6, 2027. The compliance deadline for the 2024 Rule's startup standard was January 2, 2025. 89 Fed. Reg. at 38,564.

110.    The Exemption Proclamation purports to exempt sources from compliance with the 2024 Rule for a period that extends beyond two years from the date of the purported "determination" on technological availability and national security.

111.    The Exemption Proclamation stated that, "during this 2-year period [from July 8, 2027, to July 8, 2029], these stationary sources are subject to the compliance obligations that they are currently subject to under the [2012 Mercury and Air Toxics Standards] as [they] existed prior to the [2024] Rule." *Id.*

112.    President Trump transmitted a notification of the exemptions to Congress, dated April 14, 2025. H.R. Doc. No. 119-40, (2025). The Exemption Proclamation and "Annex 1" were published in the Federal Register on April 21, 2025. 90 Fed. Reg. 16,777 (Apr. 21, 2025), www.govinfo.gov/content/pkg/FR-2025-04-21/pdf/2025-06936.pdf.

113.    Plaintiff EDF submitted a Freedom of Information Act request to EPA seeking information about requests for exemptions from sources and their responses. To date, EDF has not received any responsive documents.

114.    The White House has since highlighted the exemptions as an example of the President broadly "pausing restrictive emissions rules for coal plants." *See, e.g.*, White House, On Earth Day, We Finally Have a President Who Follows the Science (Apr. 22, 2025), https://www.whitehouse.gov/articles/2025/04/on-earth-day-we-finally-have-a-president-who-follows-science. The same White House release stated that "President Trump is cutting wasteful regulations that stifle innovation and raise costs. Actions like pausing restrictive emissions rules for coal plants . . .  have accelerated responsible energy and infrastructure projects while

maintaining rigorous environmental standards – saving American families thousands annually on energy bills and proving that a strong economy and a healthy environment go hand-in-hand." *Id.*

EPA's Proposed Repeal

115.    On June 11, 2025, Administrator Zeldin signed and submitted to the Office of the Federal Register for publication a notice of proposed rulemaking entitled, "Repeal of Amendments to National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units," *available at* https://www.epa.gov/stationary-sources-air-pollution/mercury-and-air-toxics-standards. The notice proposes to repeal the modernized mercury standard, the modernized arsenic, nickel, and other metals standard, and the continuous emissions monitoring standard.

Facts Relating to Power Plants That Received Exemptions

116.    Although the Exemption Proclamation issued on April 8, 2025 referenced an "Annex I" for the list of exempted power plants, the Proclamation as issued did not include an "Annex I." Plaintiff EDF filed a Freedom of Information Act request with EPA and the White House Office of Management and Budget for "Annex I" on April 10. The "Annex I" list of exempted power plants was published for the first time on April 14, when EPA posted the document to its website. EPA, "Annex 1"[4] (Apr. 14, 2025) https://www.epa.gov/system/files/documents/2025-04/regulatory-relief-for-certain-stationary-annex-1.pdf (providing list of 68 exempted plants organized by operating company).

---

[4] While the Exemptions Proclamation referred to an "Annex I" using the Roman numeral, the document itself as posted on EPA's website and later in the Federal Register was titled "Annex 1" using the Arabic numeral.

117.    The list revealed that the President had exempted 68 coal-fired power plants across 23 states from the 2024 Rule. The exemptions cover approximately one-third of the entire domestic coal fleet.

118.    Annex 1 lists 47 power companies and identifies every "affected facility/source" owned by that power company granted an exemption. The document in some cases identifies specific coal-fired units located at a specified facility receiving exemptions, but in other cases only lists the facility itself. The total number of exempted coal-fired units is thus unspecified and unclear.

119.    Some of the power plants that the Exemption Proclamation exempts are already able to meet the four requirements of the 2024 Rule with their existing controls. EPA determined that these power plants do not need to install or upgrade any technology or make any changes to operations and maintenance to implement the 2024 Rule's standards. For example, the H.L. Spurlock (Kentucky), R.S. Nelson (Louisiana), Sioux (Missouri), and Cooper (Kentucky) plants have already installed the continuous emissions monitoring systems required by the 2024 Rule, are not affected by the lignite mercury standard because they do not burn lignite, are already meeting the modernized arsenic, nickel, and other metals standard with their existing technology, and are already meeting the strengthened startup standard.

120.    All but one of the exempted power plants (the Colstrip facility in Montana) are able to meet the modernized arsenic, nickel, and other metals standard with existing controls. *See* Proposed Repeal at 23. Several other exempted power plants, including D. B. Wilson (Ohio), Milton R. Young 2 (North Dakota), Martin Lake 1 (Texas), San Miguel (Texas), Mt. Storm (West Virginia), and Laramie River 3 (Wyoming) already have the necessary control technology to meet the modernized arsenic, nickel, and other metals standard and would only need to

implement operations and maintenance changes to comply with the 2024 Rule's modernized arsenic, nickel, and other metals standard.

