# EXHIBIT 1

## Declaration of Stephanie Coates

## DECLARATION OF STEPHANIE COATES

I, Stephanie Coates, declare as follows:

1.      I submit this declaration on behalf of Environmental Defense Fund ("EDF") to support its litigation challenging President Trump's Proclamation, *Regulatory Relief for Certain Stationary Sources To Promote American Energy*, 90 Fed. Reg. 16777 (Apr. 21, 2025) ("Exemptions Proclamation"), exempting sources from compliance with the U.S. Environmental Protection Agency's ("EPA") final rule: National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 86 Fed. Reg. 38508 (May 7, 2024) ("Final Rule").

2.      I am a Climate & Health Project Manager at, and a member of, EDF. I work out of Houston, Texas, where I have lived since 2013. In my role as Climate & Health Project Manager I oversee a project that seeks to characterize concentrations of air toxics in Houston through mobile air monitoring and use these data in conjunction with health data from community health centers to assist community partners in creating disaster response plans. Prior to this role, I was a Community Air Quality Fellow with EDF working directly with grassroots, community-based organizations on their environmental justice priorities – with air quality being a concern among all the groups we work with in Houston. EDF also worked with the City of Houston and the community groups to create an automated

air quality report that is generated weekly using data from the community networks and local and state monitors to identify areas with the most National Ambient Air Quality Standards ("NAAQS") exceedances and pinpoint locations with readings above thresholds. The report also includes weather data to identify the likeliest source of the pollution at the time of exceedance. Additionally, EDF engaged with community-based organizations to inform the development of the Climate Vulnerability Index[1] – a tool combining 184 different datasets to rank more than 70,000 census tracts to see which communities face the greatest challenges from the impacts of a changing climate. Harris County ranks in the 85th national vulnerability percentile. Census tracts for the community groups we work with in Harris County rank among the top 10% most vulnerable in the nation. Environmental data included in the Climate Vulnerability Index give an indication of a census tract's proximity to transportation sources and exposures to and health risks from other stationary air pollutant sources. As a Fellow, I also supported the community groups in their successful application for an EPA Community Air

---

[1] *See*, U.S. Climate Vulnerability Index, Overall Climate Vulnerability for Tract 4820121250, https://map.climatevulnerabilityindex.org/map/cvi_overall/tract-48201212500-northeast-houston-houston-tx?mapBoundaries=Tract&mapFilter=9&reportBoundaries=Tract&geo Context=State (showing data for the Houston area).

Quality Monitoring Grant. The main goal of that award will be to conduct mobile monitoring for ethylene oxide, 1,3-butadiene, formaldehyde and acrolein.[2]

3.      I understand that the Final Rule addresses toxic pollution from coal-fired power plants by (1) lowering the mercury emission standard for coal plants burning lignite coal; (2) lowering the emission standard for toxic metals such as chromium, nickel, arsenic, lead and others for coal plants; (3) requiring coal plants to use continuous emissions monitoring systems to demonstrate compliance with the standard for non-mercury toxic metals; and (4) updating the definition of "startup" to require coal plants to turn on pollution controls more quickly upon startup. I understand that the Final Rule requires coal plants to comply with the first three requirements by July 8, 2027 and has required coal plants to comply with the new "startup" definition since January 2, 2025.

4.      I am also aware that the Exemptions Proclamation exempted 68 coal plants from the Final Rule's standards through July 8, 2029. See EPA, Presidential Proclamation – Regulatory Relief for Certain Stationary Sources to Promote American Energy, at https://www.epa.gov/stationary-sources-air-pollution/presidential-proclamation-regulatory-relief-certain-stationary (providing Annex 1 list of sources exempted by the President).

---

[2] *See*, EPA, EPA Awards Nearly $500,000 to Texas Organization to improve Air Quality in the Houston Area (Nov. 29, 2023), https://www.epa.gov/newsreleases/epa-awards-nearly-500000-texas-organization-improve-air-quality-houston-area#:~:text=The%20main%20goal%20is, butadiene%2C%20formaldehyde%2C%20and%20acrolein.

5.     EDF is deeply engaged in efforts to use monitoring data to inform the public about air pollution, and as explained above, I have been involved in some aspects of this work.[3]

6.     EDF has also assisted community groups in Pleasantville, Fifth Ward and Sunnyside to install community-owned air sensor networks measuring particulate matter 2.5 ($PM_{2.5}$), nitrous dioxide ($NO_2$), and volatile organic compounds. Even though these neighborhoods are overburdened by sources of air pollution such as concrete batch plants/crushers, freeways, metal recyclers, refineries and other industrial activities, the nearest regulatory air monitors are several miles away. By installing their own sensor networks, they are able to identify concerning trends of particulate pollution above NAAQS and with dangerous peaks affecting public health. With EDF's support, community-based organizations in Fifth Ward and Pleasantville were able to successfully advocate for additional state regulatory air monitors to be sited in their neighborhood and increased monitoring and enforcement by County and City officials.

7.     EDF has been working with the community of Sunnyside on the southside of Houston since 2020. After a community assessment and asset mapping, residents recognized that the abundance of pollution sources nearby was

---

[3] *See also* Comments of EDF on Texas Commission on Environmental Quality Proposed 2025 Annual Monitoring Network Plan (May 14, 2025).

directly impacting their health. Zip codes in Sunnyside are considered to have "high asthma burden" due to high utilization of emergency services to treat asthma attacks. EDF encouraged community leaders to join the City of Houston Asthma Coalition to educate residents on asthma management practices. EDF assisted community leaders in Sunnyside to install their air sensor network in 2021 and EDF has provided technical assistance to help residents understand and use the data, which show average $PM_{2.5}$ concentrations in 2023 measuring above NAAQS of 9 $\mu g/m^3$ 62% of the time. EDF is supporting Sunnyside's request that the Texas Commission on Environmental Quality include deployment of a new regulatory monitor in their neighborhood as part of the 2024 Air Monitoring Network Plan. Having information about emissions is essential to understanding public health impacts in these communities. Monitoring data from facilities is essential to ensuring that there is information about the air pollution communities are exposed to.

8.    I am aware that sources that are major under Clean Air Act Section 112 are subject to the Clean Air Act's Title V permitting requirements. Title V requires that "a copy of each permit application, compliance plan including the schedule of compliance), emissions or compliance monitoring report, certification, and each permit. . . shall be available to the public." 42 U.S.C. § 7661b(e).

9.      Prior to the Final Rule, coal plants that are major could choose to submit only quarterly stack testing results to EPA to demonstrate their compliance with the limits on toxic metals. With the Final Rule's requirement for plants to use continuous emissions monitoring systems, plants will submit hourly compliance data instead of being allowed to submit data from just four test days per year. I understand EPA requirements will further compel coal plants to report their continuous emissions monitoring data to the Emissions Collection and Monitoring Plan System, allowing the public to easily locate, review, and download emissions data using simple, user-directed inquiries. This provides a vital benefit to communities by enabling their access to more comprehensive pollution exposure data that can be used to evaluate individual and community health impacts. This also benefits EDF in its organizational goals to understand and increase awareness of exposure to air toxics and to limit those exposures.

10.      Communities are often concerned about emissions from nearby sources of pollution such as coal plants. Having access to hourly source-specific monitoring data that is required to be made available under the Final Rule and Clean Air Act Title V helps reveal the air pollution communities are exposed to and whether additional measures need to be taken in order to reduce pollution from these sources. For example, this data may reveal that a facility is having difficulty with their pollution controls, or that they are not adequately maintaining their

facility as needed to control emissions. Communities can use this data to advocate for better enforcement and compliance by local and state regulatory agencies. Additionally, continuous emissions monitoring will provide residents with more granular information about emissions from nearby coal plants, information they can use to make decisions to better protect their health, for example, whether or not to spend time outdoors, or if it is necessary to use personal protective equipment or air filters in homes and schools.

11.    I understand that EPA determined that continuous emissions monitoring could further reduce emissions of non-mercury metals by providing power plant operators with more frequent emissions data, allowing them to quickly identify and address issues with pollution control devices not functioning as expected.[4] EPA determined that this would likely reduce exposures to people living near coal-fired power plants subject to the updated non-mercury toxic metal standard.[5]

---

[4] EPA, National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review, 89 Fed. Reg. 38508, 38536-37 (May 7, 2024).
[5] *Id.*

12.     EDF frequently uses information about sources of air pollution to inform blog posts, reports, fact sheets, and other materials to increase public awareness of threats of air pollution from particular facilities.[6]

13.     EDF's ability to carry out its organizational mission to build a vital Earth for everyone is greatly benefited by the Final Rule's new monitoring requirements. The Final Rule allows EDF to expend fewer resources towards obtaining information about sources of air pollution in order to communicate threats about air pollution exposures to the public.

---

[6] *See, e.g.*, EDF & Environmental Integrity Project, Trump EPA Pollution Pass Map (2025), https://www.edf.org/maps/epa-pollution-pass; EDF, Making the invisible visible: A guide for mapping hyperlocal air pollution to drive clean air action (Oct. 1, 2019), https://www.edf.org/sites/default/files/content/making-the-invisible-visible.pdf; Matt Tresaugue, Houston neighborhood maps decades-old pollution problem, paving way for communities nationwide (Oct. 26, 2018), https://www.edf.org/blog/2018/10/26/houston-neighborhood-maps-decades-old-pollution-problem-paving-way-communities; Jeremy Proville, Understanding how communities are vulnerable to climate change is key to improving equity and justice (Mar. 29, 2023), https://blogs.edf.org/markets/2023/03/29/understanding-how-communities-are-vulnerable-to-climate-change-is-key-to-improving-equity-and-justice/; EDF Business, How Houston's model could change the way cities map air pollution, https://business.edf.org/insights/how-houstons-model-could-change-the-way-cities-map-air-pollution/; EDF, EPA Finds Valero Energy "Significantly Underestimated" Release of Pollution in Houston (Sep. 4, 2017), https://www.edf.org/media/epa-finds-valero-energy-significantly-underestimated-release-pollution-houston; EDF, Finding pollution – and who it impacts most – in Houston (Jun. 3, 2020), https://www.edf.org/airqualitymaps/houston/findings; EDF, Texas Explosion Underscores Need to Hold Polluters Accountable, Protect Community Health (May 6, 2023), https://www.edf.org/media/texas-explosion-underscores-need-hold-polluters-accountable-protect-community-health; Jolie Villegas, We Need to Close a Mercury Pollution Loophole for Lignite Coal Plants (Apr. 12, 2024), https://blogs.edf.org/climate411/2024/04/12/we-need-to-close-a-mercury-pollution-loophole-for-lignite-coal-plants.

14.     If coal plants are exempted from the Final Rule until 2029 or longer, EDF will be harmed by the loss of access to this monitoring data for two or more years.

15.     As someone who lives and works in Houston, Texas, I have concerns about my exposure to pollution from coal plants, including mercury, which I understand is associated with harms to the nervous system, kidney, and cardiovascular system, and from toxic metals like selenium, chromium, nickel, cobalt, cadmium, beryllium, lead, and manganese which I understand are associated with a variety of health effects including the potential to cause cancer. From my work I know that Houston air quality is plagued by the heavy presence of polluting industry, including coal-fired power plants.

16.     On June 4, 2024, I was diagnosed with non-hereditary breast cancer. I am concerned that the persistent presence of air pollution in my community, including the toxic pollution from coal plants that includes known carcinogens, could have increased my risk of developing cancer. I am also concerned that the ongoing toxic pollution from nearby coal plants will exacerbate my health condition and detract from my quality of life.

17.     I am concerned about my exposure to air pollution when my family and I spend time outdoors. My family only has one car, which is primarily used by my partner. When I need to run errands or go to appointments during the day, I

usually walk or bike. My family and I regularly walk to the park, coffee shop or to family's house on the weekends. My children walk to school and have recess outdoors most days. As children grow, their developing lungs and brains make them especially vulnerable to air pollution since they breathe more rapidly and inhale more air relative to their size than adults. I receive air quality alerts from the Texas Commission on Environmental Quality and have the Air Quality Index on my smartwatch face, so I am always aware of conditions. If the air quality is unhealthy for sensitive groups such as children, we limit our time outdoors. When there have been air pollution incidents like chemical fires in our region, I use the Clarity openmap and EDF Air Tracker tools to try to understand the threat to my area. I'm grateful that I am aware of such tools so that I can make decisions to protect my and my family's health.

18. We have several coal plants in the surrounding area. The closest coal plant to my home is the W.A. Parish Coal Plant. It is 25 miles from my home. Outside of Houston are also the Martin Lake plant in Tatum; the Oak Grove plant in Petteway; and the San Miguel plant in Christine. I am aware that these plants burn lignite coal, one of the dirtiest types of coal that produces high amounts of mercury emissions. I understand the Final Rule will place a more stringent emissions limit for non-mercury toxic metals for these plants, require them to use continuous emissions monitoring to demonstrate compliance with the limit on non-

mercury toxic metals, and require them to abide by more stringent startup conditions. I understand the Final Rule will require the Martin Lake, Oak Grove, and San Miguel plants to reduce their emissions of mercury.

19.    I also understand that all four of these plants are listed on "Annex 1" as plants that the Exemptions Proclamation exempts from the Final Rule's requirements through July 9, 2029. *See* Regulatory Relief for Certain Stationary Sources To Promote American Energy, 90 Fed. Reg. 16777 (Apr. 21, 2025); EPA, Presidential Proclamation – Regulatory Relief for Certain Stationary Sources to Promote American Energy, at https://www.epa.gov/stationary-sources-air-pollution/presidential-proclamation-regulatory-relief-certain-stationary (providing Annex 1 list of sources exempted by the President).

20.    The Exemptions Proclamation effected these suspensions of the Final Rule's requirements without rulemaking notice and an opportunity for me to comment, or for EDF to comment on my behalf.

