IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIR ALLIANCE HOUSTON, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD TRUMP, et al.,<br><br>*Defendants*. | Case No. 1:25-cv-1852-PLF |

**PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER GRANTING ABEYANCE**

In light of new evidence, Plaintiffs respectfully move the Court to reconsider its September 3, 2025, minute order placing this case in abeyance for six months, until March 3, 2026. In this case, Plaintiffs challenge two Presidential Proclamations ("Exemption Proclamations") that summarily exempted nearly a third of the country's coal-burning power plants from emissions standards for mercury and other hazardous air pollutants by falsely asserting that the technology necessary to meet the standards is "not available."[1] The high bar for reconsideration of the Court's abeyance order is met here, for at least four reasons:

*First*, new evidence shows that the purpose of the Presidential exemptions challenged by this litigation was to allow affected coal plants to halt compliance activities and investments required by the 2024 MATS Rule during the Environmental Protection Agency's ("EPA's") reconsideration of the 2024 standards.[2]

---

[1] *Regulatory Relief for Certain Stationary Sources To Promote American Energy*, 90 Fed. Reg. 16,777 (Apr. 21, 2025); *Regulatory Relief for Certain Stationary Sources To Further Promote American Energy*, 90 Fed. Reg. 34,583 (July 23, 2025).

[2] The 2024 Rule refers to the *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 89 Fed. Reg. 38,508 (May 7, 2024).

1

*Second*, abeyance in anticipation of the Administration's possible repeal of the 2024 Rule compounds a patent legal flaw of the Exemption Proclamations: they subvert Congress's express three-month limit on stays of Clean Air Act rules pending administrative reconsideration. 42 U.S.C. § 7607(d)(7)(B) ("The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months."). This statutory limitation properly informs this Court's equitable discretion as to whether to stay (or abate) litigation over the Exemption Proclamations. *Cf. Nken v. Holder*, 556 U.S. 418, 436 (2009) (noting "public interest" in prompt execution of statute); *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987) (statutory requirements properly inform court's exercise of its equitable discretion).

*Third*, the President has now granted two-year exemptions for three other industrial categories,[3] also while EPA has promised to reconsider the Clean Air Act hazardous-pollutant standards for those source categories. Abeyance under these circumstances would allow the Administration to "perpetually dodge review" of an unlawful and unprecedented assertion of Presidential power. *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 388 (D.C. Cir. 2012) ("*API*").

*Fourth*, and as recent Freedom of Information Act (FOIA) disclosures confirm, the Exemption Proclamations harm public health by causing coal plants to halt pollution-control investments and defer work towards compliance that operators have said must occur now to meet

---

[3] *See Regulatory Relief for Certain Stationary Sources to Promote American Chemical Manufacturing Security*, 90 Fed. Reg. 34,587 (July 23, 2025) (exempting one-quarter of synthetic organic chemical manufacturers); *Regulatory Relief for Certain Stationary Sources to Promote American Security With Respect to Sterile Medical Equipment*, 90 Fed. Reg. 34,747 (July 23, 2025) (exempting approximately half of commercial ethylene oxide sterilizers); *Regulatory Relief for Certain Stationary Sources to Promote American Iron Ore Processing Security*, 90 Fed. Reg. 34,743 (July 23, 2025) (exempting the entire taconite iron ore processing industry).

2

the 2024 Rule's compliance deadlines. And despite counsel for Defendants' suggestion that the proclamations do not apply to already-operative requirements concerning the redefinition of "startup," that representation is not reflected in the proclamations themselves, nor was the government willing to stipulate to it.

Judicial review in this case is of vital importance. At stake are two unlawful Exemption Proclamations delaying compliance deadlines for Clean Air Act limits on mercury and other toxic air pollutants for one-third of coal-fired power plants, some of the country's largest sources of such hazardous air pollutants. There is no statutory basis for the indiscriminate sweep of the President's exemptions, issued without standard- or source-specific analysis of the statutory prerequisites for use of Section 7412(i)(4)'s narrow, never-before-used authority. Nor is there any plausible argument that the technology needed to implement the 2024 Rule is "not available," as required by the Clean Air Act, 42 U.S.C. § 7412(i)(4). *See* Suppl. Compl. ¶¶ 118-125 (ECF No. 31-1); *see also* 90 Fed. Reg. 25,535, 25,541 (June 17, 2025) (stating that only one plant is "unable to meet" the 2024 Rule's filterable particulate matter requirement with the equipment and controls they already have). Absent immediate judicial review, this Administration's brazen attempt to circumvent the Clean Air Act without proper process will go unchallenged, with significant present and future costs to Americans forced to breathe toxic air.