121.    Some exempted power plants would need to upgrade their existing pollution controls with commercially available equipment to comply with the 2024 Rule's standard for arsenic, nickel, and other metals. Colstrip (Montana), Labadie (Missouri), and Harrison (West Virginia) need to invest in fabric filters or electrostatic precipitators to meet the modernized arsenic, nickel, and other metals standard. John B. Rich (Pennsylvania) and Westwood (Pennsylvania) need a bag-type upgrade to their existing fabric filters to meet the modernized arsenic, nickel, and other metals standard.

122.    Only 10 of the coal plants exempted by the Exemption Proclamation are lignite-fired: Antelope Valley (ND), Coal Creek (ND), Coyote (ND), Leland Olds (ND), Limestone (TX), Martin Lake (TX), Milton R. Young (ND), Oak Grove (TX), Red Hills Generating Facility (MS), and San Miguel (TX). All 10 of the lignite-fired coal plants exempted by the Exemption Proclamation are already using some form of sorbent or activated carbon injection system to control emissions. Those 10 facilities have thus installed the technology necessary to meet the 2024 Rule's modernized mercury standard and would only need to change some aspects of the operation of that technology to further control mercury emissions sufficient to meet the 2024 Rule's modernized mercury standard. 89 Fed. Reg. at 38,547-49.

123.    At least 42 of the 68 coal-fired plants exempted by the Exemption Proclamation are already using fabric filters and electrostatic precipitators and have been meeting, on average, the levels of the arsenic, nickel, and other metals standard of the 2024 Rule.

124.    Eleven of the 68 coal-fired power plants exempted by the Exemption Proclamation already have continuous emissions monitoring systems installed.

125.    Two of the coal-fired power plants exempted by the Exemption Proclamation were previously using the extended startup compliance option and have been required to use the strengthened startup standard in the 2024 Rule beginning in January 2025. These plants are Rausch Creek Generation/Westwood (Pennsylvania) and Brame Energy Center (Unit 2) (Louisiana). All other exempted power plants were already using the strengthened startup standard to comply.

<u>Lack of Source-Specific Determinations Made by the President</u>

126.    The Exemption Proclamation does not reveal any factual consideration or deliberation of the statutory prerequisites for granting a Section 7412(i)(4) exemption. Readily discernible facts reveal that the statutory prerequisites are not met.

127.    The President has not, in the Exemption Proclamation, Annex 1, or (on information and belief) otherwise, for any power plants granted exemptions, made a source-specific determination that "the technology to implement" each (or any) of the 2024 Rule's requirements "is not available" for that specific power plant or any of the coal-fired units at that power plant.

128.    The Exemption Proclamation states without explanation, analysis, basis, or specificity that "[t]he technology to implement the Rule is not available" and "does not exist in a commercially viable form sufficient to allow implementation of and compliance with the Rule by its compliance date of July 8, 2027." This statement is not a determination that the technology to comply with each requirement is unavailable for each of the exempted power plants.

129.    The Exemption Proclamation states "the technology to implement the Rule is not available." The Exemption Proclamation does not specify which technology is not available. The Exemption Proclamation does not specify for which of the four requirements of the 2024 Rule

the technology to implement such requirement is not available. Each of the four requirements depends on implementing distinct technologies.

130.    The President has not, in the Exemption Proclamation, Annex 1, or (on information and belief) otherwise made any determination that any of the power plants listed on Annex 1 will shut down if required to comply with the 2024 Rule.

131.    The President has not, in the Exemption Proclamation, Annex 1, or (on information and belief) otherwise made any determination that the retirement or shutdown of any of the plants listed on Annex 1 would pose national security risks to the United States. The Exemption Proclamation declares "[t]he current compliance timeline of the Rule therefore raises the unacceptable risk of the shutdown of many coal-fired power plants," but does not say which power plants are at risk of shutting down or assert that any of the power plants listed in Annex 1 are at "unacceptable risk of shutdown." The President has not, in the Exemption Proclamation, Annex 1, or (on information and belief) otherwise made any determination for each power plant granted an exemption (1) that the technology is not available for it to comply with the 2024 Rule, (2) that the plant will retire as a result, or (3) that such retirement would pose a national security threat.

132.    The President has not, in the Exemption Proclamation, Annex 1, or (on information and belief) otherwise made any determination as to the individual exempted plants and the different requirements from which they necessitated an exemption.

133.    The Exemption Proclamation exempts power plants from having to comply with the strengthened startup standard from July 8, 2027 to July 8, 2029 after they have been subject to compliance with the standard from January 2, 2025 to July 7, 2027. This illogic underscores

the absence of a fact-based determination made about the availability of technology to implement the 2024 Rule over any particular time period.

134.    In the alternative, if the exemption from the strengthened startup standard were to apply immediately to power plants, it would provide an exemption for over four years, when 42 U.S.C. § 7412(i)(4) allows the President to issue a single exemption "of not more than 2 years."