21.    If I were given an opportunity to comment, or had EDF had the opportunity to comment on my behalf, I could have shared information about my exposures to air pollution and my concerns about my and my family's health as a result of pollution from coal plants and EDF could have shared information about the availability of technology needed for coal plants to comply with the Final Rule.

22.     Suspending the Final Rule's CEMS monitoring requirement harms me and EDF by denying me and the organization more detailed and regular information about coal plant toxic emissions that would have otherwise been available under the Final Rule. The exemptions mean we will instead need to rely on infrequent stack test information based on tests conducted merely four times a year.

23.     I believe the Final Rule's requirements will lead to improved air quality in the Houston area where I live, work, and raise my children. The Exemptions Proclamation harms me and my family by permitting coal plants to emit more pollution during the period of exemption than they would otherwise emit if required to comply with the Final Rule according to its original compliance schedule.

24.     The harms to me and my family would be redressed by a Court Order preventing federal authorities from implementing, enforcing, or recognizing the exemptions. Such a Court Order would ensure that coal plants install the emissions controls necessary to comply with the Final Rule and reduce the pollution harming my family and me.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Houston, TX on May 30, 2025.

Stephanie Coates

# EXHIBIT 2

## Declaration of Michelle L. Marley-Knox

## DECLARATION OF MICHELLE L. MARLEY-KNOX

I, Michelle L. Marley-Knox, declare as follows:

1.      My name is Michelle L. Marley-Knox. I am a citizen of the United States, am over 18 years of age, and am competent to give this declaration. All of the information provided is based on my own personal knowledge unless otherwise noted.

2.      I am a member of the Environmental Law & Policy Center ("ELPC") and have been involved with ELPC since approximately 2018. ELPC was instrumental in partnering with a coalition of solar businesses that I formed in 2018 and has since provided assistance to me and my business related to energy policy.

3.      I currently live in Owaneco, Illinois and have been in my current home since March of 1989. I have lived within thirty miles of the Kincaid power plant for my entire life and often see the pollution it emits from its coal stacks.

4.      I own WindSolarUSA, Inc., a renewable energy development company that focuses on designing and installing solar photovoltaics for residential, commercial, and agricultural applications. I formed WindSolarUSA, Inc. in September of 2008 in an effort to offer Illinoisans a level of self-sufficiency and sustainability utilizing clean energy products. We serve Central and Southern Illinois. I have customers living near the Kincaid power plant, including in Taylorville, Glenarm, Rochester, Auburn, Pawnee, Chatham, and Springfield, who have all made a choice to use clean energy for the production of their electricity in an effort to reduce our dependence on fossil fuels.

5.      I have completed significant training through the Midwest Renewable Energy Association and am an active member of the Illinois Clean Jobs Coalition, the Illinois Environmental Council, Sierra Club, the Natural Resources Defense Council, and other

1

organizations through which I take ongoing training to stay abreast of environmental and energy issues that affect our state, nation, and world. I have also served as an instructor of Solar Photovoltaics at Lincoln Land Community College and participate in Workforce Development Program interviews and feedback opportunities in terms of creating clean energy jobs in Illinois.

6.    I am involved in community and advocacy work related to environmental and energy issues. I participate every year in the Illinois Environmental Council's Lobby Days in Springfield, Illinois to educate legislators about the importance of clean air, water, and soil.  I also work to educate utilities about the importance of using storage to supplement their ability to store and dispatch clean energy in times of peak demand to avoid having to engage peaker plants that are generally aging and tend to be the dirtiest of our generating facilities.

7.    I engage with environmental and clean energy issues in both my business and volunteer work because it is important to me that future generations are able to enjoy clean air, clean water, and safe food.

8.    I enjoy outdoor recreational activities near the Kincaid power plant such as bicycling on the path from Taylorville to Pana and water activities at Shelbyville Lake. I have always enjoyed fishing, and I grew up fishing with my father in Kincaid Lake. As an adult, I used to enjoy camping at Sangchris Lake State Park and fishing in Sangchris Lake and Taylorville Lake. My friends and I had a lake lot on Taylorville Lake until a few years ago. Each of these lakes is near the Kincaid plant.

9.    Over recent years, I have come to understand that the waters in the lakes surrounding the Kincaid plant are contaminated by mercury and other pollutants stemming from the Kincaid plant. Mercury and other hazardous pollutants emitted into the air end up in fish because they settle into lakes or are washed into the water after settling on the ground. I understand

that fish in contaminated lakes can contain mercury, which is dangerous to human health. I have needed to stop fishing and swimming in the water in recent years due to the polluted water.

10.    I understand that compliance with the 2024 MATS Rule would improve air and water quality, provide accessible up-to-date emissions information, and help facilitate a transition to clean energy. I understand that the exemption from compliance with the 2024 MATS Rule given to the Kincaid power plant could lead to it operating as a coal-fired power plant for longer than planned and/or being subject to less stringent air toxics standards and monitoring requirements. This would increase air and water contamination.

11.    Everyone in my family suffers from a susceptibility to bronchitis at least once per year. We each must carry inhalers to use as needed for wheezing and shortness of breath. An increase in emissions of hazardous air pollutants from coal-fired power plants will adversely affect my health and the health of my family. Further, a lack of up-to-date emissions information would prevent my family and me from effectively evaluating the personal health risks we are exposed to on a day-to-day basis.

12.    I looked forward to the positive impacts of the 2024 MATS Rule and the planned closure of the Kincaid power plant so that I could enjoy camping and fishing in the nearby lakes again without concerns for my health. If mercury and air toxics emissions continue to increase, my ability to enjoy fishing and other outdoor recreational activities will be greatly compromised and will degrade my quality of life.

13.    Through my work, I know that Illinois has an aggressive Renewable Portfolio Standard ("RPS") that currently has a goal of 40% renewable energy for investor-owned utilities by 2030. That RPS is complimented by the IL Shines Program, which incentivizes all Illinoisans to choose solar energy. Granting an exemption to the 2024 MATS to the Kincaid plant – and other

plants in Illinois – goes against our state's goals and serves to keep Illinois dependent on sources of energy that have harmful effects to our air and water. This would result in chilling the urgency of people making clean energy choices, which would impact not only our environment and public health, but also the success of my own clean energy business. This exemption, if allowed to stand, will compromise the financial wellbeing of my business.

14.    Exempting the Kincaid power plant from the 2024 MATS Rule will significantly jeopardize my personal, health, recreational, and financial interests.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: _May 29, 2025_____

_Michelle L. Marley-Knox_
Michelle L. Marley-Knox

# EXHIBIT 3

## Supplemental Declaration
## of Michelle L. Marley-Knox

### SUPPLEMENTAL DECLARATION OF MICHELLE L. MARLEY-KNOX

I, Michelle L. Marley-Knox, declare as follows:

1.      My name is Michelle L. Marley-Knox. I am a citizen of the United States, am over 18 years of age, and am competent to give this declaration. All of the information provided is based on my own personal knowledge unless otherwise noted.

2.      I signed a declaration on May 29, 2025 as a member of Plaintiff Environmental Law & Policy Center in *Air Alliance Houston v. Trump*, No. 1:25-cv-01852 (D.D.C.), filed on June 12, 2025. All of the information in that declaration remains true and accurate. I give this supplemental declaration to assert new facts which were not relevant at the time of my initial declaration.

3.      I recently learned that a July 17, 2025 Presidential Proclamation extended an exemption from compliance with the 2024 MATS Rule to the Dallman Power Plant, Unit 4 ("Dallman 4"), in Springfield, Illinois.

4.      I live within approximately forty miles of Dallman 4.

5.      I serve as an advisor to Sustainable Springfield, Inc., and am helping to provide comments and information to City Council about creating an energy mix within the city that incorporates more solar and battery storage to help shave peak demand and levelize energy costs for ratepayers.

6.      Dallman 4 sits on Lake Springfield. There are many public parks directly across the lake from Dallman 4. I have hosted birthday parties in these parks, attended functions/fundraising events at clubs around the lake, and kayaked the lake. Though I would like to get in the water, swim, and/or fish, I cannot partake in these activities due to concerns about the water quality amplified by the close proximity of Dallman 4.

1

7.      My business, WindSolarUSA, has done many residential installations of solar PV systems in CWLP territory (Springfield's municipal utility). We have also done several installations in Rochester, Illinois, and around Lake Springfield, all of which are close to Dallman Unit 4's coal fired stacks.

8.      Given the proximity of Dallman 4 to my home and work sites, I redeclare the health, financial, recreational, and personal interests outlined in my initial declaration as they are similarly threatened by the exemption given to Dallman 4.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.


Executed on: _____8/8/2025_____


_____*Michelle L. Marley-Knox*_____
                                                    Michelle L. Marley-Knox

# EXHIBIT 4

## Declaration of Derf Johnson

## DECLARATION OF DERF JOHNSON

I, Derf Johnson, declare as follows:

1. I am over 18 years of age and competent to give this declaration. I have personal knowledge of the following facts, and if called as a witness could testify competently to them. As to those matters which reflect an opinion, they reflect my personal experience, opinion and judgment on the matter.

2. I am a lifelong resident of Montana, and currently reside in Helena, Montana.

3. I have been a member of the Sierra Club since 2018. I am also a member and an employee of the Montana Environmental Information Center ("MEIC"), at which I currently serve as Deputy Director and am responsible for overseeing and supporting programs seeking to maintain a clean and healthful environment for all Montanans. In those capacities, I have worked to address the environmental problems associated with natural resource extraction, with a specific focus on fossil fuel development and climate change.

4. I am a graduate of the University of Montana School of Law. I chose to stay in Montana after law school and begin my career in environmental and natural resources law. I regularly testify before the Montana legislature, state boards, and commissions, on the environmental impacts associated with energy development in Montana, including testimony on the pollution associated with such development. I feel strongly that Montana is one of the most beautiful and spectacular landscapes on Earth and must be protected.

5. I enjoy a variety of outdoor recreational activities. My hobbies include fishing, swimming, floating on water bodies and riverways, and hunting. I also find great joy in

observing the state's abundant wildlife, including bald eagles, elk, and grizzly bears. I

spend a majority of my leisure time outdoors and regularly travel around the state.

6.  I have regularly visited the Colstrip area for over a decade for both work and leisure

purposes. When I first started working at MEIC, I would travel to the Colstrip area once

every few months to meet with our members and assess the ecological and policy issues

in the area. Since 2016, I travel to the Colstrip area at least one to two times a year. My

most recent visit to Colstrip was in August 2024 where I witnessed and photographed

devastating ecological damage from the expansion of the Rosebud mine, the coal mine

directly adjacent to the Colstrip plant that exclusively supplies its coal, as well as the

power plant. I will continue visiting Colstrip and the surrounding area for both work and

pleasure, and I am currently planning a trip to southeastern Montana, including the

Colstrip area, in mid-June of 2025.

7.  I've always had an appreciation for the beautiful landscape of Eastern Montana with its

sandstone cliffs, grasslands, rolling hills, and Ponderosa Pine stands. Southeastern

Montana in particular is one of the more beautiful and majestic places that I've had the

good fortune of visiting. However, on my trips to Colstrip over the past decade, it is

really shocking to have watched the landscape continue to degrade because of the

Colstrip power plant and associated mining operations. It is disconcerting to see the

billowing smokestacks of toxic chemicals in the midst of an otherwise beautiful town

with abundant wildlife. The air pollution and other damage I have witnessed, caused by

the Colstrip plant, significantly degrades my experience visiting southeastern Montana.

At times, I've seen Colstrip's pollution billowing into the sky on the horizon from thirty

or forty miles away.

8.  I am aware that coal-fired power plants, including Colstrip, emit mercury, toxic metals, particulate matter, sulfur dioxide, nitrogen oxides, and other pollutants which have been linked to serious health complications. I am also aware that these pollutants can be significantly mitigated with pollution controls which the Colstrip plant operators have for decades refused to install. When I'm visiting the area surrounding Colstrip, I'm concerned that I'm being exposed to the hazardous air pollution emitted by Colstrip and the health harms it may cause. My potential exposure to these hazardous air pollutants in the Colstrip region diminishes my enjoyment of activities and makes me concerned for my personal wellbeing. I also know that certain populations are at higher risk for these complications, and it disgusts me that despite evidence on the public health impacts of pollution, modern industry standard pollution controls are not in place at the Colstrip facility. It's alarming that Colstrip knowingly emits harmful pollutants that are linked to illness and death when there are proven technologies to reduce emissions at most (if not all) coal fired power plants in the same class as the Colstrip plant.

9.  I have also visited and hunted in the Tongue River Valley on a private ranch about 40 miles as the crow flies from the Colstrip plant. I have every intention to continue visiting the ranch in the future. However, I am deeply concerned about my health and the health of the wildlife that live in this region. Wildlife breathe air and drink water just like people, and I am worried about what kinds of ailments may result from living downwind of the ongoing pollution from the Colstrip plant. I am also aware of the poisoning risks associated with consuming wildlife with bioaccumulated toxics in their tissues. My worry ultimately diminishes my enjoyment of hunting and outdoor recreation in the area, but especially when I am skeptical of being able to safely consume my game.

10. I am aware that the EPA - through the Mercury and Air Toxics Standards ("MATS")- set standards to reduce toxic pollution from coal-fired power plants, which reduces the impact of this pollution. I also understand that EPA has recently updated those standards in a new Technology Review for coal-fired power plants. As a result of that review EPA has, among other things, set lower standards for particulate matter, as a surrogate for toxic metals, emitted by the Colstrip and other coal-fired power plants.

11. I wholeheartedly believe that clean air is absolutely critical for sustaining life in the region. I also do not enjoy being exposed to these pollutants when I travel to the Colstrip area for work or when I am traveling through the town to other locations. I am concerned about the ongoing pollution from the Colstrip power plant from an environmental and public-health perspective.

12. In its rule, EPA established July 2027 as the compliance deadline for the strengthened standards, allowing Colstrip 3 years to achieve compliance. Based upon the amount of pollution that has already been released from Colstrip's sub-par pollution control technology, I view this timeline as incredibly generous. I am extremely concerned that the President has granted an additional 2-year exemption from compliance to Colstrip.