In accordance with LCvR 7(m), Plaintiffs' counsel conferred with counsel for Defendants and counsel for Intervenor-Defendant Talen Montana, LLC. Defendants and Intervenor-Defendant oppose this motion.

## ARGUMENT

Federal Rule of Civil Procedure 54(b) permits the revision of interlocutory orders. *See Reps. Comm. for Freedom of the Press v. FBI*, 754 F. Supp. 3d 56, 63 (D.D.C. 2024). Though "the judicial interest in finality disfavors reconsideration" a district court may reconsider an

interlocutory order "as justice requires" and has "broad" "judicial discretion."  *United States v. All Assets Held at Bank Julius Baer & Co.*, 502 F. Supp. 3d 91, 95 (D.D.C. 2020), *aff'd sub nom. United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 F.4th 426 (D.C. Cir. 2022).  Courts look at "whether the moving party has demonstrated (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order."  *Id.* (citation modified).  The Court may also reconsider if "there are other good reasons for doing so."  *Cobell v. Norton*, 355 F. Supp. 2d 531, 540 (D.D.C. 2005).

I.   **New Evidence Shows Abeyance Is Inequitable.**

Plaintiffs recently received EPA records pursuant to Freedom of Information Act requests that demonstrate that the Exemption Proclamations are *intended* to provide coal plant operators unlawful immunity from making investments necessary for compliance pending EPA's reconsideration of the 2024 Rule.  An abeyance of this litigation during that same period leaves Plaintiffs "[w]ithout any means—judicial or administrative—to obtain review" of their claim that this Administration has unlawfully used its exemption power to suspend obligations pending reconsideration that the law would not otherwise allow.  *Limnia, Inc. v. U.S. Dep't of Energy.*, 857 F.3d 379, 388 (D.C. Cir. 2017); Suppl. Compl. ¶ 171.

   A.  **Recently Uncovered Documents Show the Exemptions Are Intended to Suspend Sources' Obligations During EPA's Reconsideration.**

On March 12, 2025—the same day EPA announced its reconsideration of the 2024 Rule—EPA invited coal plants to request an exemption from the 2024 Rule "while EPA goes through the rulemaking process."[4]  Plaintiffs recently secured copies of the exemption requests coal plant operators emailed to EPA.  *See* Suppl. Compl. ¶ 100.  These requests confirm that

---

[4] *See* EPA, News Release, *Trump EPA to Reconsider Biden-Harris MATS Regulation That Targeted Coal-Fired Power Plants to be Shut Down* (Mar. 12, 2025) (Ex. 1).

4

regulated entities understood the purpose of the exemptions as suspending any obligation to make the investments necessary to comply by 2027 with standards that might be repealed as a result of EPA's reconsideration.  For example:

- Ameren Missouri, owner/operator of the Labadie and Sioux power plants, described the exemption as a way to "avoid forcing Ameren to make commitments to very costly and cost-ineffective control retrofits . . . as EPA reconsiders this rule." Ex. 2 at 15.

- Otter Tail Power Company, owner of the Big Stone plant, sought an exemption so it could "avoid" a budgeted investment of "$400,000 to install [continuous emissions monitoring] in 2026" "if EPA were to reconsider the MATS [2024 Rule] and provide relief." Ex. 2 at 33.  *Accord id.* at 46 (similar statement regarding the installation of continuous emissions monitoring at Coyote Station); *id.* at 45 (similar statement on how an exemption would permit Coyote Station to "avoid" costs of compliance with the 2024 Rule's mercury standard).

- Big Rivers Electric Corp., operator of the D.B. Wilson Station, requested an exemption on the basis that it would otherwise have to "commit to millions of dollars in capital investments . . . all while being faced with the regulatory uncertainty of other regulatory actions which are also being reconsidered."  The operator asked for a "2-year exemption to allow adequate time for [the] Administration to reconsider those aspects of the rule that are significantly flawed." Ex. 2 at 90.