135.    Similarly, the Exemption Proclamation's erroneous assertion that the compliance deadline of the 2024 Rule is July 8, 2027, rather than July 6, 2027, means the terms of the proclamation may require sources to install controls and comply with the 2024 Rule's requirements for two days in July 2027 before sources are exempted. This illogic underscores the absence of a determination about the availability of technology over any particular time period.

136.    The Exemption Proclamation granted Brame Energy Center Unit 2 an exemption from the 2024 Rule for the period from July 8, 2027, to July 8, 2029. Brame Energy Center Unit 2 is one of the few coal-fired units that was previously not in compliance with the 2024 Rule's startup standard. Brame Energy Center Unit 2, like all other coal-fired units subject to the 2024 Rule, was required to comply with the more stringent startup standard starting January 2, 2025. On its face, if the Exemption Proclamation exempts sources from compliance with the startup standard, it would mean that Brame Energy Center Unit 2 will be exempt from that standard from July 8, 2027, to July 8, 2029. And it would mean that Brame Energy Center Unit 2 will either need to procure and use technological controls before July 8, 2027, to comply with the strengthened startup standard—or be in noncompliance with the 2024 Rule—but then be permitted to not use such technological controls from July 8, 2027, to July 8, 2029 due to a Presidential determination that such technology is "not available" to achieve compliance during that later period. This belies an assertion that the technology to implement the startup standard is

not available and demonstrates that there was no determination made as to the availability of technology necessary for Brame Energy Center Unit 2 to implement the strengthened startup standard.

137.    Similarly, the factual allegations *supra* at ¶¶ 119, 121, 122-125, that the Exemption Proclamation exempts coal-fired power plants from requirements of the 2024 Rule that they are already in compliance with demonstrates that there was no determination made about the availability of technology for exempted sources to implement the 2024 Rule.

<u>Facts Contradicting the Exemption Proclamation</u>

138.    The facts alleged *supra* at ¶¶ 63-93 demonstrate that the technology to implement the 2024 Rule is available and that compliance with the 2024 Rule will not cause any power plant to retire.

139.    The Exemption Proclamation's determination that technology is not "available" is contradicted by the fact that all of the different technologies necessary to implement the 2024 Rule, such as continuous emission monitoring systems, are already installed and in use by existing coal-fired power plants. As explained *supra* ¶¶ 119, 121, 122-125, several of the exempted power plants already have installed the technology necessary to comply with the 2024 Rule.

140.    The Exemption Proclamation directly contradicts the findings made by EPA just 11 months earlier, on the basis of an ample administrative record developed through public notice and comment, that the control technologies needed to implement each of the four requirements of the 2024 Rule are available and cost reasonable, and that each of the four requirements of the 2024 Rule are achievable. *See, e.g.*, 89 Fed. Reg. at 38,533, 38,535-36, 38,539.

141.    EPA found that the 2024 Rule will not drive any coal plant retirements, and that the 2024 Rule can be implemented without interfering with electric system reliability or resource adequacy. The Exemption Proclamation directly contradicts those findings, made just 11 months earlier.

142.    Since the time the 2024 Rule was finalized, upon information and belief, no unit has publicly indicated that it intends to shut down as a result of the 2024 Rule.

143.    Since President Trump issued the Exemption Proclamation, certain power plant owners and operators who did not receive an exemption have publicly shared that they did not request an exemption. One power plant operator stated: "The 2024 MATS rule does not impact our ability to continue to provide safe, reliable and affordable energy to our customers while continuing to comply with environmental regulations." Morgan Watkins, *Why two Kentucky utilities sought coal pollution exemption from Trump, but others didn't*, Louisville Public Media (Apr. 29, 2025), https://www.lpm.org/investigate/2025-04-29/why-two-kentucky-utilities-sought-coal-pollution-exemption-from-trump-but-others-didnt. Another power plant operator said: "After careful consideration of the statutory requirements necessary to seek a presidential exemption, Duke Energy determined that it was in the best interest of our customers not to seek an (exemption)." *Id.* The fact that certain power plant owners and operators did not request an exemption illustrates how technology is available to implement the 2024 Rule's requirements.

## STANDING

144.    Plaintiffs' members live, work, and recreate in areas affected by the excess pollution that is and will be emitted from the exempted coal-fired power plants. Members are harmed by breathing in air pollution from the exempted plants. Members are concerned that exposure to pollution from the exempted plants could have harmful impacts on their health.

41

Exposure to mercury, particulate matter, and arsenic, nickel, and other heavy metals emitted at higher volumes by exempted plants as a result of the Exemption Proclamation has adverse health effects, which may include cancer, kidney damage, and detrimental effects to the central nervous system.[5]

145.    Plaintiffs' members are also harmed by exposure to excess mercury when consuming fish contaminated with power plant mercury. Coal plant mercury emissions can travel through the air before being deposited on land or in waterbodies. Once deposited into waterbodies, microbial action can turn mercury into methylmercury. Methylmercury can be taken up by aquatic organisms and bioaccumulate in larger, longer-living organisms that eat smaller organisms. Humans are exposed when they eat fish with high concentrations of methylmercury. Exposure to methylmercury from fish consumption causes adverse health effects, including neurodevelopmental and cardiovascular harms. 89 Fed. Reg. at 38,515. Birds and mammals can also become exposed via fish consumption and face resulting adverse health effects.