13. I am confident that I would be harmed if Colstrip was able to avoid the new MATs standards for an additional two years. Emissions of particulate matter (including toxic metals) from Colstrip and other existing coal plants would continue at high levels during this time, therefore prolonging the amount of air pollution to which I, my family, and my friends are exposed. If this level of pollution were to continue at the current harmful levels for an additional two years, I would feel less safe on my work and recreational trips to the area, and my enjoyment in doing so would be reduced.

14. If the Colstrip plant were required to reduce its pollution levels during this time, I would feel much more comfortable visiting the area knowing that I'm less likely to be exposed to toxic pollution and would consider visiting the Colstrip area more often.

15. For these reasons, I support MEIC's lawsuit challenging the MATS exemptions and the attempt to stop them from having effect. I believe that if Colstrip is not exempted from compliance with the strengthened MATS Rule by July 2027, my concerns over air pollution and toxic exposure would be at least partially alleviated.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of May 2025, in Helena, Montana.

Derf Johnson

# EXHIBIT 5

## Declaration of Catherine Fleischman

## DECLARATION OF CATHERINE FLEISCHMAN

I, Catherine Fleischman, hereby declare as follows:

1.     I am currently a member of the Natural Resources Defense Council ("NRDC") and joined in 2025.

2.     I live in Davis, West Virginia. I have lived at my current residence full time since 2024, and I have lived here part time since 1999.

3.     I spend a significant amount of time outside. I bought this property 30 years ago and retired here specifically because I spend a lot of time outside. I mountain bike, cross country ski, hike, and camp. I am a master naturalist, an avid birder, and I am on the trail maintenance board of the Heart of the Highlands.

4.     I personally do not have asthma, but I have concerns that because of environmental deregulation, I will not know what the quality of my air is. I remember in the 1970s that we worked to address the impact of acid rain and smog, and I know of the impact of these and other environmental harms. We have seen huge improvements in air quality since the 1970s, but without regulations, we will not have any ability to know if our air is damaged or unsafe. I am also concerned about my neighbors who are particularly sensitive to air quality – some are on oxygen or have difficulty breathing, and I am concerned about them.

5.     I was in West Virginia when the fires in Canada brought all the smoke and haze to our air and I am concerned about coal companies having all the say

about what is in the air – it's everyone's air, not just the coal companies' air! If there were such a thing as clean coal, I would support it, but the current administration gives me no indication that the coal is "clean," as they put it.  I am aware that fossil fuels pollute, and coal is a fossil fuel. Mt. Storm burns fossil fuels. There has to be a strong regulatory system to combat the effects of putting pollutants in the air. Davis, West Virginia, where I live, is a high elevation bog, which means that air quality tends to bottle up here because of the valley and the high elevation of the mountains surrounding it. This is a process called inversion, so I'm particularly worried about air quality in my area that results from pollution.

6.      I keep track of the air quality in my area by looking at the NOAA website. There is also a weather station near Dolly Sods that reports air quality data, and we often get data from here. We are in an area where cold air sinks and we often record the lowest temperatures in the lower 48. This tendency keeps pollutants in our area longer. I look at my smartphone or check the news for information on air quality every day. If the air quality is bad, I try to limit my outdoor activities, because if I don't, I notice fatigue and lethargy from poor air quality. I have a dehumidifier that filters air quality in my house and an air conditioner unit in my house that filters air.

7.      I am concerned about the Mt. Storm power plant near me because it is a fossil fuel plant. I have at times noticed a smell from Mt. Storm, and I have seen

the stacks there for years. I have seen the coal from the mine down the road heading towards Mt. Storm. I can see what is coming out of the smokestacks, and I can see that it comes out 24 hours a day, 7 days a week. I'm a homeowner with solar panels, so I know that there is technology out there that works better than fossil fuel burning. I know we need to transition from burning fossil fuels, and I know that the technology to transition is available, we just need to make the transition. I think that Mt. Storm should do everything it can to limit its toxic air pollution so that it emits very small amounts of pollution - such small amounts of pollution that the environment can dilute it. We need to train ourselves to not add to the toxic burden in our environment, and we should work towards being "net neutral."

8.      I am aware that the U.S. EPA finalized new, stronger standards to reduce toxic soot pollution and mercury pollution from power plants in 2024. Some facilities, including Mt. Storm received an exemption from complying with these standards in 2025. I want power plants to do everything they can to meet toxic air pollution standards sooner rather than later, and in particular because of our environmental crisis. Allowing standards to not be met impacts the very near future just as much as it impacts the present. We have answers to this environmental dilemma that are better answers than deregulation. I fully support

NRDC's lawsuit challenging these exemptions from standards for toxic air pollution from power plants.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on May 29, 2025.

Signature: _____

Name: Catherine Fleischman

# EXHIBIT 6

## Declaration of Barbara Sue

## DECLARATION OF BARBARA SUE

I, Barbara Sue, hereby declare as follows:

1.     I am currently a member of the Natural Resources Defense Council ("NRDC") and have been for about one year.

2.     I live in Macon, Georgia. I have lived at my current residence since 2003, and I moved back to Georgia in 2001.

3.     I limit the amount of time I spend outside because I have such severe allergies. I used to like to walk outside a lot, but now I do much of my exercises indoors. I limit my time outside to yardwork, watering my plants, cleaning out the bird baths, and tending to the plants on the porch.

4.     I have very severe ongoing allergies – they are not just limited to spring and summer, they last throughout the year, and they get worse and worse every year. I have sinus problems for which I take a number of medications, and I get frequent sinus infections which cause me to need antibiotics. I also now have fluid in my ears that I think the allergies have contributed to as well. My husband also has allergies, but he does not have them as bad as me. My adult daughter, who lives nearby, also gets severe allergies and migraines, like me. I was prescribed albuterol by my doctor since I was coughing at night and occasionally experiencing chest tightness. I thought my allergies were just attributable to pollen, but I am now concerned that they are exacerbated by air pollution.

1

5.    I sometimes keep track of the air quality on my smartphone or watch, but since I try to limit my time outside, I do not keep track of it regularly. I have an air purifier in my bedroom to help with my allergies.

6.    Ever since I moved back to Georgia, my allergies have gotten worse. I am concerned about the impact that climate change is having on our environment, and that those impacts are also contributing to my allergies. For example, because of climate change, the plants are blooming earlier and earlier and releasing their pollen earlier than usual. I live near the Scherer power plant, and I'm concerned that air pollution plays a role in my allergies as well.

7.    I believe we should do everything in our power to make sure that the air and water is not uninhabitable for animals and for biodiversity – we need everything on the planet to help clean the planet, and everything is interconnected. We are animals too, and we need to be good stewards of the planet. The current administration at EPA is trying to repeal regulations, and rolling back these regulations will set us back one hundred years.

8.    I am very concerned that Georgia Power has gotten a two-year extension for their power plants. I want power plants to do everything that they can to clean up their toxic pollution – we are caretakers of the world, and we need to do better. God did not make us caretakers of the animals and the earth so we could be supreme over them, it's our responsibility to care for them. Now that we know

how to take care of the earth, we can and should right all the wrongs we did to the planet unintentionally. Now that we know better, we should do better, and shame on us for not doing that.

9.      I am aware that the U.S. EPA finalized new, stronger standards to reduce toxic soot pollution and mercury pollution from power plants in 2024. Some facilities, including Scherer, received an exemption from complying with these standards in 2025. I want power plants to do everything they can to meet toxic air pollution standards as soon as possible, and I do not think deregulation is the answer. I fully support NRDC's lawsuit challenging these exemptions from standards for toxic air pollution from power plants.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on May 28, 2025.

Signature: _____

Name: Barbara Sue

# EXHIBIT 7

**Amended Motion for Stay**

***North Dakota v. EPA***, No. 24-1119 (D.C. Cir.)

**ORAL ARGUMENT NOT YET SCHEDULED**
**Case No. 24-1119 (and consolidated cases)**

# United States Court of Appeals
# For the District of Columbia Circuit

STATE OF NORTH DAKOTA, STATE OF WEST VIRGINIA, et al.,

Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

On Petition for Judicial Review of Final Agency Actions of the United States
Environmental Protection Agency, 89 Fed.Reg. 38508 (May 7, 2024)

## AMENDED MOTION FOR STAY

PATRICK MORRISEY
Attorney General

LINDSAY S. SEE
Solicitor General
MICHAEL R. WILLIAMS
Principal Deputy Solicitor General
Office of the Attorney General of
West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
lindsey.s.see@wvago.gov
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

DREW H. WRIGLEY
Attorney General

PHILIP AXT
Solicitor General
600 E Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: 701.328.2210
pjaxt@nd.gov

NESSA HOREWITCH COPPINGER
DAVID M. FRIEDLAND
Special Assistant Attorneys General
1900 N Street NW, Suite 100
Washington, DC 20036
ncoppinger@bdlaw.com
dfriedland@bdlaw.com

*Counsel for State of North Dakota*

*Additional Counsel Listed in Signature Block*

Date: **June 07, 2024**

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 18(a)(4), 27, and 28(a)(1)(A), Petitioners

certify:

## A.    Parties, Intervenors, and *Amici* to this Case (No. 24-1119)

Petitioners: State of North Dakota, State of West Virginia, State of Alaska, State of Arkansas, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, Commonwealth of Virginia, and State of Wyoming.

Respondent: The United States Environmental Protection Agency.

Proposed Intervenors:  (1) Air Alliance Houston, Alliance of Nurses for Healthy Environments, American Academy of Pediatrics, American Lung Association, American Public Health Association, Chesapeake Climate Action Network, Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, Downwinders at Risk, Environmental Defense Fund, Environmental Integrity Project, Montana Environmental Information Center, Natural Resources Council of Maine, Natural Resources Defense Council, the Ohio Environmental Council, Physicians for Social Responsibility, and Sierra Club moved to Intervene on June 3, 2024; (2) State of Massachusetts, State of Minnesota, State of Connecticut, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of New Jersey, State of New York, State of Oregon, State of Pennsylvania, State of Rhode Island, State of Vermont, State of Wisconsin, District of Columbia, City of Baltimore, City of Chicago, City of New York moved to intervene on June 6, 2024; (3) San Miguel Electric Cooperative, Inc. moved to intervene on June 7, 2024.

Proposed *Amici*: None at present.

- ii -

**B.    Rulings Presented for Review**

Final rule entitled *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*.  89 Fed.Reg. 38508 (May 7, 2024).

**C.    Parties, Intervenors, and Amici in Related Cases in this Circuit**

Consolidated cases: (1) *NACCO Natural Resources Corp. v. EPA and Michael S. Regan*, No. 24-1154; (2) *National Rural Electric Cooperative Association, Lignite Energy Council, National Mining Association, Minnkota Power Cooperative, Inc., East Kentucky Power Cooperative, Inc., Associated Electric Cooperative Inc., Basin Electric Power Cooperative, and Rainbow Energy Center, LLC v. EPA and Michael S. Regan,* No. 24-1179; and (3) *Oak Grove Management Company LLC and Luminant Generation Company LLC v. EPA and Michael S. Regan*, No. 24-1184.


/s/ Philip Axt
PHILIP AXT
Solicitor General of North Dakota


- iii -

## CERTIFICATE OF COMPLIANCE WITH RULES 18(A)(1) AND (A)(2)

The undersigned certifies that this motion complies with Fed. R. App. P. and D.C. Cir. R. 18(a)(1).  On May 14, 2024, Petitioners submitted to EPA a Request for Administrative Stay Pending Judicial Review of the *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, published in the Federal Register at 89 Fed.Reg. 38508 (May 7, 2024).  EPA acknowledged receipt of this request on May 21, 2024, but has not otherwise responded.

In accordance with Fed. R. App. P. and D.C. Cir. R. 18(a)(2), counsel for Petitioners notified EPA's counsel by voicemail and email on June 3, 2024, that Petitioners planned to file this motion.  EPA opposes this motion.