- Sunflower Electric, operator of the Holcomb Station, asserted that it needed "additional time to assess the impact of operational variability on its ability to achieve continuous compliance and sufficient compliance margin with the revised limitation" as well as to "select, procure, install, and determine the reliability of [continuous emissions

monitoring]." It requested an exemption because "[s]ites subject to this standard, such as Sunflower, must commit to $2.3 million in capital investments to meet the 2027 standard or cease operation by that date, all while being faced with the regulatory uncertainty of other regulatory actions which are also being reconsidered by your Administration." Ex. 2 at 65-66.

- Minnkota Power Cooperative, owner of the Milton R. Young Power Station, tied its request for an exemption not to any defined time needed to comply with the standard, but specifically to the length of time EPA would need to reconsider the 2024 Rule, asking for "an exemption for a two-year period from the current compliance date of July 6, 2027 (as calculated, July 6, 2029) for the Milton R. Young Station (Young Station) Unit 1 and Unit 2, with the potential for a further extension should the reconsideration of the MATS [2024 Rule] require EPA additional time." Ex. 2 at 102; *see also id.* at 110 (seeking exemption to avoid specified capital expenditures "while EPA reconsiders the MATS [2024 Rule]").[5]

Coal plant operators and representatives have made similar statements elsewhere. The National Rural Electric Cooperative Association (NRECA), representing over 900 electrical cooperatives, stated in regulatory comments that "NRECA appreciates the regulatory certainty and prevention of unnecessary expenditures [provided by the exemptions] while EPA reconsiders the 2024 MATS Rule." Ex. 3 at 5-6. NRECA further acknowledged that "[t]he Presidential Proclamations saved companies these expenses for the time being" while EPA reconsiders the rule. *Id.* at 30. East Kentucky Power Cooperative commented that the

---

[5] All of the above requests were granted. *See* ECF No. 31-2 at 4-8.

exemptions "save[] sources from expending resources that might be unnecessary if the regulations change. This is particularly important for a cost-sensitive cooperative." Ex. 4 at 26.

In sum, regulated sources' own statements make clear that the MATS exemptions operate, and are widely understood to operate, as a suspension of rules pending administrative reconsideration.

### B. An Abeyance that Defers Relief from the Administration's Unlawful Exemptions Conflicts with Statutory Limits on Staying Clean Air Act Regulations.

Recent statements from regulated sources confirming that the exemptions' intent and effect was to excuse compliance obligations while EPA reconsiders the 2024 Rule serve to underline why abeyance of this litigation is inappropriate. The Clean Air Act constrains both EPA's and a court's ability to stay a rule after it has gone into effect. EPA lacks "inherent authority to issue a brief stay of a final rule [] while it reconsiders it." *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017).

Instead, the only authority to do so is found in Section 7607(d)(7)(B), which permits a stay of an in-effect rule for no more than three months and only during mandatory reconsideration proceedings convened by EPA when a person raised an objection to a rule which was both "impracticable" to raise during notice-and-comment proceedings (or based on grounds that arose after the comment period) and is of "central relevance" to the outcome of the rule. *Pruitt*, 862 F.3d at 9-10. Courts in this circuit have repeatedly relied on this provision to strike down stays of rules and extensions of their compliance deadlines that exceeded the bounds of this authority. *See id.* at 14 (vacating EPA stay where reconsideration was not mandatory); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 33-34 (D.D.C. 2012) (vacating EPA stay of rule's effective date under the Administrative Procedure Act, 5 U.S.C. § 705, where rule was stayed *pending reconsideration* when Section 705 only permits stays "*pending judicial review*"); *Nat.*

7

*Res. Def. Council, Inc. v. Reilly*, 976 F.2d 36, 41 (D.C. Cir. 1992) (vacating stay because EPA lacked authority under Clean Air Act Section 7601 to stay regulations pending reconsideration); *see also Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 558 (D.C. Cir. 2015) (questioning court's authority to grant petitioners' request for a stay of a rule pending EPA's reconsideration of it due to three month limitation on such stays under Clean Air Act).

Delaying Plaintiffs' ability to secure relief by six months because EPA is reconsidering the 2024 Rule fails to honor Congress's manifest concern about delaying the Clean Air Act's public health protections. An abeyance is tantamount to a six-month stay. *Cotton v. Bauman*, No. 18-cv-13145, 2022 WL 16827576, at *1 (E.D. Mich., Oct. 12, 2022) ("Cotton's request to have the Court hold his petition in abeyance is the equivalent of a request for a stay.") (citing *Nken v. Holder*, 556 U.S. 418, 429 (2009)).