146.    Plaintiffs' members are concerned that air pollution from the exempted power plants is present in the locations where they live, work, and recreate. These reasonable concerns about their increased exposure to air pollution while engaged in those activities and other resulting harms from that exposure diminish their enjoyment of outdoor activities and areas they previously enjoyed or would like to continue to engage in or use, thereby harming members'

---

[5] EPA, Fact Sheet: EPA's Final Rule to Strengthen and Update the Mercury and Air Toxics Standards for Power Plants at 4, https://www.epa.gov/system/files/documents/2024-04/fact-sheet_mats-rtrfinal_rule_2024.pdf; *see also National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units—Revocation of the 2020 Reconsideration and Affirmation of the Appropriate and Necessary Supplemental Finding*, 88 Fed. Reg. 13,956 (Mar. 6, 2023).

aesthetic and recreational interests. Some members are aware that mercury and other heavy metals can contaminate animals and are concerned about the safety of eating the fish they catch and animals they hunt in the areas affected by the exempted plants. Some members fish recreationally but curtail their fishing or refrain from fishing, or avoid eating the fish they catch, because of mercury advisories or other concerns about the mercury content of fish.

147.    Plaintiffs' members benefit from stronger controls on power plants in a variety of ways, including through reduced exposure to pollution, cleaner air and environment, reduced contamination of fish and game, and a greater ability to enjoy outdoor activities in areas affected by the power plants.

148.    Some of Plaintiffs' members live, work, fish, hunt, or recreate near power plants that are exempted from complying with the strengthened standard for arsenic, nickel, and other toxic metals beginning on July 8, 2027. Compliance with the strengthened standard will reduce health-harming pollution, including particulate matter and heavy metals. Exempting power plants from the strengthened standard injures those members by delaying or denying them the benefits of stronger pollution controls.

149.    Some of Plaintiffs' members live, work, fish, hunt, or recreate near lignite-fired power plants that are exempted from complying with the strengthened mercury standards beginning on July 8, 2027. Compliance with the strengthened standard will reduce mercury pollution. Exempting power plants from the strengthened standard injures those members by delaying or denying them the benefits of stronger pollution controls.

150.    Some of Plaintiffs' members live, work, or recreate near power plants that are exempted from the requirement to employ continuous emissions monitoring for the strengthened standard for arsenic, nickel, and other toxic metals beginning on July 8, 2027. Requiring

43

continuous emissions monitoring can result in reduced pollution and strengthened compliance through faster identification and correction of problems with pollution control devices. 89 Fed. Reg. at 38,508, 38,536. EPA recognized those benefits in its 2024 rulemaking. Continuous emissions monitoring will also generate up-to-date information for Plaintiffs, their members, and the public about particulate matter and toxic metal emissions at the power plants.

151.    Exempting power plants from the requirement to employ continuous emissions monitoring injures members by delaying or denying them the pollution reduction and improved compliance that can result from continuous monitoring. The exemptions also deny Plaintiffs and their members the information about emissions at the power plants that continuous emissions monitoring would provide. Sources that are major under Clean Air Act Section 7412, 42 U.S.C. § 7412, are subject to the Clean Air Act's Title V permitting requirements. Title V requires that "a copy of each permit application, compliance plan including the schedule of compliance), emissions or compliance monitoring report, certification, and each permit . . . shall be available to the public." 42 U.S.C. § 7661b(e). Some Plaintiffs and their members would use such monitoring data to raise public awareness of air pollution and to further Plaintiffs' and their members' advocacy, education, and outreach efforts to reduce air pollution. For example, it can allow Plaintiffs and their members to better identify violations and act when the data shows a power plant has not complied with pollution standards. It would also help the communities some Plaintiffs serve make educated decisions about how they engage in advocacy to reduce air pollution. And improved monitoring data empowers Plaintiffs, their members, and the communities they work with to better understand their own pollution exposures so that they can modify their behavior to limit their exposure to pollution from coal power plants. Without continuous emissions monitoring data, Plaintiffs and their members will be unable to improve

their advocacy and public education work, and some members will be deprived of information

they could have used to evaluate the pollution exposure and health risks of areas affected by the

exempted power plants and make decisions to reduce their exposure.

152.    Some of Plaintiffs' members live, work, or recreate in areas near power plants that

are exempted from the requirement to comply with more stringent startup standards, for which

compliance was required starting on January 2, 2025. Compliance with the strengthened standard

will reduce mercury and other toxic air pollution. Exempting power plants from the strengthened

standard injures those members by delaying or denying them the benefits of stronger pollution

controls.