*/s/ Philip Axt*
PHILIP AXT
Solicitor General of North Dakota

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................v

TABLE OF AUTHORITIES ......................................................................vi

GLOSSARY OF KEY ABBREVIATIONS AND ACRONYMS ...........................x

INTRODUCTION ........................................................................................1

BACKGROUND ..........................................................................................2

ARGUMENT ...............................................................................................5

I.  Petitioners Are Likely to Prevail on the Merits..................................6

    A.  The Rule Violates Clean Air Act Section 112(d)(6) Because Revising the MATS Standard Is Not "Necessary"................................................6

    B.  The Rule is Arbitrary and Capricious for Multiple Reasons ...............8

II.  Petitioners Will Suffer Imminent and Irreparable Harm Absent a Stay .......17

    A.  Petitioner States Will Suffer Irreparable Economic Harm..................17

    B.  The Rule's Compliance Costs and Infeasible Standards Risk Catastrophic Consequences for the Power Grid .................................18

III.  The Balance of Harms and the Public Interest Favor a Stay.........................22

CONCLUSION ..........................................................................................23

CERTIFICATE OF COMPLIANCE.........................................................30

CERTIFICATE OF SERVICE ..................................................................30

(Page 5 of Total)

# TABLE OF AUTHORITIES

## **Cases**

*Ass'n of Battery Recyclers v. EPA*,
  716 F.3d 667 (D.C. Cir. 2013).............................................................8

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ............................................................17

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*,
  785 F.3d 1 (D.C. Cir. 2015)..................................................... 11, 12

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019)............................................................ 14, 16

*La. Envtl. Action Network v. EPA*,
  955 F.3d 1088 (D.C. Cir. 2020)..........................................................6

*Mexican Gulf Fishing Co. v. U.S. Dep't of Comm.*,
  60 F.4th 956 (5th Cir. 2023) ............................................................10

*Michigan v. EPA*,
  576 U.S. 743 (2015)......................................... 1, 9, 10, 18, 19

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
  463 U.S. 29 (1983)..............................................................8, 12

*Nat. Res. Def. Council v. EPA*,
  529 F.3d 1077 (D.C. Cir. 2008)................................................ 7, 8, 9

*Portland Cement Ass'n v. EPA*,
  665 F.3d 177 (D.C. Cir. 2011)...........................................................13

*Sierra Club v. EPA*,
  895 F.3d 1 (D.C. Cir. 2018).................................................................2

*Sierra Club v. Ga. Power Co.*,
  180 F.3d 1309 (11th Cir. 1999) .......................................................22

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) .................................... 12, 19, 21, 22, 23

(Page 6 of Total)

*West Virginia v. EPA*,
    597 U.S.697, 735 (2022)................................................................. 14, 15

*West Virginia v. EPA*,
    90 F.4th 323 (4th Cir. 2024) ..................................................................22

*Wyoming v. Dep't of Interior*,
    493 F. Supp. 3d 1046 (D. Wyo. 2020)...............................................9

**Statutory Authorities**

Clean Air Act § 112
    42 U.S.C. § 7412......................................................................................2

    42 U.S.C. § 7412(c)(9)(B)(i)....................................................................8

    42 U.S.C. § 7412(d)(6) ................................................................... 3, 6, 7

    42 U.S.C. §§7412(f)(2)..............................................................................3

**Rules and Regulations**

Executive Order No. 13990, Protecting Public Health and the Environment and
    Restoring Science to Tackle the Climate Crisis,
    86 Fed. Reg. 7037 (Jan. 25, 2021)................................................ 3, 4, 14

National Emission Standards for Coke Oven Batteries,
    69 Fed. Reg. 48338 (Aug. 9, 2004) .......................................................4

National Emission Standards for Organic Hazardous Air Pollutants From the
    Synthetic Organic Chemical Manufacturing Industry,
    71 Fed. Reg. 76603 (Dec. 21, 2006).......................................................4

National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-
    Fired Electric Utility Steam Generating Units and Standards of Performance for
    Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small
    Industrial-Commercial-Institutional Steam Generating Units,
    77 Fed. Reg. 9304 (Feb. 16, 2012) ..................................................3, 12

National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired
    Electric Utility Steam Generating Units—Reconsideration of Supplemental
    Finding and Residual Risk and Technology Review,
    85 Fed. Reg. 31286 (May 22, 2020).......................................................3

(Page 7 of Total)

National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired
    Electric Utility Steam Generating Units Review of the Residual Risk and
    Technology Review,
    88 Fed. Reg. 24854 (Apr. 24, 2023) ...................................................................4, 5

National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired
    Electric Utility Steam Generating Units Review of the Residual Risk and
    Technology Review,
    89 Fed. Reg. 38508 (May 7, 2024) ................ 2, 5, 6, 7, 8, 9, 10, 11, 14, 17, 20, 22

D. C. Cir. R. 18(a)(1) ........................................................................................ iv, 5

D. C. Cir. R. 18(a)(2) ............................................................................................. iv

**Docketed Materials**

Coal Conversion Counties Ass'n Comment,
    EPA-HQ-OAR-2018-0794-6003 ...........................................................................11

Lignite Energy Council Comment,
    EPA-HQ-OAR-2018-0794-5957 ...........................................................................11

Minnkota Power Coop. Inc. Comment,
    EPA-HQ-OAR-2018-0794-5978 ...........................................................................12

Nat'l Min. Ass'n Comment,
    EPA-HQ-OAR-2009-0234-20531 .........................................................................13

Nat'l Mining Ass'n Comment,
    EPA-HQ-OAR-2018-0794-5986 ...........................................................................11

Power Generators Air Coalition Comment,
    EPA-HQ-OAR-2018-0794-5994 ...........................................................................12

Rainbow Energy Center Comment,
    EPA-HQ-OAR-2018-0794-5990 ...........................................................................12

Westmoreland Mining Holdings Comment,
    EPA-HQ-OAR-2018-0794-5935 ................................................................... 10, 11

## Additional Authorities/Scientific Studies/Additional Materials

2023 Technology Review for the Coal- and Oil-Fired EGU Source Category ("2023 Tech Review") ...........................................4, 5

2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-Fired EGU Source Category ("2024 Tech Update") ..................................4, 5

Black's Law Dictionary (11th ed. 2019) ..................................6

Cass, R. *Staying Agency Rules: Constitutional Structure and Rule of Law in the Administrative State*, 69 Admin. L. Rev. 225, 254-57 (2017)...............................2

EPA, *Biden-Harris Administration Finalizes Suite of Standards to Reduce Pollution from Fossil Fuel-Fired Power Plants* (Apr. 25, 2024)........................13

FERC-NERC-Regional Entity Staff Report: *The February 2021 Cold Weather Outages in Texas and the South Central United States* (Nov. 16, 2021) .............18

Geman, *EPA floats path on electricity CO2 emissions—with an asterisk*, Axios (Mar. 11, 2022)..........................................15

Milman, *New US climate rules for pollution cuts 'probably terminal' for coal-fired plants*, Guardian (May 2, 2024)..........................................16

PBS, EPA Administrator Michael Regan discusses Supreme Court ruling on climate change, YouTube (June 30, 2022) ..........................................16

Power Sector Strategy: Climate, *Public Health, Environmental Justice, Briefing for Gina McCarthy and Ali Zaidi* (Feb. 4, 2021) ..................................15

Pratson et. al., *Fuel Prices, Emission Standards, and Generation Costs for Coal v Natural Gas Power Plants*, Am. Chem. Soc'y, Env'l Sci. & Tech., 4929 (Mar. 2013)..................................13

U.S. Energy Info. Admin., *Planned coal-fired power plant retirements continue to increase* (Mar. 20, 2014) ..................................13

White House, *Press Gaggle by Principal Deputy Press Secretary Karine Jean-Pierre & Env't Prot. Agency Adm'r Michael Regan* (Feb. 17, 2022).........16

*Authorities on which Petitioners chiefly rely are marked with asterisks.

- ix -

# GLOSSARY OF KEY ABBREVIATIONS AND ACRONYMS

| Abbreviation Or Acronym | Defined |
|---|---|
| CAA | Clean Air Act |
| EGU | Electric Utility Steam Generating Units |
| EPA | Environmental Protection Agency |
| fPM | Filterable Particulate Matter |
| HAP | Hazardous Air Pollutant |
| Hg | Mercury |
| MATS | Mercury and Air Toxics Standards |
| RIA | Regulatory Impact Analysis |

- x -

## INTRODUCTION

With this Rule, EPA is ratcheting down the Mercury and Air Toxics Standards (MATS) for coal-fired power plants by 66-70%. The implementation costs will be substantial, power plants may be forced onto early retirement tracks, and power grid reliability will be threatened. Conversely, there is no relevant public health benefit from the mandated reduction in hazardous air pollutant (HAP) emissions. None. EPA recognizes that the 2012 MATS rule already reduced HAP emissions **well below** any threshold that would impact public health.

Petitioners will establish multiple legal infirmities on the merits requiring the Rule be set aside. But that victory will be meaningless absent a stay, because to comply with the Rule's three-year deadline for implementing the mandated changes (or retiring if they cannot), power plants need to take action immediately. EPA knows this. The last time the MATS Rule was litigated, the Supreme Court held EPA acted "unreasonably when it deemed cost irrelevant to the decision to regulate power plants." *Michigan v. EPA*, 576 U.S. 743, 760 (2015). But the victory proved hollow, because without a stay while the merits were heard, power plants were forced to make compliance and retirement decisions, resulting in billions expended and many plant closures in response to an unlawful regulation. The last time the MATS Rule was litigated is a textbook example for when agency rules should be

- 1 -

stayed.  *E.g.*, Ronald Cass, *Staying Agency Rules: Constitutional Structure and Rule of Law in the Administrative State*, 69 Admin. L. Rev. 225, 254-57 (2017).

While EPA claims this Rule will have no impact on the power grid or energy prices, Petitioners have included with this motion an array of declarations from power plants and State regulators attesting that is not the case.  And EPA has an established record of grossly understating the effect its rules will have on the power grid.  The last time the MATS Rule was litigated, EPA assured the country that it would only cause about 5,000 MW to go offline.  EPA was wrong.  The number ended up being closer to 60,000 MW.  Our power grids do not have the same buffer of dispatchable energy that they did a decade ago.  If EPA is wrong to the same degree that it was last time, the impact to our power grids will be substantial.

Petitioners ask the Court to preserve the status quo by staying the Final Rule until the merits of this dispute are resolved.  An expedited briefing schedule will limit the duration of any such stay.

## BACKGROUND

Section 112 of the Clean Air Act (CAA) (codified at 42 U.S.C. § 7412) provides EPA statutory authority to set emission levels for certain HAPs enumerated in Section 112(b)(1).  *Sierra Club v. EPA*, 895 F.3d 1, 7 (D.C. Cir. 2018).  As EPA acknowledges, "Congress intended for CAA Section 112 to achieve significant reductions in HAP."  89 Fed.Reg. at 38535.

- 2 -

EPA issued the original MATS rule for HAP emissions from coal- and oil-fired electric generating units (EGUs) in 2012. 77 Fed.Reg. 9304 (Feb. 16, 2012). That rule identified different achievable control standards for mercury from EGUs that use lignite coal compared to other types of coal. The distinction was based on science: lignite is more variable than other types of coal and available technologies cannot consistently achieve the same control levels. 77 Fed.Reg. at 9393.

Eight years after a HAP emission level is set, EPA must evaluate if any "residual risks" remain to public health from those HAP emissions and whether there have been any developments in available control technologies. 42 U.S.C. §§7412(f)(2), (d)(6). EPA calls these the Residual Risk and Technology Reviews.

In 2020, EPA conducted those reviews for the MATS Rule. For the Residual Risk Review, EPA "determined that the current [standard] provides an ample margin of safety to protect public health and prevent an adverse environmental effect." 85 Fed.Reg. 31286, 31314 (May 22, 2020). And for the Technology Review, EPA determined there were no developments in emission control technologies, practices, or processes that warranted revising the MATS Rule. *Id.* at 31298.

But six months later there was a change in presidential Administration and Executive Order 13990, entitled "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis," which directed EPA to consider "suspending, revising, or rescinding" the 2020 Residual Risk and Technology

- 3 -

Reviews for the MATS Rule.  86 Fed.Reg. 7037 (Jan. 25, 2021).  That was so despite the fact that EPA's authority for promulgating the MATS Rule under CAA Section 112 has nothing to do with climate change—it is about protecting the public from specified HAPs, not greenhouse gases.

Following Executive Order 13990, EPA reconsidered its 2020 Residual Risk and Technology Reviews for the MATS Rule.  For public health, EPA reached the same conclusion.  88 Fed.Reg. 24854, 24895 (Apr. 24, 2023) ("the residual risk assessment showed all modeled exposures to HAP to be below thresholds for public health concern.").  That should have been the end of it.  In other Section 112(d)(6) rulemakings, EPA has taken the position that if its standards already "provide an ample margin of safety to protect public health and prevent adverse environmental effects, one can reasonably question whether further reviews of technological capability are 'necessary.'"  69 Fed.Reg. 48338, 48351 (Aug. 9, 2004); *see also* 71 Fed.Reg. 76603, 76608 (Dec. 21, 2006).  But EPA pressed on.

For its technology re-review, EPA again found "no new practices, processes, or control technologies" for the relevant HAP emissions.  88 Fed.Reg. at 24868.  The control technologies used in 2012 are the same as today.  *See* 2023 Technology Review for the Coal- and Oil-Fired EGU Source Category ("2023 Tech Review") at 1; 2024 Update to the 2023 Proposed Technology Review for the Coal- and Oil-

- 4 -

Fired EGU Source Category ("2024 Tech Update") at 17, 50.[1]  Undeterred, to justify revising the standards, EPA points to alleged cost efficiencies for using those technologies, concluding those alleged efficiencies mean that all coal-fired plants, regardless of configuration or coal type, can now meet a 66% lower surrogate fPM emission standard for non-mercury HAPs.  89 Fed.Reg. at 38530.[2]  For mercury, EPA concludes lignite is now capable of meeting the same control standard as other types of coal, dropping the emission standard by 70%.  89 Fed.Reg. at 38586.  Coal-fired power plants must meet the new standards in three years or be on a retirement track.  89 Fed.Reg. at 38519.

## ARGUMENT

The Court should stay the Rule while the merits are resolved because Petitioners are likely to prevail on the merits of their claims, Petitioners will suffer irreparable harm in the absence of a stay, and the balance of harms and public interest favor a stay.  D.C. Cir. R. 18(a)(1).

---

[1] For non-mercury HAPs, the control technology remains electrostatic precipitators and fabric filters, and for mercury the control technology remains activated carbon injection.  2023 Tech Review at 16–18; 2024 Tech Update at 30–32.

[2] The Final Rule uses filterable particulate matter (fPM) as a surrogate for measuring the non-Hg metal HAP emissions. 89 Fed.Reg. at 38508.

- 5 -

## I.   Petitioners Are Likely to Prevail on the Merits

### A.   The Rule Violates Clean Air Act Section 112(d)(6) Because Revising the MATS Standard Is Not "Necessary"

EPA issued this Rule under CAA Section 112(d)(6), which permits revising HAP emission standards only as "necessary (taking into account developments in practices, processes, and control technologies)."   42 U.S.C. § 7412(d)(6).   The operative phrase is "revise as necessary," and "EPA must consider practical and technological advances" when determining whether revision is "necessary."   *La. Envtl. Action Network v. EPA,* 955 F.3d 1088, 1097-98 (D.C. Cir. 2020).