Because the exemptions undermine the clear statutory limits Congress placed on delaying the effect of Clean Air Act regulations, the Court should reconsider and lift its abeyance, allowing Plaintiffs to proceed with the prompt adjudication of their challenge to the exemptions. Upon lifting of the abeyance, Plaintiffs anticipate promptly moving for summary judgment.

### C. The Administration's Now-Manifest Pattern of Using Section 7412(i)(4) to Obviate Pre-Compliance Investments Pending EPA's Reconsideration of Rules Weighs Against Continued Abeyance that Would Prevent Review.

In addition to the exemptions challenged in this litigation, the Administration has gone on to exempt 97 facilities from three other Section 7412 hazardous air pollutant rules that EPA announced it would reconsider.[6] On October 22, a coalition of community, health, and

---

[6] Proclamation No. 10959, Regulatory Relief for Certain Stationary Sources to Promote American Security With Respect to Sterile Medical Equipment, (July 17, 2025), *National Emission Standards for Hazardous Air Pollutants: Ethylene Oxide Emissions Standards for Sterilization Facilities Residual Risk and Technology Review*, 89 Fed. Reg. 24,090 (Apr. 5, 2024) (imposing new emissions-control requirements on commercial sterilization facilities);

8

environmental groups filed a challenge to exemptions issued to chemical manufacturing plants. *Tex. Env't Just. Advoc. Serv. v. Donald Trump*, No. 1:25-cv-03745 (D.D.C. Oct. 22, 2025). The pattern and purpose for these actions is clear: the Administration has (mis)used its exemption authority to suspend compliance obligations and rewrite its hazardous air pollutant rules. And there are likely to be even more. EPA has sought (but the President has not yet granted) requests for exemptions from five additional air toxics rules.[7] Because the Administration's unlawful practice is certain to arise again, judicial economy—the "primary reason" for abeyance—is not furthered by abeyance of this litigation. *Utah by & through Cox v. EPA*, No. 23-1157, 2025 WL 1354371, at *2 (D.C. Cir. May 2, 2025).

Coal plants' requests for exemptions reveal that the MATS exemptions were granted without consideration of the relevant criteria under Section 7412(i)(4). The exemptions were granted indiscriminately for two years and for all requirements of the 2024 Rule with no tailoring to specific facilities, standards, or the availability of technologies needed to comply with them. For example, the Southern Company, owner of Georgia Power Company—the operator of the Bowen and Scherer plants—said it did not anticipate needing to install new equipment to comply

---

Proclamation No. 10958, Regulatory Relief for Certain Stationary Sources to Promote American Iron Ore Processing Security, (July 17, 2025), *National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing*, 89 Fed. Reg. 16,408 (Mar. 6, 2024) (providing exemptions for taconite iron ore processing facilities); Proclamation No. 10957, Regulatory Relief for Certain Stationary Sources to Promote American Chemical Manufacturing Security, (July 17, 2025), *Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 89 Fed. Reg. 42,932 (May 16, 2024) (providing exemptions for chemical manufacturing facilities).

[7] *See* EPA, *National Emission Standards for Hazardous Air Pollutants (NESHAP), Powering the Great American Comeback Fact Sheet*, (Ex. 5) (soliciting applications for exemption from national emission standards for hazardous air pollutants for rubber tire manufacturing, primary copper smelting, integrated iron and steel manufacturing, lime manufacturing, and coke ovens (pushing, quenching, and battery stacks, and coke oven batteries)).

with the more stringent fPM standard.[8] The plants nevertheless received an exemption for all of the pollution requirements of the 2024 Rule, including the fPM standard. 90 Fed. Reg. 16,777, 16,873. The same is true for multiple other plants.[9] It is absurd to suggest that the technology to implement the fPM standard "is not available," as required under Section 7412(i)(4), when operators state the opposite in the exemption applications themselves. Similarly, Cleco Power's Brame plant was granted an exemption for a full two years (i.e., until July 8, 2029) even though it said it would "cease firing of coal by October 17, 2028." Ex. 2 at 3. It is therefore clear that the Exemption Proclamations were not granted for the purposes authorized by Section 7412(i)(4) and instead, as explained *infra*, seek to exert power that Congress withheld from the President, EPA, and the courts.