153.    Power plants that were issued exemptions are now able to emit toxic air pollution

at higher levels during the period of exemption than otherwise would have been allowed. They

are also able to forgo use of continuous emissions monitoring during the period of exemption.

Power plants that may have already been complying with the strengthened standards of the 2024

Rule will now have no legal obligation to do so during the period of exemption. They will be

permitted to stop using already-installed pollution control technologies and raise their emissions,

significantly increasing the risk to Plaintiffs and their members of exposure to increased

emissions and the health harms associated with such exposures.

154.    A coal industry group stated that the 2024 Rule will require coal power plants to

take immediate actions and make immediate expenditures to be able to meet the rule's

requirements by the compliance deadline.

155.    Stephanie Coates is a member of the Environmental Defense Fund and works as a

Climate & Health Project Manager for EDF. Ms. Coates lives in Houston with her family and

enjoys spending time outdoors with her family, including biking and taking regular walks to the

park or coffee shop. She lives about 25 miles from the W.A. Parish Coal Plant. The W.A. Parish

coal plant needs to install CEMS to comply with the 2024 Rule. The Martin Lake coal plant, the

Oak Grove coal plant, and the San Miguel coal plant are located outside of Houston. All three

plants are lignite-fired and must make operations changes to comply with the strengthened

mercury standard. Martin Lake and San Miguel also need to invest in increased operations and

maintenance to meet the strengthened standard for arsenic, nickel, and other metals, and San

Miguel needs to install CEMS to comply with the 2024 Rule. All four of those coal plants are

exempted from compliance with the 2024 Rule by the Exemption Proclamation. Ms. Coates has

concerns about her exposure and her children's exposure to mercury and other toxic emissions

from those exempted coal plants, and the effect of such exposures on their health. Ms. Coates

was diagnosed with non-hereditary breast cancer and is concerned that toxic pollution from those

exempted coal plants will exacerbate her health condition and detract from her quality of life.

Ms. Coates relies on public information about air quality to make decisions about the health risks

of outdoor activities, and limits the time she and her children spend outdoors when air quality is

unhealthy. Exemptions for W.A. Parish and other Houston-area coal plants deny her the more

detailed and regular information about coal plant emissions that would have otherwise been

available under the 2024 Rule. The exemptions also harm Ms. Coates and her family by

permitting exempted coal plants to emit more pollution during the period of exemption than they

would otherwise emit.

    156.    Michelle L. Marley-Knox is a member of ELPC and has lived within thirty miles

of the Kincaid power plant in Christian County, Illinois for her entire life. She enjoys outdoor

recreational activities near the Kincaid plant, including bicycling, camping, water activities, and

fishing. In recent years, she has needed to stop fishing and swimming in the lakes near her home

due to concerns over mercury pollution. Everyone in Ms. Marley-Knox's family suffers from a susceptibility to bronchitis and must carry inhalers. The Kincaid plant was scheduled to close down by the end of 2027 but has recently received an exemption from the 2024 Rule. It already has the technology sufficient to implement the arsenic, nickel, and other toxic metals standard of the 2024 Rule. With the exemption, the Kincaid plant will no longer be required to implement or use that technology and will be allowed to emit levels of pollution in excess of the 2024 standard beginning in July 2027. Ms. Marley-Knox is also concerned that the Kincaid plant may remain open longer than it had originally planned and continue to jeopardize her health, recreational, and business interests. Further, Ms. Marley-Knox is concerned that the Kincaid plant will no longer be required to conduct continuous monitoring and that the subsequent lack of up-to-date emissions information would prevent her from effectively evaluating the health risks she and her family are exposed to each day.

157.    Derf Johnson, a lifelong resident of Montana, is a member of the Sierra Club and the Montana Environmental Information Center (MEIC), and a Deputy Director of MEIC. Mr. Johnson enjoys outdoor activities in Montana including hunting, fishing, swimming, and observing wildlife. Mr. Johnson regularly visits the area around the Colstrip coal plant and has definite plans to return to the area. Annex 1 lists the Colstrip coal plant as exempted from compliance with the 2024 Rule. Colstrip needs to install pollution controls to be able to achieve the levels in the arsenic, nickel, and other metals standard of the 2024 Rule. Visible air pollution from the Colstrip coal plant and concerns about the health implications of air pollution degrade his experience visiting southeastern Montana, where Colstrip is located. Mr. Johnson is aware that the Colstrip coal plant emits mercury and other toxic metals, as well as particulate matter. He is concerned about exposure to the coal plant's emissions and the resulting harm to his health.

158.    Catherine Fleischman is a member of the Natural Resources Defense Council. She lives in Davis, West Virginia, in close proximity to the Mt. Storm Generating Station coal-fired power plant. Mt. Storm is listed in Annex 1 as exempted from the 2024 Rule. Mt. Storm already has technology sufficient to implement the modernized arsenic, nickel, and other toxic metals standard and the continuous emissions monitoring standard of the 2024 Rule. Ms. Fleischman frequently checks air quality information. She spends a significant amount of time outside in the area of the Mt. Storm plant and limits her outdoor activities when air quality is poor because she suffers fatigue and lethargy from poor air quality.  She is concerned about the health effects from air quality degradation as a result of pollution from the Mt. Storm plant and frequently observes and smells plumes of pollution from Mt. Storm.