The Rule's revisions are not "necessary" for several reasons.[3]  For one, there is no relevant public health benefit.   EPA acknowledges current HAP emission standards provide an ample margin of safety to protect public health and does not identify *any* quantifiable health benefit from the Rule's further reduction in HAPs. 89 Fed.Reg. at 38558-59.  The alleged health "benefits" EPA purports to quantify— reducing criteria pollutants and greenhouse gases, *id.* at 38561-62—cannot serve as a basis for exercising Section 112(d)(6) authority.

Absent any relevant public health benefits from the Rule, EPA claims the revisions are "necessary" due to "developments" in controlling HAP emissions.  *Id.* at 38518.  But even if a "development" in control technologies could make revising

---

[3] Black's Law Dictionary (11th ed. 2019) (*Necessary*: "needed for some purpose or reason; essential.").

- 6 -

a HAP emission standard that provides no relevant health benefits "necessary" under Section 112(d)(6), EPA identified no new technologies, practices, or processes that would justify revising the MATS Rule. 42 U.S.C. § 7412(d)(6). The primary control technologies used today are the same as they were the last two times EPA undertook a technology review. 89 Fed.Reg. at 38517-18.

Rather than pointing to any new technology, EPA interprets "development" to mean cost-efficient compliance with already-existent technology. *Id.* at 38510. That interpretation of "development" is an atextual attempt to expand EPA's regulatory reach. *Cf. Nat. Res. Def. Council v. EPA*, 529 F.3d 1077, 1084 (D.C. Cir. 2008) (Section 112(d)(6) rulemaking revises "*technology-based* standards in light of *technological* developments" and requires identification of "*technological innovations*") (emphases added).

EGUs are *required* to comply with HAP emission standards after they are issued, and they must comply with a margin that accounts for fuel variability to consistently meet the emission standard 100% of the time. EPA's interpretation of such compliance as a "development" warranting further rulemaking constitutes a significant power grab—ignoring Section 112(d)(6)'s constraint to only revise the standards as "necessary," and empowering EPA to drive any disfavored source out of the market by tightening HAP emission limits until an emission source with a variable fuel supply is unable to comply *at all times.*

- 7 -

**B.     The Rule is Arbitrary and Capricious for Multiple Reasons**

A rule is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem…or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).  This Rule is arbitrary and capricious for many reasons, each of which warrants vacating it.

***First***, EPA's cost-benefit analysis is indefensible.     Section 112(d)(6) rulemaking requires reasonable consideration of cost.  *See Ass'n of Battery Recyclers v. EPA,* 716 F.3d 667, 673-74 (D.C. Cir. 2013) (rejecting argument cost is irrelevant to emission standard revisions under Section 112(d)(6)).  Yet EPA candidly admits the Rule has a "negative net monetized benefit."  89 Fed.Reg. at 38511.  Under the standards already in place, EPA found the lifetime cancer risk of the person most exposed to coal-fired HAP emissions is 0.344-in-a-million—significantly less than the Clean Air Act's one-in-a-million threshold where EPA can stop regulating a source entirely.  42 U.S.C. § 7412(c)(9)(B)(i); *see also Nat. Res. Def. Council*, 529 F.3d at 1082 (one-in-one million standard is the CAA's "aspirational goal").

Even EPA's qualitative generalizations don't evidence any meaningful health benefits from the mandated reduction in HAPs.  EPA admits the benefits of Hg reduction associated with the Rule are so small they can't be reliably extrapolated to

- 8 -

the broader population of fish consumers.  RIA 4-5.  And where risk to subsistence fishers located near lignite-fired plants has been studied, fisherman are already not exposed at a level associated with appreciable risk—and that is before the further reductions associated with this Rule.  RIA 4-4.  EPA's analysis of non-Hg HAP emissions is much the same, with EPA acknowledging "cancer risk was … within the acceptable range for multipathway exposure to the persistent and bioaccumulative non-Hg HAP metals."  RIA 4-7.  Likewise, noncancer risks did not exceed current thresholds for adverse health effects.  *Id.*

To the extent EPA identified any quantifiable "benefits" of the Rule, they are <u>*all*</u> ancillary to the Rule's reduction in HAP emissions and cannot drive a Section 112 cost-benefit analysis.  *E.g.,* 89 Fed.Reg. at 38561 (pointing to alleged particulate matter, ozone, and "climate" benefits).  As Chief Justice Roberts noted during oral argument in *Michigan v. EPA,* it is improper for EPA to use Section 112 authority to "get at the criteria pollutants that you otherwise would have to go through a much more difficult process to regulate.  In other words, you can't regulate the criteria pollutants through the HAP program…"  Transcript of Oral Argument at 59:19–60:5, *Michigan v. EPA*, 576 U.S. 743 (2015).  *Cf. Wyoming v. Dep't of Interior*, 493 F. Supp. 3d 1046, 1079 (D. Wyo. 2020) (agency "cannot rationally claim the Rule's objective is waste prevention while justifying its considerable costs almost entirely on climate change benefits").

- 9 -

In exchange for zero relevant public health benefits, the Rule will impose tremendous costs on coal-fired EGUs and electricity consumers. Under EPA's own calculations, the estimated cost-per-ton of HAP removed exponentially exceeds cost-benefit ratios that EPA has rejected for other Section 112 rulemakings. For surrogate fPM emissions, by EPA's own math, the cost effectiveness is $10.5 million per ton of HAP removed. 89 Fed.Reg at 38532-33. That is orders of magnitude higher than cost-benefit ratios EPA has explicitly *rejected* as being excessive. *E.g.,* Westmoreland Mining Holdings Cmt. at 4, EPA-HQ-OAR-2018-0794-5935 (compiling examples). EPA admits as much. 89 Fed.Reg. at 38523 ("EPA acknowledges that the cost-effectiveness values for these standards are higher than cost-effectiveness values that the EPA concluded were not cost-effective…for some prior rules.") 89 Fed.Reg. at 38523. These costs will likely force power plant retirements and threaten grid reliability, *see infra*, but, even if they didn't, they will increase the price of electricity for consumers. Just as it is arbitrary and capricious for EPA to impose significant economic costs "for a few dollars" of benefit, *Michigan,* 576 U.S. at 752, so too where EPA imposes substantial costs with "no meaningful benefit." *Mexican Gulf Fishing Co. v. U.S. Dep't of Comm.,* 60 F.4th 956, 966 (5th Cir. 2023).

**Second**, even assuming cost-efficient compliance using existing technology can lawfully be considered a "development" in practices, processes or control

technologies warranting further restrictions under Section 112(d)(6), EPA has not provided a reasoned explanation to support its conclusion that coal-fired EGUs are capable of consistently meeting the Rule's new emission standards with available control technologies.  Comment after comment put EPA on notice that the Rule's conclusions regarding compliance feasibility were flawed.[4]  But to support its contrary conclusion, the Final Rule relies almost entirely on a single comment (the "Andover Report") that largely parrots EPA's conclusions from the proposed rule without sufficient factual basis or explanation and is woefully inadequate to support EPA's conclusions.  *E.g.,* 89 Fed.Reg. at 38523, 38528, 38530, 38538.

*Third,* EPA failed to adequately consider the Rule's foreseeable impact on our nation's already-precarious power grids. Where, as here, EPA promulgates a Rule under Section 112(d) that will foreseeably impact grid reliability, it must thoroughly address the concern.  *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015) ("'Costs' can mean many different things, including the cost associated with increased risk" of grid unreliability).

EPA's perfunctory conclusion that the significant costs the Rule imposes on coal-fired EGUs will have <u>no</u> effect on the power sector, 89 Fed.Reg. at 38555-56,

---

[4] *E.g.,* Lignite Energy Council Cmt. at 8-9, EPA-HQ-OAR-2018-0794-5957; Nat'l Mining Ass'n Cmt. at 10-15, EPA-HQ-OAR-2018-0794-5986; Westmoreland Mining Holdings Cmt. at 16-17 (proposed fPM standard is not achievable or feasible); Coal Conversion Counties Ass'n Cmt. at 8, EPA-HQ-OAR-2018-0794-6003 (proposed mercury standard is not achievable or feasible).

- 11 -

does not reflect reasoned analysis entitled to any degree of deference. "EPA has no expertise on grid reliability," *Texas v. EPA*, 829 F.3d 405, 432 (5th Cir. 2016), and comment after comment put EPA on notice that the Rule will foreseeably have significant impacts on power grid reliability.[5]  Nonetheless, the Final Rule does not reflect any attempt by EPA to seek input from the Federal Energy Regulatory Commission (FERC), the North American Electric Reliability Corporation (NERC), or any similar entity that could have apprised it of the Rule's likely impact on grid reliability.  EPA also failed to address power outages or grid reliability in its Regulatory Impact Analysis.  *See* RIA Section 3.  EPA's failure to adequately consider one of the Rule's most important impacts was arbitrary and capricious. *State Farm*, 463 U.S. at 43; *see also Del. Dep't of Nat. Res.*, 785 F.3d at 18 (encouraging EPA to solicit input from FERC).

Moreover, as noted *supra*, the last time the MATS Rule was litigated, EPA claimed it would only cause about 5,000 MW to go offline.  77 Fed.Reg. at 9407 ("…expected retirements of coal-fueled units as a result of this final rule (4.7 GW) are fewer than was estimated at proposal and much fewer than some have

---

[5] *E.g.,* Rainbow Energy Center Cmt. at 4, EPA-HQ-OAR-2018-0794-5990; *see also id.*, Attachment A at 3-4 (MISO Cmt. on Docket ID Nos. EPA-HQ-OLEM-2021-0283, EPA-HQ-OLEM-2021-0282, EPA-HQ-OLEM-2021-0280); Minnkota Power Coop. Inc. Cmt. at 3, EPA-HQ-OAR-2018-0794-5978; Power Generators Air Coalition Cmt. at 12, EPA-HQ-OAR-2018-0794-5994.

- 12 -

predicted"). EPA was wrong. It ended up being closer to 60,000 MW.[6] That dramatic difference represents a profound failure on EPA's part to analyze the rule's impacts on power generation. Consequently, EPA's perfunctory conclusion that this Rule (dropping emission standards by 66-70%) will not cause a single retirement, RIA at 3-16, should be viewed with extreme skepticism given the number of comments and declarations attesting EPA has gotten it profoundly wrong again.

EPA's analysis of the Rule's grid impacts also fails to "acknowledge and account for" the impacts of "contemporaneous and closely related rule[s]." *Portland Cement Ass'n v. EPA,* 665 F.3d 177, 187 (D.C. Cir. 2011). EPA expressly issued this Rule as part of a "suite" of rules targeting coal power plants with retirement-inducing costs. *See* EPA, *Biden-Harris Administration Finalizes Suite of Standards to Reduce Pollution from Fossil Fuel-Fired Power Plants* (Apr. 25, 2024).[7] EPA's

---

[6] *See, e.g.,* U.S. Energy Info. Admin., *Planned coal-fired power plant retirements continue to increase* (Mar. 20, 2014), bit.ly/4dbYwfM (between 2012 and 2020, "about 60 gigawatts of coal-fired capacity is projected to retire ... assum[ing] implementation of the MATS standards"); Pratson et. al., *Fuel Prices, Emission Standards, and Generation Costs for Coal v Natural Gas Power Plants*, Am. Chem. Soc'y, Env'l Sci. & Tech., 4929 (Mar. 2013), bit.ly/3w7yLN2 (most coal-fired EGU retirements in the wake of the original MATS Rule were due to "stronger regulations," not unrelated market forces); *see also* Nat'l Min. Ass'n Cmt. at 2 & n.4, EPA-HQ-OAR-2009-0234-20531 (for the nearly 60 gigawatts of coal-fired EGU retirements announced between 2012 and 2016, "virtually all" stated the closures were "either fully or partially attributable to MATS and other EPA regulations").

[7] Available at https://tinyurl.com/y5u92sx3.

failure to meaningfully assess how the confluence of these (and many other) rules targeting coal-fired power plants will affect the power grid further cements its arbitrary and capriciousness.

   ***Fourth,*** the Rule is arbitrary and capricious because EPA's stated reasons for it are pretextual.  When an agency promulgates a rule, it must truthfully "disclose the basis of its action," and courts must set aside rulemaking when "the evidence tells a story that does not match the explanation."  *Dep't of Commerce v. New York,* 139 S. Ct. 2551, 2575-76 (2019).  Despite claiming it engaged in this rulemaking to protect the public from specified HAP emissions, 89 Fed.Reg. at 38509-10, available evidence—not least of which is the Executive Order *on climate change* which EPA admits spurred this rulemaking—indicates EPA is using its Section 112(d)(6) authority as part of an effort to force a nationwide transition away from coal for putative climate change reasons.  *Contra West Virginia v. EPA*, 597 U.S.697, 735 (2022) (declaring it "not plausible" the CAA empowers EPA to "force a nationwide transition away from the use of coal to generate electricity").

   Internal documents produced through FOIA indicate EPA and the White House Climate Office contrived revising the MATS Rule as a means of reducing power plant emissions for climate change reasons.  For example, in February 2021, EPA prepared a presentation for the White House Climate Advisor.  *See* Power Sector Strategy: Climate, Public Health, Environmental Justice, Briefing for Gina

McCarthy and Ali Zaidi (Feb. 4, 2021).  Ex.15 (Chang Decl.) ¶¶3-5.  While heavily redacted, the document evidences EPA's intent to use its regulatory authority under various programs, including the MATS Rule, for reducing power plant emissions to implement the Administration's climate agenda.  *Id.* ¶¶6-7.

Those internal documents match public comments from the EPA Administrator, who repeatedly stated EPA would issue a "suite of rules" designed to close fossil fuel-fired power plants, with the co-benefit of combating climate change.  *E.g.*, Geman*, EPA floats path on electricity CO2 emissions—with an asterisk*, Axios (Mar. 11, 2022).[8]

As just one example, Administrator Regan said his agency would "couple" climate regulations with "health-based" regulations to regulate greenhouse gases and get around the *West Virginia v. EPA* decision.