Abeyance in this case allows the Administration to continuously "stave off judicial review" of this unlawful strategy "simply by initiating a new proposed rulemaking." *API*, 683 F.3d at 388. These exemptions are *premised* on EPA's planned reconsideration of all the clean air

---

[8] Southern Company exemption request, Ex. 2 at 12 (indicating in both the Bowen and Scherer plant requests that "Georgia Power Company (GPC) does not anticipate the installation of additional controls to comply with the revised [fPM] standards.").

[9] Seward Generation exemption request, Ex. 2 at 53 ("The plant continues to meet LEE criteria and are in compliance with not only the current PM emission limit of 0.030 lbs/mmBtu and would also be in compliance with 'new' compliance limit of 0.010 lbs/mmbtu."); *id.* at 54 (providing "recent tested PM emission value" of "0.00736 lbs/mmbtu"); Ebensburg Power exemption request, Ex. 2 at 57 (claiming to be in compliance with "new" PM limit and providing "recent tested PM emission value" of "0.00188 lbs/mmbtu"); Colver Green Energy exemption request, Ex. 2 at 62 (claiming to be in compliance with "new" PM limit and providing "recent tested PM emission value" of ".000313 lbs/mmbtu"); *see also* Panther Creek Opr. LLC exemption request, Ex. 2 at 50 ("[T]he pending 0.01 lb/MMBtu limit is likely technically feasible under the current compliance demonstration methods"); Schuylkill Energy Resources exemption request, Ex. 2 at 69 (same).

rules for which exemptions are being offered.[10]  Relief will be impossible if the Government seeks abeyance until the rules *are* reconsidered.[11]

## II.  New Evidence Shows an Abeyance of Six Months Harms Public Health.

Recently disclosed documents show that a six-month abeyance harms public health due to increased emissions of particularly harmful contaminants designated as hazardous by Congress itself.  *See* Suppl. Compl. ¶¶ 34-43.

With review of the exemptions deferred, coal plants will continue to forgo preparations to comply with the 2024 Rule including making investments in control technologies, beginning construction, and undertaking testing to understand current emission levels and what additional compliance actions are needed.  This means more air pollution, and more harm to the public—including Plaintiffs' members.  Before the Exemption Proclamations, regulated entities had begun actions to comply with the 2024 Rule.  Defendant-Intervenor Talen stated that the 2024 Rule's deadlines "would require substantial and immediate expenditures" but that it has "suspended those activities" "[i]n reliance on the Presidential Exemption."  Mem. in Support of Mot. to Intervene, at 1-2 (ECF No. 29-1).

In recently disclosed FOIA documents, coal plants said that compliance with the 2024 Rule requires preparation *now*.  For example, Otter Tail Power Co., stated that "testing would need to occur later this year (2025) and continue in 2026" to comply with the new mercury

---

[10] *See* EPA, *News Release, Trump EPA Announces Reconsideration of Air Rules Regulating American Energy, Manufacturing, Chemical Sectors (NESHAPs)* (Mar. 12, 2025) (Ex. 6).
[11] This is not a case where a final rule "would likely moot the analysis [the court] could undertake if deciding the case now."  *API*, 683 F.3d at 388-89.  This case concerns the scope of the President's authority under Section 7412(i)(4).  EPA's action on its MATS proposal has no bearing on the legal question of whether the President can lawfully grant Section 7412(i)(4) exemptions without making the necessary determinations on technology and national security in order to deregulate sources while EPA reconsiders standards.

standards. Ex. 2 at 45.[12]  NorthWestern and Defendant-Intervenor Talen told EPA that "the only way to meet the Rule's deadline is if detailed engineering and design work begin in the fall of 2024, and construction commences in the spring of 2025" to install necessary pollution controls. Ex. 2 at 84.  If coal plants fail to prepare to comply by 2027, they say they will not be able to comply in 2027, and that will harm people's health in 2027.  That future harm is real and weighs strongly against delayed review.