159.    Barbara Sue is a member of the Natural Resources Defense Council. She lives in Macon, Georgia, near the Scherer coal-fired power plant in Monroe County, Georgia. The Scherer Plant is listed in Annex 1 as exempted from the 2024 Rule. It has technology sufficient to implement the modernized arsenic, nickel, and other toxic metals standard of the 2024 Rule. With the exemption, the Scherer Plant will no longer be required to implement or use the technology and will be allowed to emit levels of pollution in excess of the standard beginning in July 2027. Ms. Sue frequently checks air quality information. She suffers severe ongoing allergies, sinus problems, and migraines that she is concerned are exacerbated by air pollution from the Scherer plant.

160.    As set forth above, Plaintiffs' members directly benefit from the public-health and environmental protections and informational benefits provided by the requirements adopted in the 2024 Rule and as a result are harmed by exempting power plants from compliance with those

requirements.[6] Granting the requested relief would redress these injuries. The interests Plaintiffs

seek to protect by bringing this case are germane to their organizational purposes of working to

secure reductions of harmful air pollutants from sources covered by the 2024 Rule. The

participation of individual members is not required because the claims and entitlement to relief

will be resolved without consideration of those members' individual circumstances.

## CLAIMS FOR RELIEF

### COUNT ONE:

**Unlawful Executive Action in Violation of the Clean Air Act**
**(Nonstatutory Review for Violations of Federal Law by Federal Officials;**
**Against All Defendants)**

161.    Plaintiffs re-allege and incorporate by reference the allegations contained in all

preceding paragraphs of this Complaint.

162.    The Court possesses inherent equitable power to "grant injunctive relief . . . with

respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr.,*

*Inc.*, 575 U.S. 320, 326–27 (2015). Such authority is presumptively available "absent only 'the

clearest command' otherwise in a statute, . . . either express or implied." *Mathis v. United States*

*Parole Commission,* 749 F. Supp. 3d 8, 23 (D.D.C. 2024) (quoting *McQuiggin v. Perkins*, 569

U.S. 383, 397 (2013)). Congress has nowhere foreclosed review of the interpretation and

application of 42 U.S.C. § 7412(i)(4).

163.    Section 7412(i)(4) establishes a judicially manageable standard with clear and

precise limits of the sort federal courts routinely construe to determine whether the officials

have acted consistent with law.

---

[6] Plaintiffs are prepared to file their members' declarations with their principal brief or in the
event their standing is challenged.

164.    The Exemption Proclamation is an unlawful action that clearly exceeds the scope of the President's statutory authority and rests upon an unlimited, and plainly untenable, interpretation of the Clean Air Act and application of both. The Exemption Proclamation exceeded the authority afforded to the President by Congress in 42 U.S.C. § 7412(i)(4) in multiple respects.

165.    Section 7412(i)(4) authorizes an exemption only for a "stationary source," and only if the President "determines that the technology to implement such standard is not available" for that source and determines "that it is in the national security interests of the United States" to exempt that source.

166.    The President failed to make a factual determination as to "any stationary source" that a technology is not available for that "stationary source" to implement the 2024 Rule, in violation of 42 U.S.C. § 7412(i)(4) and in excess of lawful authority.

167.    The President failed to make a factual determination as to "any stationary source" that an exemption for that source is in the "national security interests of the United States," in violation of 42 U.S.C. § 7412(i)(4) and in excess of lawful authority.

168.    The President failed to make factual determinations as to "any stationary source" that the technology is not available *and* that an exemption is in the national security interests of the United States, in violation of 42 U.S.C. § 7412(i)(4) and in excess of lawful authority.

169.    EPA and the President are bound by the Clean Air Act's duties with respect to implementing 42 U.S.C. § 7412(i)(4), following rulemaking procedures, and being bound by lawfully adopted regulations.

170.    The Exemption Proclamation exceeds the President's statutory authority and is contrary to Section 7412 of the Clean Air Act because, by granting sweeping exemptions to one

third of regulated sources without determinations pertaining to those sources, the Proclamation effectively amends the compliance dates of EPA's 2024 Rule without observing the statutorily mandated process for amending a rule. Section 7412(i)(4) is a narrow provision applicable in exceptional circumstances; it is not intended to be used as a substitute for notice-and-comment rulemaking to amend EPA standards that were themselves adopted after a full rulemaking process and that reflected EPA determinations that technology is available and standards achievable. The failure to make the required findings here operated as a process-free, evidence-free amendment to the 2024 Rule.

171.    The Exemption Proclamation unlawfully attempts to amend a rule and/or stay a rule pending reconsideration in violation of the Clean Air Act, 42 U.S.C. § 7607(b), (d).