> **PBS**: How much of a setback is [the *West Virginia v. EPA* decision] to your efforts to regulate greenhouse gases?
>
> **Regan**: …We still will be able to regulate climate pollution. And we're going to use all of the tools in our toolbox. …
>
> **PBS**:  Well, can you give us a couple of examples of the kind of tools that you believe you still can use to regulate this industry?
>
> **Regan**: …We also have a suite of regulations that are facing the power sector. And so, *as we couple the regulation of climate pollution with the regulation of health-based pollution*, we are providing the power

---

[8]  Available at https://www.axios.com/2022/03/11/epa-electricity-co2-emissions.

sector with a very clear picture of what regulations they're facing so that they can make the right investment decisions.

PBS, *EPA Administrator Michael Regan discusses Supreme Court ruling on climate change*, YouTube (June 30, 2022) (emphasis added);[9] *see also, e.g*., White House, *Press Gaggle by Principal Deputy Press Secretary Karine Jean-Pierre & Env't Prot. Agency Adm'r Michael Regan* (Feb. 17, 2022) (stating if the Supreme Court limits EPA's ability to regulate greenhouse gas emissions, EPA will respond with "bread-and-butter regulations," such as "regulating mercury").[10]

EPA's public statements and documents evidence this Rule was not promulgated to protect the public from exposure to the regulated HAPs.  The purpose for EPA's recent "suite" of rules targeting coal-fired plants is recognized around the world,[11] and courts are "'not required to exhibit a naiveté from which ordinary citizens are free.'"  *Dep't of Commerce*, 139 S. Ct. at 2575 (citation omitted).

---

[9] Available at https://www.youtube.com/watch?v=Ic_1UxwsXj8 (accessed May 7, 2024).

[10] Available at https://tinyurl.com/bddpr22j.

[11] *E.g.,* Milman, *New US climate rules for pollution cuts 'probably terminal' for coal-fired plants*, Guardian (May 2, 2024), https://www.theguardian.com/us-news/2024/may/02/us-climate-rules-coal-plants-pollution.

## II.    Petitioners Will Suffer Imminent and Irreparable Harm Absent a Stay

### A.    Petitioner States Will Suffer Irreparable Economic Harm

Petitioner States will suffer irreparable economic harm if the Rule is not stayed during the pendency of litigation.

EPA's claim that the Rule will have almost no impact on electricity prices, 89 Fed.Reg. at 38555-56, does not reflect reasoned decision-making. EPA acknowledges that complying with the Rule will impose millions in costs (presuming plants are able to comply at all). 89 Fed.Reg. at 38561. Those costs must be borne somewhere, and Petitioners have provided declaration after declaration attesting that implementing the Rule will inevitably require prices to increase. Ex.2 (Fedorchak Decl.) ¶¶25-33; Ex.3 (Lane Decl.) ¶23; Ex.7 (Huston Decl.) ¶¶16-17; Ex.8 (Bohrer Decl.) ¶¶18-21; Ex.9 (McLennan Decl.) ¶43; Ex.10 (Tschider Decl.) ¶29; Ex.11 (McCollam Decl.) ¶¶33-35; Ex.16 (Purvis Decl.) ¶11. Any increase in retail electric rates will impose unrecoverable costs on Petitioner States and their residents, including the States as consumers of electricity. *E.g.*, *California v. Azar,* 911 F.3d 558, 581 (9th Cir. 2018) (economic injury sustained by states due federal agency action "is irreparable … because the states will not be able to recover monetary damages").

Moreover, absent a stay of the Final Rule during the pendency of litigation, State regulators will need to expend substantial resources overseeing

- 17 -

implementation of the Final Rule and attempting to mitigate its deleterious effects. Ex.2 (Fedorchak Decl.) ¶7; Ex.3 (Lane Decl.) ¶¶29-31.

## B.    The Rule's Compliance Costs and Infeasible Standards Risk Catastrophic Consequences for the Power Grid

Even more concerning than the imposition of unrecoverable economic costs, the Rule also threatens irreparable harm by undermining power grid reliability, as power outages are frequently paid for with human lives. *E.g.,* FERC-NERC-Regional Entity Staff Report: The February 2021 Cold Weather Outages in Texas and the South Central United States (Nov. 16, 2021) (over 200 fatalities during weather event "with most of the deaths connected to the power outages").

Although the Rule includes a three-year implementation period, absent a stay during the pendency of litigation, complying with that deadline (or commencing retirement plans if they cannot) requires EGUs to make decisions and take requisite actions *now*. Power plants cannot start and stop instantaneously; actions taken now will be irreversible and will affect power grids for years to come. Ex.8 (Bohrer Decl.) ¶¶24-28; Ex.9 (McLennan Decl.) ¶58; Ex.10 (Tschider Decl.) ¶¶25-30; Ex.11 (McCollam Decl.) ¶¶34-43; Ex.12 (Friez Decl.) ¶¶16-17; Ex.16 (Purvis Decl.) ¶¶15-19. As discussed *supra*, that is precisely what happened the last time the MATS Rule was litigated. Even though the Supreme Court ultimately held EPA acted unreasonably in promulgating the last MATS rule, *Michigan*, 576 U.S. at 743,

regulated EGUs had already been required to spend billions in compliance costs (or begin shutdown operations).

Power plants are again saying this Rule will result in substantial costs and may result in plant closures. Ex.8 (Bohrer Decl.) ¶¶21-24; Ex.9 (McLennan Decl.) ¶¶34-39, 70 ("Recent test data suggest that Minnkota will not be able to meet the New Mercury Limitation even at the higher PAC injection rates that EPA assumed to be sufficient to meet the New Mercury Limitation."); Ex.10 (Tschider Decl.) ¶¶21-23; Ex.11 (McCollam Decl.) ¶¶34-43; Ex.16 (Purvis Decl.) ¶¶24-25 (upgrades to comply "will certainly fail, despite best engineering and maintenance practices, due to the lack of any margin to meet the aggressively low new fPM limitation"). That injury will be irreparable. *Texas v. EPA*, 829 F.3d at 434 (potential closures threatened "the very existence of some of Petitioner's businesses and, even assuming, *arguendo*, that the plant operators could recover their costs from…their consumers, this would not be a recovery made in the course of the litigation").

EPA's perfunctory conclusion this Rule will not affect the power grid at all, 89 Fed.Reg. at 38519, should not be trusted. "EPA has no expertise on grid reliability." *Texas v. EPA,* 829 F.3d at 433. That expertise resides in FERC and NERC, yet EPA did not consult either before finalizing the Rule. Nor does EPA's Regulatory Impact Analysis reflect a long-term assessment of grid reliability, despite receiving comment after comment that the Rule would have significant impacts on

- 19 -

the power grid. *See* RIA at 3-23–3-24. And EPA's feasibility determinations are supported almost entirely by a single comment that is woefully inadequate to support EPA's conclusions. *See* Ex.13 (Holmes Decl.) ¶11 (summarizing EPA's reliance on the Andover Report as "bootstrapping at its worst").[12] State and grid regulators attest the foreseeable impacts of this Rule on power grid reliability will be significant. Ex.1 (Vigesaa Decl.) ¶¶11-26; Ex.2 (Fedorchak Decl.) ¶¶7-24; Ex.3 (Lane Decl.) ¶¶18-34; Ex.4 (Rickerson Decl.) ¶¶13-15; Ex.5 (Nowakowski Decl.) ¶¶7-12; Ex.6 (Webb Decl.) ¶¶6-10; Ex.7 (Huston Decl.) ¶12.

In a telling section, EPA dismisses widespread concerns about the Rule's foreseeable impact on power grid reliability by assuming that State or regional regulators will be able to use emergency powers to prop up the power grid if the Final Rule makes EGUs no longer commercially viable. 89 Fed.Reg. at 38526. EPA's reliance on such emergency, stopgap powers to prevent the Rule from breaking the power grids is the epitome of arbitrary and capricious agency action.

According to a study commissioned by the North Dakota Transmission Authority, if the Rule causes any of North Dakota's lignite-fired EGUs to retire, it will risk causing the entire MISO grid to experience black-outs resulting in economic damages ranging from $29 million to over $1 billion. Ex.1 (Vigesaa Decl.) ¶¶22-

---

[12] Further, an author of one of the few other studies EPA relies upon for its feasibility determination attests EPA is also misusing that study. Ex.14 (Benson Decl.) ¶¶6-8.

25.  Given that the Rule will likely have the effect—if not the deliberate goal—of setting HAP emission standards that coal-fired EGUs in North Dakota and elsewhere will be unable to comply with, undermining long-term grid reliability is a foreseeable impact of the Rule that EPA failed to take seriously.

Furthermore, as noted *supra*, EPA's conclusion the Rule will have no impact on power plant operations should be viewed with skepticism given EPA's history of woefully underestimating the impact that its rules—and the MATS Rule specifically—will have on power plant operations.  The last time EPA promulgated the MATS Rule, its claim that it would impact only about 5,000 MW of power ended up being wrong by over a factor of ten.  The power grids today do not have the same buffer of dispatchable power that they had a decade ago, and an error on the same magnitude as EPA's last profound error would likely have catastrophic results.  Ex.1 (Vigesaa Decl.) ¶11-12; Ex.3 (Lane Decl.) ¶¶12-13; Ex.7 (Huston Decl.) ¶¶8-14.

In similar circumstances, the Fifth Circuit stayed an EPA rule that a state plausibly alleged would result in grid instability due to the likely closure of coal-fired power plants during the pendency of litigation.  *Texas v. EPA*, 829 F.3d at 434.  In that case, Texas argued that the changes mandated by the challenged rule would cost power plants upwards of "$2 billion, rendering them uneconomical and forcing the plants to close" potentially "remov[ing] 3,000 MW to 8,400 MW of generating

- 21 -

capacity." *Id.* at 416.  Consequently, the court held that "the threat of grid instability and potential brownouts alone constitute irreparable injury." *Id.*

## III.    The Balance of Harms and the Public Interest Favor a Stay

Staying the Rule while Petitioners' challenge is heard on the merits will maintain the status quo, and EPA acknowledges the status quo already protects public health.  89 Fed.Reg. at 38508 (existing standards already provide an "ample margin of safety").

The public interest also favors a stay when that rule would potentially threaten the public's access to affordable electricity.  *Texas v. EPA*, 829 F.3d at 435 (granting stay where "public interest in ready access to affordable electricity" outweighed "inconsequential" emissions reductions that rule implementation would have achieved during the pendency of the litigation); *see also, e.g.*, *Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999) (denying preliminary injunction where it threatened to reduce power generation, as "[a] steady supply of electricity … especially … [for] the elderly, hospitals and day care centers, is critical."); *West Virginia v. EPA,* 90 F.4th 323, 332 (4th Cir. 2024) ("the public [] has an interest in the efficient production of electricity and other industrial activity in the State, even as such production is balanced with environmental needs").

And courts have found "unconvincing" the suggestion that the public will be injured from a stay pending litigation where, as here, complying with the rule "would

- 22 -

not reduce emissions for at least three years." *Texas v. EPA,* 829 F.3d at 434. That is particularly the case where, as here, the existing conditions already far exceed federal safety or environmental goals. *Id.* at 434–35.

## CONCLUSION

Petitioners ask the Court to stay implementation of the Final Rule.

Respectfully submitted,

DREW H. WRIGLEY
Attorney General

By: */s/ Philip Axt*

PHILIP AXT
Solicitor General
600 E Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: 701.328.2210
pjaxt@nd.gov

NESSA HOREWITCH COPPINGER
DAVID M. FRIEDLAND
Special Assistant Attorneys General
1900 N Street NW, Suite 100
Washington, DC 20036
Phone: 202.789.6053
ncoppinger@bdlaw.com
dfriedland@bdlaw.com

*Counsel for State of North Dakota*

- 23 -

PATRICK MORRISEY
Attorney General

*/s/ Lindsay S. See*
LINDSAY S. SEE
Solicitor General
MICHAEL R. WILLIAMS
Principal Deputy Solicitor General
Office of the Attorney General of West
Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
lindsay.s.see@wvago.gov
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*


TIM GRIFFIN
Attorney General

*/s/ Nicholas J. Bronni*
NICHOLAS J. BRONNI
Solicitor General
DYLAN L. JACOBS
Deputy Solicitor General
Office of the Arkansas Attorney
General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
nicholas.bronni@arkansasag.gov

*Counsel for State of Arkansas*

TREG TAYLOR
Attorney General

*/s/ Garrison Todd*
GARRISON TODD
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Ave. Ste. 200
Anchorage, AK 99501
(907) 269-5100
Garrison.Todd@alaska.gov

*Counsel for State of Alaska*


CHRISTOPHER M. CARR
Attorney General

*/s/ Stephan J. Petrany*
STEPHEN J. PETRANY
Solicitor General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

- 24 -

RAÚL R. LABRADOR
Attorney General

*/s/ Joshua N. Turner*
JOSHUA N. TURNER
Chief of Constitutional Litigation and
Policy
ALAN M. HURST
Solicitor General
Office of Idaho Attorney General
P.O. Box. 83720
Boise, Idaho 83720
(208) 334-2400
Josh.Turner@ag.idaho.gov
Alan.Hurst@aga.idaho.gov

*Counsel for State of Idaho*

BRENNA BIRD
Attorney General

*/s/ Eric H. Wessan*
ERIC H. WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

THEODORE E. ROKITA
Attorney General

*/s/ James A. Barta*
JAMES A. BARTA
Solicitor General
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*

KRIS W. KOBACH
Attorney General

*/s/ Anthony J. Powell*
ANTHONY J. POWELL
Solicitor General
Office of Kansas Attorney General
120 SW 10thAvenue, 2ndFloor
Topeka, Kansas 66612
(785) 368-8539
Anthony.Powell@ag.ks.gov

*Counsel for State of Kansas*

- 25 -

RUSSELL COLEMAN
Attorney General

*/s/ Matthew F. Kuhn*
MATTHEW F. KUHN
Solicitor General
JACOB M. ABRAHAMSON
Assistant Solicitor General
Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for Commonwealth of Kentucky*