Defendants have also denied Plaintiffs' request to stipulate to their assertion that the Exemption Proclamations do not exempt sources from the strengthened startup provisions for which the 2024 Rule required compliance by January 2025.  89 Fed. Reg. at 38,519, 38,564. Given the vagueness of the Exemption Proclamations, Plaintiffs have no certainty that sources understand the exemptions as such and that Plaintiffs are not additionally harmed by increased emissions from failure to comply with those requirements.

Contrary to Defendants' assertions in this Court, the health benefits of the 2024 Rule are significant.  It is undisputed that implementation of the 2024 Rule would reduce exposure to toxic air pollution and reduce health risk.[13]  Conversely, delaying implementation of the rule subjects Plaintiffs' members to greater exposure and risk than they would otherwise experience.

---

[12] Other companies' requests include many similar statements.  *See* Southern Company exemption request, Ex. 2 at 12-13 (reporting that it has already conducted installation and testing of monitoring equipment, highlighting the need for time to calibrate and verify compliance before the 2027 deadline); Luminant Generation Co. LLC exemption request, Ex. 2 at 18 ("The compliance deadline for meeting the revised fPM standard and for installing and using PM CEMS is July 6, 2027, but work to design, purchase, install, and/or test any necessary controls or changes to operating procedures or maintenance practices, and implement required adjustments to the CEMS would need to begin much sooner."); Coleto Creek Power, LLC exemption request, Ex. 2 at 23 (similar statement); Dynegy Midwest Generation LLC exemption request, Ex. 2 at 28 (similar statement).

[13] EPA, *Regulatory Impact Analysis for the Proposed Repeal of Amendments to National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units* at ES-4, EPA-HQ-OAR-2018-0794-6996 (2025) (Ex. 7).

Defendants imply that these harms are negligible by relying on EPA's 2020 conclusions that the pre-existing MATS standards "provide an ample margin of safety to protect public health," conclusions EPA reached pursuant to its Section 7412(f)(2) obligation to review and revise standards if such margin of safety is lacking, Defs.' Reply, at 8-9 (ECF No. 35), but this reliance is badly misplaced.  *See* Declaration of Dr. Paige Varner ("Varner Decl.") ¶¶ 12, 18-25 (attached as Ex. 8).  On its own terms, EPA's residual risk finding does not demonstrate an absence of risk.  Instead, EPA strives to prevent lifetime cancer risks greater than 1 in 10 thousand, and to provide a "margin of safety" by minimizing the number of people experiencing a lifetime cancer risk greater than 1 in 1 million.  84 Fed. Reg. 2,670, 2,681; *Nat. Res, Def. Council, Inc. v. EPA*, 529 F.3d 1077, 1082 (D.C. Cir. 2008); Varner Decl. ¶¶ 22-25.  Moreover, EPA's residual risk finding was challenged via a petition for reconsideration to which EPA has not yet responded, and in a D.C. Circuit petition for review that is in abeyance pending EPA's final action on the administrative reconsideration petition.[14]

The residual risk prior to the 2024 Rule was substantial: Looking at cancer risk alone, at least 193,000 people (based on actual emissions) and up to 636,000 people (based on allowable emissions) faced a lifetime cancer risk greater than one in one million from emissions covered by the 2012 MATS Rule.  89 Fed. Reg. at 38,517.  EPA found that the 2024 Rule will produce substantial public health benefits by reducing this cancer risk and other threats.  89 Fed. Reg. at 38,563.  EPA estimated that the 2024 Rule will eliminate emissions of 5,400 tons of fine

---

[14] *See* 89 Fed. Reg. at 38,518 ("[T]he EPA also acknowledges that it received a petition for reconsideration from environmental organizations ... of certain aspects of the 2020 Residual Risk Review.").  The D.C. Circuit petition for review, *Air Alliance Houston, et al. v. EPA*, D.C. Cir. No. 20-1268, remains in abeyance pending EPA's consideration of the petition for administrative reconsideration.  *See* EPA's Status Report, *Air Alliance Houston v. EPA*, D.C. Cir. No. 20-1268 (Oct. 10, 2025) (Doc. No. 2139492).