172.    The Exemption Proclamation is unlawful because it flouts the statutory purpose of Section 7412(i)(4) authority—to address circumstances where requiring compliance with a standard would prevent the operation of national security-related equipment due to the unavailability of necessary control technology and instead has an improper purpose to relieve sources of regulatory burdens and compliance costs while EPA reconsiders the 2024 Rule.

173.    The Proclamation exceeds the authority granted in Section 7412(i)(4) because it seeks to exempt sources from all the 2024 Standards indiscriminately, without identifying for each source which of the four distinct standards would call for technology that is unavailable. For example, units producing over 98% of coal plant-generated electricity in 2022 already employed the 2024 Rule's startup standard, and 93% of power plants covered by the 2024 Rule are already meeting the arsenic, nickel, and other toxic metals standard. Section 7412(i)(4) authorizes the President to exempt a source from a requirement if technology is unavailable to implement that requirement. The statute does not authorize the President or EPA

to exempt sources from requirements as to which the relevant technology is available. Accordingly, there could be no basis for exempting sources from all four of the 2024 Rule's requirements, even if (contrary to fact) the conditions for exemption could be satisfied for a subset of the requirements. The effect of that unlawfully indiscriminate approach is to exempt many sources from compliance with standards that will be implemented by technologies already installed at such sources, and to exempt other sources from compliance even where the requisite technologies required by the 2024 Rule's compliance date are readily available and in widespread use at similar sources.

174.    The President lacks any independent authority under the U.S. Constitution to issue the exemptions.

175.    Because the Exemption Proclamation is beyond the Clean Air Act authority and *ultra vires*, EPA actions implementing or giving effect to the proclamation are similarly beyond the Clean Air Act authority and *ultra vires*.

## COUNT TWO:

### Unlawful Executive Action in Violation of the Clean Air Act
### (Nonstatutory Review for Violations of Federal Law by Federal Officials; Against All Defendants)

176.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

177.    The President granted exemptions when the technology needed to implement the 2024 Rule is in fact available, in violation of 42 U.S.C. § 7412(i)(4) and in excess of lawful authority. The relevant technologies were in widespread use by regulated sources, including at the time of the Exemption Proclamation by many of the sources listed in Annex 1.

178.     The purported determinations are not supported by any factual analysis or reasoning and are unambiguously contradicted by factual evidence, including EPA's own findings and record for the 2024 Rule.

179.     The absence in the Exemption Proclamation, in Annex 1, or otherwise of any findings, reasoning, or other facts to establish the necessary factual predicate that the needed technology is not available demonstrates that the President did not make the determinations required by 42 U.S.C. § 7412(i)(4). That is confirmed by the fact that many of the exempted sources had already installed the technologies in question. Rather, the Exemption Proclamation bypassed and contravened statutory requirements to achieve sweeping compliance exemptions unauthorized by any law.

180.     Because the Exemption Proclamation is beyond the Clean Air Act authority and *ultra vires*, EPA actions implementing or giving effect to the proclamation are similarly beyond the Clean Air Act authority and *ultra vires*.

### COUNT THREE:

**Unlawful Executive Action in Violation of the Clean Air Act**
**(Nonstatutory Review for Violations of Federal Law by Federal Officials;**
**Against All Defendants)**

181.     Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

182.     Section 7412(i)(4) authorizes the President to exempt a stationary source only "for a period of not more than 2 years" that begins immediately following the statutorily-required determinations. With an end date of July 8, 2029—more than four years away—the Exemption Proclamation purports to grant exemptions exceeding the "period of not more than 2 years" that Congress prescribed to allow technology to become available or national security

issues to be resolved following the President's determinations, in violation of 42 U.S.C. § 7412(i)(4) and in excess of lawful authority.

183.    The Exemption Proclamation is unlawful because the President has not made and cannot make a determination that the technology to implement the 2024 Rule will not be available during the future period during which the exemption applies.

184.    The Exemption Proclamation is unlawful because the President has not made and cannot make a determination that it is in the national security interests of the United States to exempt sources from compliance with the 2024 Rule during the future period during which the exemption applies.

185.    Because the Exemption Proclamation is beyond the Clean Air Act authority and *ultra vires*, EPA actions implementing or giving effect to the proclamation are similarly beyond the Clean Air Act authority and *ultra vires*.