ELIZABETH B. MURRILL
Attorney General

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
Solicitor General
Louisiana Department of Justice 1885
N. Third Street
Baton Rouge, Louisiana 70802
(225) 506-3746
aguinagab@ag.louisiana.gov

*Counsel for State of Louisiana*

LYNN FITCH
Attorney General

*/s/ Justin L. Matheny*
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Attorney General
P.O. Box 220
Jackson, Mississippi 39205
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW T. BAILEY
Attorney General

*/s/ Samuel C. Freedlund*
SAMUEL C. FREEDLUND
Deputy Solicitor General
Office of the Attorney General
815 Olive St., Suite 200
St. Louis, Missouri 63101
(314) 340-4869
Samuel.Freedlund@ago.mo.gov

*Counsel for State of Missouri*

- 26 -

AUSTIN KNUDSEN
Attorney General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORSTENSEN, JR.
Deputy Solicitor General
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406)444-2707
Christian.Corrigan@mt.gov

*Counsel for State of Montana*


GENTNER DRUMMOND
Attorney General

*/s/ Garry M. Gaskins, II*
GARRY M. GASKINS, II
Solicitor General
JENNIFER L. LEWIS
Deputy Attorney General
Office of the Attorney General of
Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov
jennifer.lewis@oag.ok.gov

*Counsel for State of Oklahoma*

MICHAEL T. HILGERS
Attorney General

*/s/ Grant D. Strobl*
GRANT D. STROBL
Assistant Solicitor General
Nebraska Attorney General's Office
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
grant.strobl@nebraska.gov

*Counsel for State of Nebraska*


ALAN WILSON
Attorney General

*/s/ Thomas T. Hydrick*
THOMAS T. HYDRICK
Assistant Deputy Solicitor General
Office of the Attorney General of
South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South Carolina*

- 27 -

MARTY J. JACKLEY
Attorney General

*/s/ Steve Blair*
STEVE BLAIR
Deputy Attorney General
Office of the Attorney General of
South Dakota
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
(605) 773-3215
atgservice@state.sd.us
steven.blair@state.sd.us

*Counsel for State of South Dakota*

JONATHAN SKRMETTI
Attorney General

*/s/ Whitney Hermandorfer*
WHITNEY HERMANDORFER
Director of Strategic Litigation
MATTHEW RICE
Solicitor General
Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
Matthew.Rice@ag.tn.gov

*Counsel for State of Tennessee*

KEN PAXTON
Attorney General

*/s/ John R. Hulme*
JOHN R. HULME
Assistant Attorney General
BRENT WEBSTER
First Assistant Attorney General
JAMES LLOYD
Deputy Attorney General for Civil
Litigation
KELLIE E. BILLINGS-RAY
Chief, Environmental Protection
Division
Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
John.hulme@oag.texas.gov

*Counsel for State of Texas*

SEAN REYES
Attorney General

*/s/ Stanford Purser*
STANFORD PURSER
Solicitor General
Office of the Utah Attorney General
160 East 300 South, Fifth floor
Salt Lake City, Utah 84111
(385) 366-4334
Spurser@agutah.gov

*Counsel for State of Utah*

- 28 -

JASON MIYARES
Attorney General

*/s/ Kevin M. Gallagher*
KEVIN M. GALLAGHER
Principal Deputy Solicitor General
BRENDAN T. CHESTNUT
Deputy Solicitor General
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us
bchestnut@oag.state.va.us

*Counsel for Commonwealth of Virginia*

BRIDGET HILL
Attorney General

*/s/ D. David DeWald*
D. DAVID DEWALD
Deputy Attorney General
Wyoming Attorney General's Office
Water & Natural Resources Division
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 phone
david.dewald@wyo.gov

*Counsel for State of Wyoming*

- 29 -

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), (f) and (g) and Circuit Rule 32(e)(1), because it contains 5,193 words, excluding exempted parts, according to the count of Microsoft Word 2010.  I further certify that the foregoing brief also complies with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared using Microsoft Word 2010 in 14-point proportionally spaced Times New Roman font.

*/s/ Philip Axt*
PHILIP AXT
Solicitor General of North Dakota

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2024, the foregoing Amended Motion for Stay was served electronically on all registered counsel through the Court's CM/ECF system.

/s/ Philip Axt
PHILIP AXT
Solicitor General of North Dakota

- 31 -

# EXHIBIT 8

## Declaration of Penny E. Lassiter

*Blue Ridge Environmental Defense League v. Regan*,
No. 22-03134 (D.D.C.)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BLUE RIDGE ENVIRONMENTAL )
DEFENSE LEAGUE, *et al.*, )
)
Plaintiffs, )
v. )    Case No. 1:22-cv-03134
)
MICHAEL S. REGAN, in his official )    Hon. Amit P. Mehta
capacity as Administrator of the )
U.S. Environmental Protection Agency, )
)
Defendant. )
_____ )

## <u>DECLARATION OF PENNY E. LASSITER</u>

1.      I, Penny E. Lassiter, under penalty of perjury, affirm and declare that the

following statements are true and correct to the best of my knowledge and belief

and are based on my personal knowledge or on information contained in the

records of the United States Environmental Protection Agency ("EPA") or

supplied to me by EPA employees under my supervision.

2.      I am the Director of the Sector Policies and Programs Division ("SPPD")

within the Office of Air Quality Planning and Standards ("OAQPS"), Office of Air

and Radiation ("OAR") at EPA. I have held this position in a permanent capacity

since May 26, 2019. SPPD is the division within OAQPS that has responsibility for

developing, reviewing, and revising, as required and appropriate, regulations under

section 112 of the Clean Air Act ("CAA"), 42 U.S.C. § 7412, the National

Emission Standards for Hazardous Air Pollutants ("NESHAP") program, including regulations relevant to hazardous waste combustion.

3.　　As Director of SPPD, I am responsible for overseeing EPA's promulgation of regulations under the NESHAP and other CAA programs. From my longstanding experience, including 26 years of leadership in SPPD and its predecessor division with similar regulatory development responsibilities, I am very familiar with the processes required in developing and promulgating major EPA regulations under the CAA and the time periods allotted for EPA to take regulatory actions thereunder, including issuing rules pursuant to CAA sections 112(f)(2)(A) and 112(d)(6), 42 U.S.C. §§ 7412(f)(2)(A) and 7412(d)(6), respectively. I have also relied upon my staff to provide the factual information concerning the regulatory steps and schedule needed for the particular CAA section 112, 42 U.S.C. § 7412, actions at issue in the case for which I make this declaration.

4.　　At this time, the earliest possible completion date for a final rule making for the National Emission Standards for Hazardous Air Pollutants from Hazardous Waste Combustors (HWC NESHAP) is August 14, 2026. The dates for the rule making phases described in my July 27, 2023, declaration are updated as follows to reflect events since that time; asterisks indicate where time was removed from the phase in comparison to the July 27, 2023, declaration and why:

| Phases from July 27, 2023 Declaration | Completion or Estimated Completion Date |
|---|---|
| Phase I. Project Kickoff | Completed June 2023 |
| Phase II. Preliminary Information Collection | Completed July 2023 |
| Phase III. Supplemental Information Collection and Outreach to Stakeholders | November 22, 2024 (1 month) |
| Phase IV. Data Analyses and Modeling File Development | December 30, 2024 (1 month) |
| Phase V. Residual Risk Analysis and Technology Review | April 29, 2025 (4 months) |
| Phase VI. Development and Completion of Proposed Rule | October 24, 2025 (6 months)  * Two months of exclusive OMB time removed |
| Phase VII. Proposed Rule Publication and Comment Period | January 22, 2026 (3 months) |
| Phase VIII. Summarization of Comments, Development of Comment Responses and Analysis of Data | March 23, 2026 (2 months) |
| Phase IX. Development and Completion of Final Rule | August 14, 2026 (5 months)  * Remaining two months of exclusive OMB time removed |

5.      Analysis of title V permits during Phase II showed that some hazardous waste combustors have emissions limits for hazardous air pollutants (HAPs) that are not currently regulated in the HWC NESHAP, including polychlorinated biphenyls (PCBs). Other HAPs or HAP precursors of potential interest at that time

included fluorinated compounds, brominated compounds, polycyclic aromatic hydrocarbons (PAHs), hydrogen cyanide (HCN), and asbestos.

6.     My staff therefore issued the "first survey" to nine entities seeking information that was needed to identify the actual additional HAPs or HAP precursors that should be regulated. To expedite the rulemaking process, we chose to survey nine entities that own or operate hazardous waste combustors. Together, these nine entities are representative of the six distinct HWC NESHAP subcategories. If EPA surveys more than nine entities, it must do so through a formal information collection request issued pursuant to the Paperwork Reduction Act. It can take over a year to issue such a request to recipients because it must be developed though public notice and comment and must be approved by the White House's Office of Management and Budget.

7.     The first survey was issued on August 17, 2023, and the initial response deadline was October 31, 2023. Due to multiple requests for an extension, we extended the deadline to November 15, 2023. Copies of all responses with confidential business information removed are publicly available at http://www.regulations.gov (Docket ID EPA-HQ-OAR-2004-0022).

8.     Based on the responses to the first survey, in Phase III my staff issued the "second survey" of the information collection request, which was an emissions testing request. EPA requested testing of 23 HWCs owned or operated by 9 entities

and targeted four HAPs and one potential HAP surrogate: PCBs, polycyclic aromatic hydrocarbons (PAHs, a class of organic HAPs), hydrogen fluoride (HF), hydrogen cyanide (HCN), and hydrogen bromide (HBr). While HBr itself is not a HAP, it can potentially serve as a surrogate for the release of brominated HAP emissions. Because responses to the first survey indicated that some hazardous waste combustors do not combust the chemical components required to form some of the HAPs, testing requirements in the second survey were tailored to each survey recipient.

9.      The initial deadline for providing emission test results in response to the second survey was August 30, 2024.  Some companies asked for and were granted deadline extensions for operational reasons (*i.e.*, their combustors were undergoing maintenance and were not operational during the expected testing window). In August 2024, multiple companies contacted EPA and asked for emissions testing extensions due to delays at a third-party laboratory, Eurofins Environment Testing - Knoxville.  That laboratory is one of three that, to our knowledge, can process the required samples nationwide. EPA contacted the laboratory, which confirmed a significant delay in sample processing. Because companies had completed their tests in a timely manner but had not yet received their results for reasons beyond their control, EPA extended the emissions testing deadline to September 29, 2024.

In September 2024, because EPA learned that some laboratory results had still not been returned, EPA extended select deadlines until October 31, 2024.

10. On October 30, 2024, one entity requested an extension to November 22, 2024, because they received their final analytical results from the laboratory on October 23, 2024. This data must still undergo review by the facility and appropriate data entry so that the company can use the data to calculate the emission results to respond to the second survey. EPA believes that this timeline is reasonable and granted this request.

11. As of November 1, 2024, EPA has received 19 of 23 emissions testing responses, or 83%, from 7 of 9 entities. We expect to receive results from one of the two remaining entities by November 22, 2024. We do not expect another extension request from this entity because the entity, which is submitting results for three liquid fuel boilers, is no longer waiting on analytical results.

12. EPA has received no test results from the last remaining entity, Norlite, LLC, which suspended operations of their HWCs in March 2024 before testing could be conducted and has not restarted. As described in paragraphs 7 through 9 of my declaration dated September 15, 2023, EPA must obtain emissions testing data in order to develop emissions limits for currently unregulated HAPs. Since Norlite, LLC operates the only hazardous waste burning lightweight aggregate

kilns in the country (one of the six distinct HWC NESHAP subcategories), we will move forward with the RTR rulemaking process with the currently regulated HAPs for lightweight aggregate kilns and require the emissions testing for this subcategory for the currently unregulated HAPs if and when the facility restarts operations.

13.     Because we are missing data from only two of the six distinct HWC NESHAP subcategories (liquid fuel boilers and lightweight aggregate kilns), we are proceeding with the rulemaking process for unregulated HAPs for the other four subcategories in the interim. We are also proceeding with the rulemaking process for regulated HAPs from all six HWC NESHAP subcategories. EPA collected available data for regulated HAPs during Phase II of the rulemaking; the second survey was specific to unregulated HAPs.

14.     To the extent possible, EPA already is conducting Phase IV by organizing and analyzing data that we have collected. Most of the information collected in Phase II was in PDF format, which cannot be used directly in calculations. We have been extracting that data into a usable format and expect to complete that process in November 2024, facilitating completion of Phase IV in December 2024.

Executed this 4th day of November 2024.

PENNY
LASSITER

Digitally signed by PENNY
LASSITER
Date: 2024.11.04 13:14:14
-05'00'

_____

Penny Lassiter

## <u>CERTIFICATE OF SERVICE</u>

I, Heather E. Gange, hereby certify that on November 4, 2024, I electronically filed the foregoing with the Clerk of Court using the ECF system, which effected service on counsel for all parties of record.

<u>        */s/ Heather E. Gange*        </u>
Heather E. Gange

# EXHIBIT 9

## Declaration of Panagiotis E. Tsirigotis

### *Sierra Club v. Pruitt*, No. 16-02461 (D.D.C.)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLUE RIDGE ENVIRONMENTAL DEFENSE LEAGUE, *et al.*,<br><br>    *Plaintiffs*,<br><br>        v.<br><br>SCOTT PRUITT, Administrator, United States Environmental Protection Agency,<br><br>    *Defendant*. | Civil Action 1:16-CV-00364-CRC |

| | |
|---|---|
| CALIFORNIA COMMUNITIES AGAINST TOXICS, *et al.*,<br><br>    *Plaintiffs*,<br><br>        v.<br><br>SCOTT PRUITT, Administrator, United States Environmental Protection Agency,<br><br>    *Defendant*. | Civil Action 1:15-CV-00512-TSC |

## CORRECTED DECLARATION OF PANAGIOTIS E. TSIRIGOTIS

1.    I, Panagiotis E. Tsirigotis, under penalty of perjury, affirm and declare that the following statements are true and correct to the best of my knowledge and belief and are based on my own personal knowledge or on

information contained in the records of the United States Environmental Protection Agency (EPA) or supplied to me by EPA employees under my supervision.