particulate matter ($PM_{2.5}$), 9,500 pounds of mercury, and hundreds of tons of other pollutants.  89 Fed. Reg. at 38,511.  The $PM_{2.5}$ reductions are expected to prevent (in 2028, the earliest year evaluated) three to seven premature deaths, 390 lost work days, and a range of other health impacts.[15]  There is no threshold below which $PM_{2.5}$ is risk-free, so any reductions in $PM_{2.5}$ are associated with a health benefit.  Ex. 9 at 4-27 to 4-28; Varner Decl. ¶ 16.  The 2024 Rule will also reduce risk from mercury and other hazardous air pollutants, many of which are neurotoxins (e.g., lead, manganese, and mercury) and/or known or suspected carcinogens (e.g., arsenic, beryllium, cadmium, hexavalent chromium, lead, and mercury).  Ex. 9 at 3-9 to 3-10, 4-8 to 4-11; Varner Decl. ¶¶ 8, 11, 13, 16.  As with $PM_{2.5}$, there is no threshold below which carcinogens are risk-free, so any reductions in carcinogen exposures will reduce cancer risk.  Varner Decl. ¶ 16.  Unnecessarily prolonging exposure to these toxic pollutants increases health risks.  Suppl. Compl. ¶¶ 54, 144.

## CONCLUSION

The abeyance order entered on September 3, 2025, should be vacated and the parties directed to confer and submit a joint case management proposal within 14 days of the Court's order.  A proposed order is attached.

---

[15] EPA, *Regulatory Impact Analysis for the Final National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review* at 4-32, EPA-HQ-OAR-2018-0794-6966 (Apr. 2024) (Ex. 9).

DATED: October 24, 2025                    Respectfully Submitted,

/s/ Nicholas Morales
Nicholas Morales (D.C. Bar No. 1003942)
Earthjustice
1001 G St. NW, Suite 1000
(202) 667-4500
nmorales@earthjustice.org

*Counsel for Plaintiffs Air Alliance Houston, Clean Air Council, Downwinders at Risk, Montana Environmental Information Center, and Sierra Club*

Surbhi Sarang (CO Bar No. 56667, D.D.C. Bar ID CO0112)
Richard Yates (D.D.C. Bar ID CA00229)
Tomás Carbonell (D.D.C. Bar ID 989797)
Environmental Defense Fund
2060 Broadway St., Ste. 300
Boulder, Colorado 80302
Tel: (303) 440-4901
ssarang@edf.org
ryates@edf.org
tcarbonell@edf.org

/s/ Sean H. Donahue
Sean H. Donahue (DC Bar No. 450940) Donahue, Goldberg & Herzog
1008 Pennsylvania Ave., SE
Washington, DC 20003
Tel: (202) 277-7085
sean@donahuegoldberg.com

*Counsel for Plaintiff Environmental Defense Fund*

/s/ Sarah Buckley
Sarah Buckley (Va. Bar No. 87350) (*Pro Hac Vice*)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 836-9555
sbuckley@nrdc.org

15

Katherine Desormeau (D.D.C. Bar ID CA00024)
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, California 94104
(415) 875-6100
kdesormeau@nrdc.org

*Counsel for Plaintiff Natural Resources Defense Council*

s/ Abel Russ
Abel Russ (D.D.C. Bar ID 1007020)
Environmental Integrity Project
888 17th St. NW, Suite 810
Washington, DC 20006
(802) 482-5379
aruss@environmentalintegrity.org

/s/ Sanghyun Lee
Sanghyun Lee (D.D.C. Bar ID 1632212)
Environmental Integrity Project
888 17th St. NW, Suite 810
Washington, DC 20006
(202) 263-4441
slee@environmentalintegrity.org

*Counsel for Plaintiff Environmental Integrity Project*

/s/ Brian H. Lynk
Brian H. Lynk (D.C. Bar No. 459525)
Environmental Law & Policy Center
740 15th Street, NW, Suite 700
Washington, DC 20005
(240) 461-4241
blynk@elpc.org

*Counsel for Plaintiffs Environmental Law & Policy Center and Dakota Resource Council*

/s/ Shaun A. Goho

Shaun A. Goho (D.D.C. Bar ID MA0013)
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
617-624-0234
sgoho@catf.us

*Counsel for Plaintiff Citizens for Pennsylvania's Future*

*/s/ Ryan Maher*
Ryan Maher (D.C. Bar No. 1620024)
Center for Biological Diversity
1411 K Street, NW, Suite 1300
Washington, DC 20005
(781) 325-6303
rmaher@biologicaldiversity.org

*Counsel for Plaintiff Center for Biological Diversity*