### COUNT FOUR:

**Unauthorized Executive Action in Disregard of Section 7412(i)(4)'s Inapplicability to Provisions Independently Justified under Statutory Authority Other than Section 7412 (Nonstatutory Review for Violations of Federal Law by Federal Officials; Against All Defendants)**

186.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

187.    The Exemption Proclamation is *ultra vires* as to the continuous emissions monitoring requirement because that requirement of the 2024 Rule rests on statutory authority independent of 42 U.S.C. § 7412—and hence beyond the scope of the exemption provision, which is limited to standards promulgated under "this section." 42 U.S.C. § 7412(i)(4).  The continuous emissions monitoring requirement was independently grounded on Section

7414(a)(1)(C) of the Clean Air Act, 42 U.S.C. § 7414(a)(1)(C) (authorizing EPA to require "any person who owns or operates any emission source … or who is subject to any requirement of this chapter" to install, use, or maintain monitoring equipment). *See* 89 Fed. Reg. at 38,562 (monitoring requirements "are specifically authorized by" 42 U.S.C. § 7414); 89 Fed. Reg. at 38535 (promulgating continuous emissions monitoring requirement based on "additional authority" under 42 U.S.C. § 7414). Because the continuous emissions monitoring requirement rests on legal grounds separate from Section 7412, the President cannot delay its implementation under Section 7412(i)(4). Insofar as it purports to exempt sources from the continuous emissions monitoring requirement, the Exemption Proclamation is *ultra vires*. 89 Fed. Reg. at 38,535 (promulgating continuous emissions monitoring requirement based on "additional authority" under Section 7414(a)(1)(C)).

188.    Because the Exemption Proclamation is beyond the Clean Air Act authority and *ultra vires*, EPA actions implementing or giving effect to the proclamation are similarly beyond the Clean Air Act authority and *ultra vires*.

## **RELIEF REQUESTED**

WHEREFORE Plaintiffs respectfully request that the Court:

189.    Declare that the Exemption Proclamation is unlawful and invalid and that the deadlines of the 2024 Rule remain as promulgated;

190.    Issue injunctive relief:

a.    prohibiting EPA and EPA Administrator Lee Zeldin from implementing, relying on, or giving effect to the Exemption Proclamation, including through its implementation of Clean Air Act Title V's operating permit program;

    b.   directing EPA to promptly notify, in writing, the operators of coal plants listed in Annex 1 and delegated state, local, and/or Tribal permitting authorities that the Exemption Proclamation is unlawful and invalid, and that any coal plants the Exemption Proclamation purported to exempt may not lawfully delay or avoid compliance with the deadlines promulgated by the 2024 Rule by relying on the Exemption Proclamation, and that EPA will object to any Title V permit which permitting authorities propose to issue which contain an exemption from compliance with the 2024 Rule in reliance on the Exemption Proclamation;

191.    Awarding Plaintiffs their fees and costs of litigation as authorized by law;

192.    Granting such other relief as the Court deems just and proper.

DATED:      June 12, 2025           Respectfully submitted,

                                    /s/ Nicholas Morales
                                    Nicholas Morales (D.C. Bar No. 1003942)
                                    James Pew (D.C. Bar No. 488201)
                                    Earthjustice
                                    1001 G Street NW, Suite 1000
                                    Washington, DC 20001
                                    Tel: (202) 667-4500
                                    nmorales@earthjustice.org
                                    jpew@earthjustice.org

                                    *Counsel for Plaintiffs Air Alliance Houston, Clean Air Council, Downwinders at Risk, Montana Environmental Information Center, and Sierra Club*

                                    Surbhi Sarang (CO Bar No. 56667, D.D.C. Bar ID CO0112)
                                    Richard Yates (*D.D.C. Admission Pending*)
                                    Tomás Carbonell (*D.D.C. Admission Pending*)
                                    Environmental Defense Fund
                                    2060 Broadway St., Ste. 300

Boulder, Colorado 80302
Tel: (303) 440-4901
ssarang@edf.org
ryates@edf.org
tcarbonell@edf.org

Sean H. Donahue (DC Bar No. 450940)
Donahue, Goldberg & Herzog
1008 Pennsylvania Ave., SE
Washington, DC 20003
Tel: (202) 277-7085
sean@donahuegoldberg.com

*Counsel for Plaintiff Environmental Defense Fund*
Patton Dycus (Georgia Bar. No. 236636)
Environmental Integrity Project
888 17th St. NW, Suite 810
Washington, DC 20006
(202) 296-8800
pdycus@environmentalintegrity.org

*Counsel for Plaintiff Environmental Integrity Project*

Sarah Buckley (Va. Bar No. 87350) *pro hac vice pending*
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 836-9555
sbuckley@nrdc.org

Katherine Desormeau (D.D.C. Bar ID CA00024)
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, California 94104
(415) 875-6100
kdesormeau@nrdc.org

*Counsel for Plaintiff Natural Resources Defense Council*

Brian H. Lynk (D.C. Bar No. 459525) (*DDC admission pending*)
Environmental Law & Policy Center
740 15th Street, NW, Suite 700
Washington, DC 20005
(240) 461-4241
blynk@elpc.org

*Counsel for Plaintiffs Environmental Law & Policy Center and Dakota Resource Council*


Shaun A. Goho (D.D.C. Bar ID MA0013)
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
617-624-0234
sgoho@catf.us

*Counsel for Plaintiff Citizens for Pennsylvania's Future*

Ryan Maher (D.C. Bar No. 1620024)
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
(781) 325-6303
rmaher@biologicaldiversity.org

*Counsel for Plaintiff Center for Biological Diversity*