2. I am the Director of the Sector Policies and Programs Division (SPPD) within the Office of Air Quality Planning and Standards (OAQPS), Office of Air and Radiation (OAR) at EPA, a position I have held since February 6, 2006. SPPD is the division within OAQPS that has responsibility for, among other things, developing regulations, policy, and guidance associated with section 112 of the Clean Air Act (CAA), 42 U.S.C. § 7412, which is the national emission standards for hazardous air pollutants (NESHAP) program.

## A. Responses to Questions Raised by the Court

3. At the hearing held on February 2, 2017, Judge Cooper requested a declaration from EPA providing additional information concerning the resources available to SPPD, including: (1) How many employees are part of SPPD; (2) How many employees in SPPD work on the risk and technology reviews (RTRs); (3) What are the other responsibilities of SPPD; (4) On what discretionary projects does SPPD work; and (5) To what extent can SPPD call on other Agency resources to complete RTR actions? Judge Cooper subsequently issued an order requiring EPA to submit such a declaration and giving Plaintiffs an opportunity to respond. This declaration is EPA's response to that order.

4.      SPPD is the division of EPA responsible for coordinating efforts of the multiple divisions and offices within EPA that support the RTR program, and SPPD also is responsible for conducting information collection, performing many of the required technical analyses, and drafting the regulatory package and much of the supporting documentation for RTRs. An SPPD staff member serves as the project lead for all RTRs. As discussed in my earlier declaration, the project lead relies on the technical expertise of other SPPD staff as well as staff from other EPA divisions and offices, as well as contractors, to complete the technical analyses and prepare the regulatory package. Other EPA offices, such as the Office of Research and Development, Office of Policy, and the Office of General Counsel, participate in workgroups for each RTR project. Workgroup members provide expertise including technical (such as risk assessment and monitoring), legal (both defensibility and enforceability), and economics. Overall, the projects require considerable coordination, communication, and technical expertise. SPPD currently has 87 employees, 79 of whom work on RTRs (which are described in detail in my previous declaration) in some capacity. Forty-two of the 79 employees are either project leads or project assistants who conduct the day-to-day project activities involved with conducting the required reviews and developing regulations, as necessary. These same staff also serve as the project leads and assistants for SPPD's other CAA-mandated regulatory work, which altogether

(including the RTRs) results in a total of about 250 regulations subject to periodic review requirements. In addition to the project leads and assistants, there are 6 managers who report directly to me and manage staff, including the project leads and assistants, on multiple projects required under the CAA, including RTRs, as described in paragraphs 5 through 11 below. There also is a group of 6 policy/program development specialists including a manager who have multiple responsibilities related to RTRs and other regulatory projects, including: reviewing all regulatory packages; providing up-to-date guidance materials to staff; supporting litigation activities including the development of legal briefs; developing schedules and tracking progress; coordinating with other EPA offices; identifying regulatory priorities; and developing and implementing policies regarding technical issues in order to ensure that SPPD's rules are consistent with statutory requirements and internally consistent. SPPD also includes a group of 10 staff, including a manager, responsible for monitoring/recordkeeping and reporting. This group develops monitoring requirements for RTRs and other rules, reviews emissions test reports that are used in RTRs and other rules, and develops electronic systems for submittal of emissions data and other information by entities subject to RTRs and other rules. I also manage 7 additional staff, in my division front office, who provide support with budgeting, planning, training, and oversight of SPPD's regulatory programs. Three staff are communication specialists who are

responsible for preparing briefings and providing technical editing support for RTRs and other work products produced by SPPD. Four staff are administrative support, who provide administrative support for all of the work in SPPD, including editing of regulatory packages, setting up meetings, setting up travel, timekeeping, and word processing. Overall, I estimate that the equivalent of 38 full-time staff work on RTRs. For the remainder of this declaration, I use the term full-time equivalents or FTEs to indicate the estimates of how many staff are dedicated to particular responsibilities. As described in paragraphs 6 through 11, SPPD's responsibilities include many other types of regulations and reviews, and the statutory requirements simply cannot be met given the size of the organization. I note that a typical regulatory project requires up to 3 FTEs within SPPD, along with contractor support, and each of the project leads and assistants typically are assigned to multiple projects.

5.    RTRs are a significant part of our current work. These reviews must be conducted for all source categories that are subject to maximum achievable control technology (MACT) standards and all section 129 solid waste incinerator rules. There are approximately 120 categories subject to this requirement. We have completed the RTRs for almost 60 of the categories, and RTRs for about 50 additional categories are overdue or will be due soon.

6.     As described in the following paragraphs, SPPD is also primarily responsible for developing and reviewing federal air regulations that apply to stationary sources of air pollution under CAA sections 111, 112, and 129.

7.     CAA section 111(b) requires EPA to promulgate standards for certain pollutants. These standards, which apply to new sources, are known as new source performance standards (NSPS). EPA also is required to review and, if appropriate, revise each NSPS every 8 years. There are about 70 NSPS that are subject to this ongoing requirement. These projects typically require a comprehensive review of the source category which includes determining whether substantive changes or improvements to the standards are needed. An estimated 11 staff in SPPD (full-time equivalents) work on the review and revision of NSPS, but significantly more staff would be needed to conduct all of the statutorily required reviews. SPPD continues to prioritize and conduct these reviews as staff and contractor resources allow.

8.     Under CAA section 112, EPA is required to identify and list categories of stationary sources that emit any of the 187 hazardous air pollutants (HAP) listed in CAA section 112(b)(1) (or any HAP subsequently added by EPA) and then to develop national emission standards for hazardous air pollutants (NESHAP), for those source categories by specified statutory deadlines. These actions are largely completed, although several NESHAP are still in litigation and

several others have been vacated or remanded by the court of appeals. An

estimated 15 staff in SPPD (full-time equivalents) are working on NESHAP (not

including RTRs). The NESHAP that apply to major stationary sources of HAP

emissions, along with a subset of NESHAP that apply to smaller area sources of

HAP emissions, are referred to as MACT standards, and EPA is required to

perform the RTR review for all MACT standards as mentioned in paragraph 5. The

other NESHAP, which apply to most of the categories of "area" or non-major

sources, are referred to as generally available control standards (GACT) and these

standards are subject only to the CAA section 112(d)(6) technology review and not

to the CAA section 112(f)(2) risk review, as described in paragraph 9.

9.      There are about 60 source categories that are only subject to the CAA

section 112(d)(6) technology review requirement. The original rules for these

source categories were mostly promulgated between 2007 and 2009. To date, EPA

has prioritized conducting the technology reviews for those source categories that

are also subject to the residual risk review requirement.

10.     SPPD is responsible for developing standards under CAA section 129

for solid waste incinerators. SPPD has already promulgated most of the statutorily

required rules, although several are subject to ongoing litigation.  SPPD is also

responsible for promulgating federal plans associated with the section 129

standards. An estimated 4 staff in SPPD (full-time equivalents) work on aspects of

7

the section 129 standards. As noted above, all section 129 rules are subject to the requirement to conduct risk reviews of the technology based standards. These rules are also subject to a technology review requirement although under section 129 such reviews are required at 5 year intervals. The staff resources devoted to the review of the section 129 rules are included in the resources we have identified for the RTRs generally.

11.    Other activities performed by SPPD include: (1) Developing existing source performance standards under CAA section 111(d); (2) Reviewing and revising (if necessary) emissions factors used for estimating emissions of volatile organic compounds, carbon monoxide and oxides of nitrogen every 3 years as required under section 130 of the CAA; (3) Responding to petitions to add and remove HAPs from the list in CAA section 112(b) of the CAA and major sources from the list in CAA section 112(c); and (4) Periodically reviewing volatile organic compound rules and Control Techniques Guidelines developed under CAA section 183(e).

12.    In addition to reviewing, revising and developing regulations and performing other statutorily prescribed actions as described above, SPPD provides programmatic support for these actions. While these activities are not specifically mandated by the statute, SPPD believes they are necessary to support issuance and implementation of the actions that are prescribed by the statute. These activities

8

include providing technical expertise and other support for litigation on the rules developed by SPPD; responding to Freedom of Information Act requests; responding to Congressional inquiries; providing technical expertise and guidance to resolve issues concerning implementation of rules developed by SPPD; optimizing and updating procedures and systems used to develop rules and improved efficiency, including quality assurance tools for large data files, comment summary systems, guidance development, and electronic data submittal systems, such as systems for stationary sources to submit emissions data; performing stakeholder outreach, including webinars, other presentations, hotlines, and face-to-face meetings to communicate the requirements of new regulations; and supporting activities, undertaken by other parts of EPA, to implement the rules written by SPPD. These types of activities are performed by most of the technical staff in SPPD as part of their general duties concerning rules and actions for which they are responsible or part of a team. Overall, an estimated 19 SPPD staff (full-time equivalents) work on these other projects and activities.

13.    In addition to the activities described above that are prescribed by the statute or that are related to actions prescribed by the statute, SPPD does perform discretionary actions. Historically, most of SPPD's work involves developing, implementing and reviewing statutorily required regulations. The discretionary items that SPPD generally undertakes include many of the types of activities that

9

are expected of high performing organizations that are focused on serving clients. Some examples include:

- Professional development of SPPD staff;
- Attendance at technical conferences;
- Development of databases and information technology systems for enabling transparency and access to information related to our programs.

These types of activities constitute a small percentage of SPPD's work that is difficult to estimate but is not appreciable.

14. Administration priorities also can result in SPPD being tasked with certain additional activities that are not required by statute, including development of regulations. Over the past five years, SPPD has expended significant resources on one such action, the Clean Power Plan. Because the Clean Power Plan was developed under the authority of CAA section 111, the administration tasked SPPD with managing the rulemaking process for the plan, the development of which relied on resources from many offices across the agency. The rule was finalized in 2015 and the staff who worked on that rule have now been assigned to work on other projects as described in paragraphs 5 thru 11 above.

15. In developing RTR actions, SPPD relies on resources in other parts of the agency, as well as contractor resources, to ensure that we engage individuals

with the needed expertise to resolve the multitude of issues that may arise. As

described above and in my earlier declaration, development of an RTR rulemaking

requires the involvement of numerous individuals with different skill sets. The

schedule provided in my previous declaration to this court includes leveraging

available resources from outside of SPPD to assist with various issues and to serve

on the project workgroups, which are described in my earlier declaration. Most

critically, the Health and Environmental Impacts Division (HEID) within OAQPS

also has significant responsibilities related to the RTR projects. The risk

assessments described in my earlier declaration are conducted by HEID's Air

Toxics Assessment Group, and economic analyses are conducted by HEID's Air

Economics Group. Overall, 9 HEID staff work on RTR projects. Of these, about 6

HEID staff (full-time equivalents) scientists and engineers serve as risk assessment

leads, and 3 HEID staff (full-time equivalents) serve as lead economists. In recent

years, HEID has conducted day-to-day risk and economic project activities for

between 8 and 11 RTR source categories per year. This level of support is near

HEID's capacity to provide such support. Other workgroup members include staff

from: (1) the Office of General Counsel, who provide legal advice and review; (2)

the Office of Research Development, who provide additional technical support,

evaluate health benchmark information for various pollutants, and help ensure

consistency with other Agency actions; (3) the Office of Policy, who evaluate

consistency across EPA programs and coordinate review with the Office of
Management and Budget; (4) the Office of Enforcement and Compliance
Assurance, who help to ensure that rules are written in a manner than can be easily
understood and implemented; and (5) regional offices who have direct experience
with the industrial facilities being regulated. We also make full use of all available
contract resources when conducting RTR projects. Contractors provide support in
many ways, including conducting technical analyses, drafting technical
memoranda explaining those analyses, summarizing comments, and other non-
decisional aspects of rulemaking.

16.     SPPD leverages resources from other parts of the Agency as explained
above; however, the division generally cannot rely on other staff within the
Agency or on contractors to perform the tasks currently performed by SPPD staff.
As noted, SPPD is a division within the Office of Air Quality and Planning
Standards (OAQPS), which is part of the Office of Air and Radiation (OAR). The
Office of Air and Radiation is responsible for implementing the CAA. Each of the
offices with OAR is responsible for implementing specific CAA programs and
many of those programs are subject to statutory deadlines. Even assuming those
offices have resources devoted to activities that could be considered discretionary,
the staff do not have expertise that would allow them to step into the shoes of the

12

experts in SPPD with little to no training. The offices outside OAQPS include staff

with expertise in significantly different programs, such as mobile sources and

stratospheric ozone protection. Even within OAQPS, the other offices typically

have significantly different expertise, such as developing national ambient air

quality standards (NAAQS) and working with states on developing plans to meet

the NAAQS. The staff responsible for RTR rulemaking are doing a specialized job

that requires specialized training and experience. An environmental engineering or

environmental science background, along with expertise in the industrial sectors

being regulated are necessary in order to effectively lead RTR projects. It also is

important to note that contractors cannot perform any "inherently governmental"

tasks, such as selecting regulatory options and establishing policy, associated with

RTR rulemaking. Finally, the time that is needed to conduct the individual tasks

cannot be shortened by the addition of more staff or contractor resources in many

instances. For example, the length of the public comment period is prescribed by

the statute; the time to perform the risk modeling is dependent on technical

constraints; and the time to collect data from industry is dependent on limitations

of the individual companies, including the time it takes to perform testing, if

required.

17.    In summary, due to SPPD's considerable workload, the available staff, and budgetary constraints, SPPD must prioritize work, and it is usually the case that the available resources are insufficient to allow all of the required work to be completed in a timely fashion.

SO DECLARED:

PANAGIOTIS E. TSIRIGOTIS

Dated:  3/1/17